No. 23-20035

# In the United States Court of Appeals for the Fifth Circuit

JENNIFER HARRIS,

*Plaintiff-Appellee,*

*v.*

FEDEX CORPORATE SERVICES, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

**BRIEF OF DEFENDANT-APPELLANT
FEDEX CORPORATE SERVICES, INC.**

Barak J. Babcock
Christopher M. Ahearn
FEDERAL EXPRESS CORPORATION
3620 Hacks Cross Road
Memphis, TN 38125

Kyle D. Hawkins
  *Counsel of Record*
Leah F. Bower
LEHOTSKY KELLER LLP
919 Congress Ave., Suite 1100
Austin, TX 78701
(512) 693-8350
kyle@lehotskykeller.com

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-20035

Jennifer Harris,

*Plaintiff-Appellee*,

*v.*

FedEx Corporate Services, Inc.

*Defendant-Appellant*.

The undersigned counsel of record certifies that the following persons and entities as described in Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Defendant-Appellant:

FedEx Corporate Services, Inc. is a Delaware organization. It is a wholly owned subsidiary of parent corporation FedEx Corporation.

### Counsel for Defendant-Appellant:

Kyle D. Hawkins (lead counsel)   Barak J. Babcock

Leah F. Bower   Christopher M. Ahearn

Lehotsky Keller LLP   Federal Express Corporation

### Plaintiff-Appellee:

Jennifer Harris

### Counsel for Plaintiff-Appellee:

Brian Sanford

Elizabeth "BB" Sanford

The Sanford Firm

*/s/ Kyle D. Hawkins*

Kyle D. Hawkins

*Counsel of Record for*

*Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

This case warrants oral argument. Following a week-long trial in this single-plaintiff employment dispute, the district court entered final judgment on a $366 million jury verdict, ordering a punitive-damages award more than 300 times higher than the compensatory award. It did so without acknowledging, let alone discussing, binding Supreme Court precedent forbidding such breathtaking and disproportionate punitive-damages awards. And it did so in a case that never should have reached trial in the first place, as the plaintiff's core claim is time-barred, and virtually no evidence supported the retaliation theory on which the jury's verdict rests. Oral argument is likely to aid the Court's resolution of these weighty issues.

# Table of Contents

Page

Certificate of Interested Persons ............................................................i

Statement Regarding Oral Argument ................................................. ii

Introduction ...........................................................................................1

Statement of Jurisdiction.....................................................................4

Issues Presented ....................................................................................5

Statement of the Case ..........................................................................6

    I.    Factual Background ...................................................................6

        A.   Harris Repeatedly Fails to Meet the Requirements of
her Managerial Role and Files an Internal Complaint.................6

        B.   Harris Performs Dismally in FY2019, Receives a Formal
Warning, and Files a Second Internal Complaint.........................9

        C.   Harris Fails to Meet the Terms of Her First Performance
Improvement Plan, Receives Another Formal Warning,
and Files a Third Complaint. ..........................................................12

        D.   FedEx Terminates Harris After She Fails to Meet the
Terms of Her Second Performance Improvement Plan..............14

    II.   Procedural Background........................................................14

        A.   Harris Files Suit and Amends her Complaint to Avoid
the Limitation Clause in Her Employment Agreement. ............14

        B.   The District Court Permits Harris's "Human Resources
Expert" to Testify and Denies FedEx's Rule 50(a)
Motion at Trial.................................................................................15

        C.   The Jury Squarely Rejects Harris's Discrimination
Theory, but Finds Her Termination Retaliatory. ........................19

        D.   The District Court Enters Judgment Without
Addressing FedEx's Post-Trial Motions for Judgment as
a Matter of Law, Remittitur, and New Trial................................21

Summary of the Argument........................................................................23

Standards of Review ................................................................................26

Argument .................................................................................................27

   I.   Harris's Section 1981 Claim is Barred by the Contractual
       Limitation Period....................................................................27

       A.   The Agreed-to Limitation Clause Unambiguously
           Applies to Harris's Retaliation Claim.............................27

       B.   The Agreed-to Limitation Clause Is Reasonable and
           Enforceable as to Harris's Section 1981 Claim. ............29

   II.   The Evidence is Insufficient to Demonstrate Retaliation as a
       Matter of Law.........................................................................31

       A.   Undisputed Evidence at Trial Confirmed FedEx's
           Legitimate Business Reasons for Terminating Harris's
           Employment. ...................................................................32

       B.   No Legally Sufficient Evidence Demonstrates That
           Harris's Complaints Were "The Reason" for FedEx's
           Employment Decisions. ...................................................34

   III.   The Damages Award Must Be Eliminated or Reduced....................41

       A.   This Court's Maximum-Recovery Rule Limits
           Compensatory Damages in This Case to $15,000. ........41

       B.   Punitive Damages are Unavailable as a Matter of Law..............45

       C.   The Extraordinary $365 Million Punitive Damages
           Award Violates Due Process.............................................47

   IV.  In the Alternative, a New Trial Is Warranted Because the
       District Court Abused Its Discretion in Failing to Exclude
       Harris's "Human Resources Expert." ..................................51

Conclusion................................................................................................55

Certificate of Service ...............................................................................57

Certificate of Compliance ........................................................................57

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Adams v. Groesbeck Indep. Sch. Dist.,*
   475 F.3d 688 (5th Cir. 2007) ............................................................. 32

*Alvarez v. Royal Atlantic Dev.,*
   610 F.3d 1253 (11th Cir. 2010) ......................................................... 38

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
   452 U.S. 490 (1981) ........................................................................... 54

*Barfield v. Fed. Express Corp.,*
   351 F. Supp. 3d 1041 (S.D. Tex. 2019) ...................................... 29, 30

*Barfield v. Orange Cnty.,*
   911 F.2d 644 (11th Cir. 1990) ........................................................... 52

*BMW of North America v. Gore,*
   517 U.S. 559 (1996) ..................................................................... 48, 49

*Boyd v. Corr. Corp. of Am.,*
   616 F. App'x 717 (5th Cir. 2015) ...................................................... 34

*Brown v. Wal-Mart Stores E., L.P.,*
   969 F.3d 571 (5th Cir. 2020) ....................................................... 38, 39

*Bryant v. Compass Grp. USA Inc.,*
   413 F.3d 471 (5th Cir. 2005) ............................................................. 33

*Burkhart v. Wash. Metro. Area Transit Auth.,*
   112 F.3d 1207 (D.C. Cir. 1997) ........................................................ 53

*Carrillo v. Anthony Indep. Sch. Dist.,*
   921 S.W.2d 800 (Tex. App.—El Paso 1996, no writ) ...................... 27

v

*Coker v. Coker*,
  650 S.W.2d 391 (Tex. 1983)......................................................28, 29

*Curtis v. Okla. City Pub. Schs. Bd.*,
  147 F.3d 1200 (10th Cir. 1998)........................................................52

*Edwards v. 4JLJ, L.L.C.*,
  976 F.3d 463 (5th Cir. 2020)........................................................5, 22

*EEOC v. Boh Bros. Constr. Co., L.L.C.*,
  731 F.3d 444 (5th Cir. 2013)............................................................46

*Elsayed Mukhtar v. Cal. State Univ.*,
  299 F.3d 1053 (9th Cir. 2002)..........................................................55

*Eubanks v. Endeavor Energy Res., L.P.*,
  No. 22-50737, 2023 WL 2612615 (5th Cir. Mar. 23, 2023)...........................37

*EZ Pawn Corp. v. Mancias*,
  934 S.W.2d 87 (Tex. 1996)................................................................30

*Forbis v. Exeter Fin., L.L.C.*,
  No. 22-10193, 2022 WL 17986689 (5th Cir. Dec. 29, 2022) .............32, 33, 40

*Fornesa v. Fifth Third Mortgage Co.*,
  897 F.3d 624 (5th Cir. 2018)............................................................26

*Giles v. Gen. Elec. Co.*,
  245 F.3d 474 (5th Cir. 2001)............................................................45

*Great Am. Ins. Co. v. Primo*,
  512 S.W.3d 890 (Tex. 2017)..............................................................28

*Hardin v. Caterpillar, Inc.*,
  227 F.3d 268 (5th Cir. 2000)............................................................46

*Hernandez v. Rush Enters., Inc.*,
  No. 4:19-CV-00638, 2021 WL 857987 (E.D. Tex. Mar. 8, 2021)...................54

*Jackson v. Flint Ink N. Am. Corp.,*
    370 F.3d 791 (8th Cir. 2004)..........................................................37

*Johnson v. Thibodaux City,*
    887 F.3d 726 (5th Cir. 2018)..........................................................26

*Jones v. R.R. Donnelley & Sons Co.,*
    541 U.S. 369 (2004)........................................................................29

*Jones v. United Parcel Serv., Inc.,*
    674 F.3d 1187 (10th Cir. 2012)......................................................49

*Kalina v. Brazoria Cnty.,*
    2011 WL 4436731 (S.D. Tex. Sept. 20, 2011)...............................50

*Kolstad v. Am. Dental Ass'n,*
    527 U.S. 526 (1999)..................................................................45, 46

*Kotla v. Regents of Univ. of Cal.,*
    8 Cal. Rptr. 3d 898 (Cal. Ct. App. 2004) ......................................53

*Lincoln v. Case,*
    340 F.3d 283 (5th Cir. 2003)..........................................................26

*Little v. Republic Refining Co.,*
    924 F.2d 93 (5th Cir. 1991)............................................................34

*Longoria v. Hunter Express, Ltd.,*
    932 F.3d 360 (5th Cir. 2019)..............................................42, 43, 45

*Mazurkiewicz v. Clayton Homes, Inc.,*
    971 F. Supp. 2d 682 (S.D. Tex. 2013) ...........................................31

*Meritor Sav. Bank v. Vinson,*
    477 U.S. 57 (1986)..........................................................................54

*Morgan v. Fed. Express Corp.,*
    114 F. Supp. 3d 434 (S.D. Tex. 2015) ......................................29, 30

*Naeem v. McKesson Drug Co.*,
    444 F.3d 593 (7th Cir. 2006)................................................................52

*Nagle v. Gusman*,
    No. 12-1910, 2016 WL 541436 (E.D. La. Feb. 11, 2016)................................53

*Neb. Plastics, Inc. v. Holland Colors Americas, Inc.*,
    408 F.3d 410 (8th Cir. 2005)................................................................52

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)................................................................53

*Njang v. Whitestone Grp., Inc.*,
    187 F. Supp. 3d 172 (D.D.C. 2016)....................................................30, 31

*Nobach v. Woodland Vill. Nursing Ctr., Inc.*,
    799 F.3d 374 (5th Cir. 2015)................................................................26

*Order of United Com. Travelers of Am. v. Wolfe*,
    331 U.S. 586 (1947)................................................................29

*Outley v. Luke & Assocs., Inc.*,
    840 F.3d 212 (5th Cir. 2016)................................................................32

*Owens v. Circassia Pharms., Inc.*,
    33 F.4th 814 (5th Cir. 2022)................................................32, 33, 39, 40

*Patterson v. P.H.P. Healthcare Corp.*,
    90 F.3d 927 (5th Cir. 1996)................................................................43, 44

*In re Prudential Ins. Co. of Am.*,
    148 S.W.3d 124 (Tex. 2004)................................................................30

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019)................................................................42

*Raggs v. Miss. Power & Light Co.*,
    278 F.3d 463 (5th Cir. 2002)................................................................32

*Ray v. FedEx Corp. Servs.,*
  668 F. Supp. 2d 1063 (W.D. Tenn. 2009) ........................................29

*Rhines v. Salinas Construction Technologies, Ltd.,*
  574 F. App'x 362 (5th Cir. 2014) .............................................46, 47

*Rogers v. Bromac Title Servs., L.L.C.,*
  755 F.3d 347 (5th Cir. 2014) .........................................................32

*Saketkoo v. Admins. of Tulane Educ. Fund,*
  31 F.4th 990 (5th Cir. 2022).........................................................33

*Salazar v. Lubbock Cnty. Hosp. Dist.,*
  982 F.3d 386 (5th Cir. 2020) ....................................................32, 40

*Salinas v. O'Neill,*
  286 F.3d 827 (5th Cir. 2002)....................................................42, 45

*Sherrod v. United Way of Tarrant Cnty.,*
  2018 WL 10435245 (N.D. Tex. Dec. 11, 2018) .............................53

*Shu-Hui Wu v. Mississippi State University,*
  626 F. App'x 535 (5th Cir. 2015) .............................................36, 37

*Smith v. Transworld Drilling Co.,*
  773 F.2d 610 (5th Cir. 1985)........................................................41

*Estate of Sowell v. United States,*
  198 F.3d 169 (5th Cir. 1999)........................................................53

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
  538 U.S. 408 (2003)................................................47, 48, 49, 50

*Stelly v. W. Gulf Mar. Ass'n,*
  407 F. Supp. 3d 673 (S.D. Tex. 2019) ...........................................50

*Strong v. Univ. Healthcare Sys.,*
  L.L.C., 482 F.3d 802 (5th Cir. 2007) .............................................38

*Sullivan v. Schlumberger Ltd.,*
    No. 4:20-CV-662, 2021 WL 1550812 (E.D. Tex. Apr. 20, 2021) ...................54

*Taylor v. W. & S. Life Ins. Co.,*
    966 F.2d 1188 (7th Cir. 1992) ...........................................................................30

*Thomas v. Tex. Dep't of Crim. Just.,*
    297 F.3d 361 (5th Cir. 2002)...............................................................42, 43, 44

*Thurman v. DaimlerChrysler, Inc.,*
    397 F.3d 352 (6th Cir. 2004)..............................................................................30

*Turley v. ISG Lackawanna, Inc.,*
    774 F.3d 140 (2d Cir. 2014) ........................................................................48, 49

*United States v. Naidoo,*
    995 F.3d 367 (5th Cir. 2021)..............................................................................55

*Vadie v. Mississippi State University,*
    218 F.3d 365 (5th Cir. 2000)...............................................................43, 44, 45

*Wantou v. Wal-Mart Stores Texas, L.L.C,*
    23 F.4th 422 (5th Cir. 2022)...............................................................................47

*Wilson v. Muckala,*
    303 F.3d 1207 (10th Cir. 2002)..........................................................................53

*Woods v. Smith,*
    60 F.3d 1161 (5th Cir. 1995)...............................................................................38

## Constitutional Provisions, Statutes, and Rules:

28 U.S.C. § 1291.....................................................................................................5

28 U.S.C. § 1331.....................................................................................................5

28 U.S.C. § 1343(a)(4) ...........................................................................................5

42 U.S.C. § 1981.................. 2, 3, 5, 14, 15, 22, 23, 24, 25, 27, 29, 30, 31, 42, 43, 45

42 U.S.C. § 2000e–2(a)(1) Title VII.................. 2, 15, 27, 31, 37, 42, 45, 46, 50, 54

**Other Authorities**

Fed. Rule Civ. P. 50 .......................................................................15, 18, 22, 23, 26

Fed. Rule Evid. 702...........................................................................................51, 52

## INTRODUCTION

Defendant-Appellant FedEx Corporate Services, Inc. ("FedEx") terminated Plaintiff-Appellee Jennifer Harris's employment after she failed time and again to meet the requirements of her managerial position, and after more than a year of regular coaching, counseling, and warning. Beginning in 2018, Harris and the eight Account Executives who reported to her ranked among the worst in the region in the critical sales-based metrics that sustain FedEx's business. In fiscal year 2019, each of Harris's eight subordinates performed below expectations. Harris's team failed to meet its targets all four quarters, ultimately missing its revenue goal by over $5.2 million. And on Harris's watch, for the first time in at least two decades, the revenue for an *entire* FedEx sales district declined from one fiscal year to the next. While total revenue for the region increased by more than $43 million, revenues for Harris's district decreased by nearly $400,000.

Harris's manager, Michelle Lamb, recognized that Harris's poor leadership and coaching were largely to blame for her team's unacceptable performance. But rather than give up, Lamb tried to help Harris turn things around. She began meeting with Harris weekly. And she arranged additional mentorship, counseling, and performance improvement plans—all designed to salvage Harris's career.

Regrettably, none of that worked. In 2020, after Harris failed to meet the reasonable requirements of two separate performance improvement plans, she left FedEx no choice but to terminate her employment.

Throughout Harris's tenure, FedEx was devoted to her success. Yet Harris, who is African-American, claimed her poor performance reviews and eventual termination were the product of racism. In early 2019, after Lamb began to address Harris's struggles to lead her team effectively, Harris lodged a complaint with Lamb's superior accusing Lamb of race discrimination. Harris would go on to file two additional internal complaints prior to her termination, each one immediately following a negative performance evaluation. And 16 months after her termination, she brought this lawsuit alleging race discrimination and retaliation under 42 U.S.C. § 1981.

That claim is time-barred. When Harris joined FedEx, she signed an employment agreement requiring her to bring any legal action against the company within six months of the events giving rise to the action. Numerous courts, including the Sixth and Seventh Circuits, have enforced similar agreements, but the district court here refused to do so. The district court also allowed Harris, "out of an abundance of caution," to move the goalposts and amend her complaint *after* summary-judgment briefing to add a brand-new Title VII claim that her employment agreement did not time bar.

Following a week-long trial, the jury squarely rejected Harris's race discrimination theory. That is no surprise, as the trial testimony established conclusively that FedEx terminated Harris due to her poor performance, just as it would any employee who failed to meet the job's demands, regardless of race.

Nevertheless, the jury found that Harris's termination was retaliatory. It did so after Harris's "human resources expert," who admitted that she knew none of the facts of this case, improperly testified that "discrimination and retaliation had occurred." And Harris's counsel, in closing, invoked the Bible, the Declaration of Independence, the Civil War, and Martin Luther King Jr., calling on the jury to visit the "bank of justice" to enter an award that would be heard not only in "Texas," but around the "world." The jury did precisely that. It awarded Harris $120,000 in past emotional damages, $1,060,000 in future emotional damages, and an astonishing $365 million in punitive damages. That punitive-damages award is more than 300 times the jury's compensatory award and represents 49% of FedEx Corporate Services' net worth at that time.

This Court should reverse. Harris's section 1981 claim is time-barred by the plain terms of her binding employment agreement. To hold otherwise would not only create a circuit split, but would upend numerous existing agreements that businesses across this Circuit rely on for predictability and the timely resolution of claims. Moreover, the jury's retaliation finding should be reversed as a matter of law. The record here establishes that Harris was terminated for her performance—not her race (as the jury agreed), and not her practice of filing complaints on the heels of each negative performance review. No reasonable juror could have concluded otherwise.

Even if FedEx were liable to Harris, the district court's monetary award is unlawful. The compensatory award violates this Circuit's maximum-

recovery rule because it is grossly disproportionate to the facts. And punitive damages are unavailable as a matter of law on this record, which presents nothing even close to the egregious behavior necessary to justify punishment. In any event, the amount of punitive damages is unconstitutionally excessive and should be reduced to an amount no greater than the compensatory award.

Finally, at bare minimum, FedEx is entitled to a new trial. The jury's verdict can only be explained as the result of prejudicial testimony from Harris's "human resources expert," who based her entire testimony exclusively on the allegations in Harris's complaint—not the record. That is no valid basis to find a defendant liable—much less to strip it of half its net worth.

Simply put, the district court's judgment imposes liability for claims both time-barred and unsupported, and it awards damages far outside the limits of this Court's precedent and the Constitution's Due Process Clause. The Court should reverse and render judgment for FedEx.

## STATEMENT OF JURISDICTION

FedEx appeals the trial court's order entering final judgment as to Jennifer Harris's claims. The jury issued its verdict on October 25, 2022. ROA.2952-70. FedEx filed post-trial motions requesting judgment as a matter of law, new trial, and remittitur on January 12, 2023. ROA.3405-53. The trial court entered final judgment on February 2, 2023, ROA.3938-39, thereby denying FedEx's pending post-trial motions without explanation, *see*

*Edwards v. 4JLJ, L.L.C.*, 976 F.3d 463, 465 (5th Cir. 2020). FedEx filed its notice of appeal the same day. ROA.3940. The district court had jurisdiction over Harris's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether Harris's employment agreement, which bars any "legal action against the Company" not brought "within the time prescribed by law or 6 months from the date of the event forming the basis of [the] lawsuit, whichever expires first," bars her section 1981 claim, which she brought 16 months after her termination.

2. Whether FedEx is entitled to judgment as a matter of law on Harris's retaliation claim because no reasonable jury could have found, consistent with this record, that FedEx's legitimate decision to terminate Harris's employment for poor performance was pretextual, and that the true reason for her termination was retaliation.

3. Whether the district court's damages award is unlawful, because the compensatory-damages award violates this Court's maximum-recovery rule, punitive damages are unavailable as a matter of law, and the punitive-damages award is unconstitutionally excessive.

4. Whether FedEx is entitled to a new trial because the district court abused its discretion in permitting Harris's "human resources expert" to offer testimony that invaded the province of the court and jury.

## STATEMENT OF THE CASE

## I.  Factual Background

### A.  Harris Repeatedly Fails to Meet the Requirements of her Managerial Role and Files an Internal Complaint.

1. FedEx Corporation is the umbrella organization that covers the FedEx operating companies, each with special strengths and capabilities. These companies collectively provide transportation and logistics services in more than 220 countries and territories and employ more than 500,000 team members. The defendant-appellant here, FedEx Corporate Services, Inc. ("FedEx") provides sales, marketing, customer service, and other critical support to the transportation segments.

Because sales managers are critical to the success of all FedEx companies, FedEx devotes enormous resources to their training, which focuses not only on sales and management techniques, but also on creating a positive work environment. In addition to robust EEO and Anti-Harassment policies, for example, FedEx has a thorough Internal EEO Discrimination Complaint process by which employees are encouraged to report discrimination or retaliation through a secure online process. ROA.5746-57. All complaints are assigned to a human resources advisor, who "investigate[s] any complaint of retaliation as quickly as possible" by reviewing pertinent documents and, where appropriate, interviewing witnesses. *See* ROA.5756. FedEx is committed, through this process, to "take swift and appropriate corrective action if retaliation has been found," up to and including termination. ROA.5756.

2. In 2007, FedEx hired plaintiff-appellee Jennifer Harris as an Account Executive in sales. ROA.2362, ROA.4782. In this role, Harris was responsible for recruiting new business for FedEx, as well as maintaining and growing existing accounts. ROA.4782. As a condition of her employment, Harris signed an agreement promising, among other things, that should she ever choose "to bring legal action against the Company," she would do so "within the time prescribed by law or 6 months from the date of the event forming the basis of [her] lawsuit, whichever expires first." ROA.5653.

Harris experienced initial success in the sales organization. In fiscal year 2011, she made the "President's Club" for being among the top sales professionals in the company. ROA.4786-87. That performance eventually earned her a promotion to District Sales Manager in Field Sales in Houston, Texas. ROA.4803-05. The Field Sales department focuses on growing existing accounts and on negotiating complex pricing agreements for new business. The department is organized geographically into regions, each led by a Managing Director. Harris was hired into the Lonestar Region in 2017, near the beginning of fiscal year 2018. ROA.4633, ROA.4803. At the time, this region spanned southern Texas and was led by Managing Director Michelle Lamb. ROA.4633, ROA.4803.

While still sales-related, Harris's new role required her to coach and lead a team of eight Account Executives ("AEs") and develop sales, through those AEs, for an entire district. ROA.2363. As a District Sales Manager, Harris's performance was measured in part by the degree to which the AEs reporting

to her met their revenue goals from year to year. ROA.2363, ROA.4725. Harris initially succeeded, winning President's Club honors for her and her team's performance in fiscal year 2018. ROA.4807-808.

3. But beginning in mid-2018, Harris's and her team's performance began to decline significantly. In August 2018, Harris's team had the "lowest percentage of AE participation" in a new sales initiative called F1R, as well as the "least participation" in a special pricing program called GGR. ROA.5816, ROA.5986. Lamb expressed concerns to Harris about her leadership and coaching, suggesting that they "get to the bottom of it before it becomes a bigger problem." ROA.5816. In September 2018, Lamb followed up to ask Harris to communicate more about her accounts. ROA.5987. And in October 2018, Harris requested that she and Lamb have frequent "one-on-one meetings," to follow Lamb's "lead in order to stay connected and consistent." ROA.5008-09, ROA.6010. Between October 2018 and March 2019, the two met more than 10 times. ROA.5986-89.

During these meetings, Lamb attempted to address deficiencies in Harris's performance through informal coaching. For example, on December 13, Lamb stressed that revenue generation needed to be Harris's top focus and that Harris should "know which accounts her AEs were working on and strategize with them." ROA.5988. On February 1, and again on February 7, Lamb expressed concern that Harris was unaware of long-running pricing issues with a customer in her district. ROA.5988. And on February 8, Lamb

spent three hours coaching Harris to present to her team a new business pro-gram called Coach2Grow 2.0. ROA.4640-43, ROA.5984.

But the next month, on March 7, Harris admitted to Lamb that she had not rolled out Coach2Grow as discussed and had instead "rushed through" the presentation. ROA.5989, ROA.4643-45. Lamb stated that she did not see evidence that Harris enjoyed coaching as much as selling, and asked Harris whether she might be happier in her former sales role, in which she had thrived. ROA.5989, ROA.4646-47.

Harris rejected this suggestion and, two days later, sent an e-mail to Lamb's boss, accusing Lamb of race discrimination (among other things). ROA.5663. Human Resources advisor Michael Clark immediately opened an investigation into Harris's allegations. ROA.5666-74. After interviewing Harris and five of her colleagues, Clark concluded the allegations were un-substantiated. ROA.5678. His incident report recommended that Lamb be coached to ensure she properly addressed her managers' concerns and that Harris be coached to ensure she carried out instructions from her supervi-sors. ROA.5678.

### B.  Harris Performs Dismally in FY2019, Receives a Formal Warn-ing, and Files a Second Internal Complaint.

Harris's performance continued to decline through early 2019. When FedEx's FY2019 concluded on May 31, 2019, Harris's district had returned the worst performance of any district under Lamb's supervision. ROA.8074. Harris's district had "failed to meet plan 4 out of 4 quarters in FY19."

ROA.5681-82. Every AE reporting to Harris had performed below expectations. ROA.8075. And the district revenue for Harris's team had declined by almost $400,000, while the district revenue for each of Harris's peers' teams had seen a collective year-over-year increase totaling over $43 million. ROA.8076, ROA.4647-48. According to Vice President Dave Russell, he could not recall another instance in his 21-year tenure in which the revenue for an entire sales district had declined from one fiscal year to the next. ROA.5336, 5347-48.

| Account Executives % At or Above Plan | | |
|---|---|---|
| District | Manager | FY19Q4 |
| Capital of Texas | Jaime Golden McElroy | 43% |
| Alamo | Richard Holley | 25% |
| Bayou Bruisers | Brian Hickman | 14% |
| Summit | Brian Conrey | 83% |
| Westside Warriors | Rebecca Callahan | 71% |
| Rocket | Casey Millner | 25% |
| Energy | Jennifer Harris | 0% |
| Central Texas | Brian Golden | 67% |
| LHR | Michelle Lamb | 39% |

| FY19 | | | | | |
|---|---|---|---|---|---|
| DSM | Number of AEs on Team | Total CY Revenue | Total PY Revenue | Growth | Avg Growth Per AE |
| Jaime Golden McElroy | 7 | $ 58,771,588 | $ 53,906,866 | $4,864,722 | $694,960 |
| Richard Holley | 8 | $ 49,776,818 | $ 48,270,132 | $1,506,686 | $188,336 |
| Brian Hickman | 7 | $ 58,790,817 | $ 56,667,650 | $2,123,167 | $303,310 |
| Brian Conrey | 8 | $ 82,694,861 | $ 61,432,228 | $21,262,633 | $2,835,018 |
| Rebecca Callahan | 8 | $ 71,000,417 | $ 64,371,273 | $6,629,144 | $855,373 |
| Lambert/Millner | 8 | $ 47,387,504 | $ 43,612,089 | $3,775,415 | $457,626 |
| Jennifer Harris | 8 | $ 57,140,204 | $ 57,538,529 | ($398,325) | ($53,110) |
| Brian Golden | 6 | $ 66,588,172 | $ 62,563,260 | $4,024,912 | $670,819 |
| Long Horn Region | 59 | $ 492,150,381 | $ 448,828,778 | $43,321,603 | $734,264 |

ROA.8075 (Ex. 246), ROA.8076 (Ex. 247)

On June 26, 2019, Lamb issued a formal Letter of Counseling requiring Harris to submit a Performance Improvement Plan (PIP) "highlighting the specific goals" she would focus on "to improve [her] team's performance and accountability." ROA.5681. The Letter stated that "a repeat of this or other performance issues" could result in "more severe corrective action up to and including termination." ROA.5681.[1]

Two days later, on June 28, Harris filed a second internal EEO complaint, alleging that Lamb's June 26 letter was issued in retaliation for her prior complaint. ROA.5688-92. Human Resources again investigated. ROA.5688-92. The department ultimately concluded that "Lamb's decision to issue [a Letter of Counseling] to Harris was in line with the unacceptable performance that Harris and her direct reports continue to demonstrate." ROA.5692.

Harris then submitted a PIP to Lamb listing seven action items by which Harris aimed to improve her performance. ROA.4652-53, ROA.5979-80. Per FedEx policy, Harris had one full fiscal quarter—through August 31, 2019—

---

[1] Lamb issued this letter several weeks after Human Resources concluded its investigation into Harris's first complaint and found the complaint meritless. ROA.5678. FedEx's anti-retaliation policies do not permit supervisors to discipline employees while complaints are pending. ROA.336-37, ROA.5119-20, ROA.5350-51.

to comply with all terms of the PIP or be subject to discipline up to and including termination. ROA.4653.

Harris met with Lamb to track her progress through July and August 2019. ROA.4660-62, ROA.5992-93. On August 24, Lamb sent an e-mail to Vice President Dave Russell, and Human Resources manager Kristi Castilow, noting that she was "not seeing sufficient performance improvement from Harris," and that she also had "concern with Harris's behavior." ROA.4603-05. Lamb explained that Harris had begun "arguing with [Lamb] about many things," demonstrating "an insubordinate attitude" rather than taking accountability for her poor performance. ROA.4604.

## C. Harris Fails to Meet the Terms of Her First Performance Improvement Plan, Receives Another Formal Warning, and Files a Third Complaint.

When August 31 arrived, Harris had failed to meet six of the PIP's seven requirements. ROA.5682, ROA.6002-03.[2] But rather than terminate Harris's employment, Lamb gave her yet another chance. ROA.4679, ROA.4685. On September 13, 2019 (after Human Resources found Harris's second complaint unsubstantiated), Lamb issued Harris a Letter of Warning, permitting Harris a second PIP. ROA.5719-21. The Letter explained that Harris had failed to meet her PIP goals and that her district had the lowest pricing

---

[2] While Harris disputed certain of the seven categories at trial, she admitted she did not meet every goal in the PIP. ROA.5020.

activity in the region in FY2020 to date. ROA.5719. And, as in June, the Letter stated that "a repeat of this or other performance issues" could result in "corrective action up to and including termination." ROA.5719.

A few days later, Harris filed a third internal complaint. ROA.5722. This time Harris alleged, among other things, that her white peers Brian Hickman and Jamie Golden-McElroy were "performing poorly yet director Lamb has not issued discipline to them." ROA.5732. Human Resources again investigated, again interviewed witnesses, and again concluded that the allegations were unsubstantiated. ROA.5732-34. The investigation report noted that the only other manager who had required as much coaching and correction as Harris, Richard Holley, had also received discipline. ROA.5732. Holley, who is white, was second only to Harris in terms of his failure to meet certain key performance metrics during the relevant period. ROA.5732, ROA.8045, ROA.8075. Holley had received Letters of Counseling in 2018 and 2019 and a Letter of Warning in late 2019. ROA.527-28. Like Harris, he was placed on a PIP. ROA.531-32. He ultimately retired in lieu of termination for poor performance. ROA.531-32.

Lamb prepared the terms of Harris's second PIP herself, substantially lowering the requirements set out in Harris's first PIP. ROA.4675. Lamb also included a goal that Harris had satisfied in her first PIP that she thought Harris "would hit . . . with no problems." ROA.4676. As with the first PIP, Lamb and Harris met to track Harris's performance. ROA.6005-06. The

second fiscal quarter, and end of the review cycle for Harris's second PIP, closed on November 30, 2019. ROA.4674-75.

### D. FedEx Terminates Harris After She Fails to Meet the Terms of Her Second Performance Improvement Plan.

By November 30, Harris had failed to meet the terms of her second PIP. ROA.4682-83, ROA.6009. At that point, Harris left FedEx with no choice. Lamb submitted a Request for Termination to Human Resources, listing as grounds Harris's continued failure to perform, including her failure to meet the terms of two consecutive PIPs. ROA.4685-86, ROA.5742-44. Human Resources approved the request, and Harris's employment was terminated effective January 8, 2020. ROA.6011.

## II. Procedural Background

### A. Harris Files Suit and Amends her Complaint to Avoid the Limitation Clause in Her Employment Agreement.

More than 16 months later, on May 20, 2021, Harris filed this lawsuit in the Southern District of Texas, alleging race discrimination and retaliation under 42 U.S.C. § 1981. ROA.21-37. After several months of discovery, FedEx moved for summary judgment, arguing that (1) Harris's claims were time-barred by the contractual limitation clause in her employment agreement, and (2) given Harris's failure to meet the terms of two PIPs and her lack of affirmative evidence of discrimination or retaliation, her claims had no merit. ROA.294-321. In response, and "out of an abundance of caution," Harris moved to amend her complaint to add claims for discrimination and

14

retaliation under Title VII, 42 U.S.C. § 2000e–2(a)(1). ROA.1770. FedEx opposed that effort vigorously. ROA.1899-1913.

The district court granted Harris leave to amend and denied FedEx summary judgment. ROA.2362. Without addressing the relevant factors, the court reasoned that FedEx would not be prejudiced by an amendment because the burden of proof for a section 1981 and a Title VII claim are "indistinguishable." ROA.2365. Regarding FedEx's motion for summary judgment, the court held that (1) the six-month limitation period "cuts against public policy and sidesteps a federal administrative process designed to meet and defeat long-standing policies of bias and discrimination in the workplace," and (2) the "temporal proximity between [Harris's] in-house EEO complaint and an adverse employment action is sufficient, as an inference, to establish a prima facie case of retaliation." ROA.2365-66. The case proceeded to trial.

## B. The District Court Permits Harris's "Human Resources Expert" to Testify and Denies FedEx's Rule 50(a) Motion at Trial.

At trial, Harris's testimony focused on her (undisputed) record of prior good performance, promotions, and awards as a junior-level Account Executive. In support of her claim that she had performed as well as many of her white peers, Harris focused on specific sales metrics from selected fiscal quarters in which she had surpassed her peers. *E.g.*, ROA.4621-23, ROA.4944-45, ROA.4954-55. Harris also focused on an account adjustment for a customer called BJ Services, which was given to her colleague Brian

Conrey, as evidence of discrimination, and on a disagreement with Lamb in which Harris was not approved to attend a training event. ROA.4898-4910, ROA.4826-34. Harris testified to her belief that Lamb discriminated and retaliated against her by suggesting that she revert to a sales role and by issuing her Letters of Counseling and Warning. ROA.4914-15. Harris also testified that she experienced emotional distress upon losing her job at FedEx, ROA.4968-71, and called three friends as witnesses to confirm this testimony, ROA.4987, ROA.5151-57.

Over FedEx's objections set forth in its *Daubert* motion, ROA.2106, the district court permitted Harris to call Coneisha Sherrod, herself a former employment-discrimination client of Harris's counsel, to testify as Harris's "human resources expert." ROA.4304-05. Sherrod testified that employers owe a "duty" to provide a "safe" working environment free of discrimination. ROA.4375, ROA.4311-44. Sherrod acknowledged that she did not have any information about FedEx's human resources team, investigation practices, or hiring procedures. ROA.4333-39. She had not read any of FedEx's manuals or policies, reviewed any deposition transcripts, or interviewed any witnesses. ROA.4335-36. But she testified that, applying her experience and "common sense," and based exclusively on the allegations set out in Harris's complaint (including allegations of discrimination the jury would come to reject), FedEx "didn't follow normal protocol and procedure, and that discrimination and retaliation did occur." ROA.4305, ROA.4310, ROA.4316-18.

Echoing its *Daubert* motion, FedEx unsuccessfully moved to strike this testimony. ROA.4346-47.

Harris also called several former colleagues to testify about her job performance and leadership. Brian Conrey testified that, whether or not it was "fair," the BJ Services revenue adjustment Harris challenged was done in accordance with FedEx's regular procedure. ROA.4717-19, ROA.4725. He explained that, at the time he worked with Harris, "she was struggling and failing and not getting the help that she needed" and that, as he opined to Human Resources, he didn't necessarily "think Michelle Lamb was treating [her] consistently." ROA.4734.

Harris's former administrative assistant, Miriam Zapata, testified that Harris "kind of held [Zapata] back a lot from doing [her] job effectively." ROA.4748. Zapata testified that it was a "breath of fresh air" when Harris was replaced by another manager, Virginia Solgot. ROA.4753. Similarly, Emily Hineman, an AE who worked under Harris, testified that Harris had been a "good" manager, but that she "had the best year of FedEx in [her] career" once Solgot took over. ROA.4767-69. Hineman explained that Solgot "coaches on what you need to focus on in order to progress," whereas "I don't feel like I got that with Jennifer [Harris]." ROA.4768. Hineman explained that Harris would instead require her team to cold call on strip mall businesses, essentially "just putting in calls to hit a call number" and "creating more work" for the AEs, rather than "moving the sales cycle. . . further." ROA.4768.

17

At the close of Harris's evidence, FedEx moved for judgment as a matter of law under Rule 50(a). As at summary judgment, FedEx argued that Harris's claims were barred by the limitation period in her employment agreement and that the evidence was insufficient as a matter of law to support any finding of discrimination or retaliation. ROA.5197-201. FedEx also argued that punitive damages were unavailable as a matter of law because the evidence did not support a finding of malice or reckless indifference. ROA.5200. Rather, the evidence demonstrated that FedEx maintained "valid lawful policies against discrimination and retaliation" and "enforced those policies, published them, and investigated complaints of discrimination and retaliation, including that of the plaintiff." ROA.5201.

The district court denied the motion. ROA.5213. The court expressed a different view on the six-month limitation period claim than in its summary judgment order. This time, the court interpreted Harris's employment agreement to apply only to claims about the agreement itself and thus to be inapplicable to her discrimination and retaliation claims arising from her employment. ROA.5213-14.

FedEx focused its case presentation on Harris's performance over fiscal years 2019 and 2020, the verbal and written coaching, warnings, and performance improvement requirements provided to Harris, *e.g.*, ROA.4657-59 ROA.5681, ROA.5719, and Harris's admitted failure to meet those requirements, ROA.8073-76. FedEx also presented testimony from the employees Harris had pointed to as comparators, Jamie Golden-McElroy and Brian

Hickman. Golden-McElroy acknowledged that she, too, had struggled in the 2019 time frame, but that, ultimately, her "revenue grew over that time period by $4.8 million," rather than decreasing as Harris's had. ROA.5327. Golden-McElroy explained that she "stress[ed] a sense of urgency with my team to close new revenue," and coached them by "strategiz[ing] on the pricing." ROA.5327-28. Similarly, Hickman testified that, coming into 2019, his team faced some "headwinds." ROA.5391. He noted that "as a leader, it is my responsibility to get it back on track" which he eventually did by setting "biweekly pipeline discussions with my account executives" and then "ensur[ing] that they are following up." ROA.5391. Hickman confirmed that he ended up improving his year-over-year revenue in 2019 by $2.1 million. ROA.5393.

Mac Chonoles, Human Resources Manager, testified about FedEx's policies and procedures to prevent retaliation and discrimination, and to the steps taken to investigate Harris's allegations. ROA.5279-87. Chonoles testified that all management received annual training on anti- discrimination and retaliation policies. ROA.5289-91. Chonoles confirmed that he oversaw and approved Human Resources Advisor Michael Clark's investigations into Harris's complaints and agreed with the results of each. ROA.5288-89.

## C. The Jury Squarely Rejects Harris's Discrimination Theory, but Finds Her Termination Retaliatory.

In closing, Harris's counsel urged the jury to focus on instances in which Harris's performance had exceeded that of her peers. ROA.5520-21. He

argued that "depending on how you look at the numbers, Ms. Harris is not the lowest performing in sales goal attainment at the time." ROA.5520. For instance, counsel argued, in the "third quarter of 2019 . . . No one gets any lower than Ms. McElroy." ROA.5521. Counsel highlighted the fact that the FedEx human resource managers who testified did not have the same human resources "certificates" as Sherrod, suggesting that this rendered them not "qualified." ROA.5531-32.

Harris's counsel invoked the Bible, the Declaration of Independence, the Civil War, and Martin Luther King Jr., inciting the jury to make "full payment" from "the bank of justice." ROA.5523-25. Counsel informed the jury "745.2 million. Now, that's the net worth of FedEx Corporate Services . . . [and] that's something you can take into account for punitive damages." ROA.5543.  Counsel then urged the jury:

> How big do you want your—this verdict to be? Who do you want to hear it? Do you want everybody in FedEx to know about this verdict? That's a number. Do you want everybody in Houston to know about it? That's a number. Do you want to know—do you want people in Texas to know about it? That's another number. The United States? That's another number. The world? That's an even bigger number. ROA.5543-44.

FedEx, in its closing argument, agreed with Harris's counsel that certain employees had sales numbers lower than Harris at specific points in time. ROA.5560-61. But counsel explained that "looking at the points in time, just like looking at only a certain part of a puzzle, does not give you the real picture"—"Harris was the only district sales manager whose revenue

declined" and the "only district sales manager who had zero of her eight account executives at or above plan for the last quarter of fiscal year 19." ROA.5561. Counsel reminded the jury that "other managers, including Ms. McElroy and Mr. Hickman, still grew their districts in 2019," and "buckled down" once confronted about their performance rather "than arguing about the numbers." ROA.5561-62. Counsel then explained that, numbers aside, "[n]o one, not even Ms. Harris herself, claims that either Ms. McElroy or Mr. Hickman exhibited leadership failures," while "[m]ultiple people told you from that chair that Ms. Harris did." ROA.5563.

After deliberating for a day, the jury asked the court what to do if it could not come to an agreement, and the court instructed the jury to continue to deliberate. ROA.2941-42. On the second day, the jury returned a verdict finding retaliation but no discrimination. ROA.2964-68. The jury awarded Harris $120,000 for past emotional distress, $1,060,000 for future emotional distress, and punitive damages in the amount of $365,000,000. ROA.2964-68. The punitive-damages award is more than 300 times the compensatory damages and, at the time, represented 49% of the company's net worth.

### D. The District Court Enters Judgment Without Addressing FedEx's Post-Trial Motions for Judgment as a Matter of Law, Remittitur, and New Trial.

Harris moved for entry of judgment on November 21, 2022, ROA.2981-88, and FedEx timely responded, informing the court that it intended to file post-trial motions quickly, ROA.2997-3002. On January 13, 2023, FedEx

moved under Rules 50(b) and 59 for judgment as a matter of law or, in the alternative, remittitur or a new trial. ROA.3401-04. FedEx argued, among other things, that (1) no legally sufficient evidence could sustain a retaliation verdict; (2) Harris's section 1981 claim was barred by the limitation period; (3) compensatory damages must be reduced per the maximum-recovery rule; (4) punitive damages were unavailable and, in the alternative, unconstitutional and excessive; and (5) Sherrod's unreliable and misleading testimony prejudiced FedEx. ROA.3405-53.

Nearly a month later, without acknowledging or addressing the arguments FedEx presented in its post-trial motions, and before Harris filed her response, the district court entered final judgment. The court acknowledged the jury had awarded $366,180,000, but without explanation, the court ordered FedEx to pay $366,060,000—i.e., $120,000 less than the jury's award. ROA.3938. That judgment necessarily denied FedEx's pending motions. *See Edwards*, 976 F.3d at 465 ("We treat the district court's entry of final judgment as an implicit denial of 'any outstanding motions, even if the court does not explicitly deny a particular motion.'" (citation omitted)).

FedEx timely appealed. ROA.3940-41.

## SUMMARY OF THE ARGUMENT

**I.** FedEx is entitled to judgment as a matter of law on Harris's 42 U.S.C. § 1981 retaliation claim because that claim is barred by an agreed-to contractual limitation period. In her employment application, Harris agreed to bring any "legal action against the Company" within "6 months from the date of the event forming the basis of [her] lawsuit." But Harris filed her complaint 16 months after her employment was terminated.

The district court offered two reasons to avoid applying the limitation clause. The court first held, in denying FedEx summary judgment, that the clause was contrary to public policy because it "sidesteps a federal administrative process." But, unlike Title VII, section 1981 *has no* requisite "administrative process." So later, in denying FedEx's Rule 50(a) motion at trial, the court instead held that the clause applied *only* to claims about the agreement itself, rather than to claims arising from Harris's employment. But this interpretation (1) is contrary to the plain text of the limitation clause, and (2) cannot be squared with the Agreement as a whole. Construed properly, the Agreement plainly covers claims arising from Harris's employment.

Contrary to the district court's summary judgment determination, the Agreement is enforceable as against Harris's section 1981 claims. Courts have held uniformly that such agreements do not violate public policy absent administrative exhaustion requirements, because six months is a reasonable time in which to investigate potential claims and file a complaint. Any contrary decision would create a circuit split and upend countless

23

contracts that businesses rely on to order their affairs. Accordingly, this Court should reverse and hold that Harris's section 1981 claim is time-barred.

**II.** FedEx is also entitled to judgment as a matter of law on Harris's retaliation claim under Title VII and section 1981 because a reasonable jury would not have a legally sufficient evidentiary basis to find that FedEx's legitimate, nonretaliatory reason for firing Harris was pretextual.

The record leaves no doubt that Harris failed to meet expectations—despite extensive coaching and multiple chances to improve. While Harris disputed her performance metrics against cherry-picked outliers from Golden-McElroy and Hickman, the undisputed evidence at trial confirmed that Harris was the *only* district sales manager (1) whose revenue declined year-over-year, (2) who had zero of her AEs at plan for the last quarter of fiscal year 2019, and (3) who was placed on and failed to meet the terms of two PIPs. Moreover, numerous witnesses, including Harris's own, testified to problems with Harris's leadership.

Harris did not proffer legally sufficient evidence that FedEx's decision to terminate her employment was pretextual and retaliatory. To the contrary, the undisputed evidence at trial demonstrated that Harris's manager expressed concern about Harris's performance *before* Harris filed a single complaint, negating temporal proximity and retaliatory animus. The only other evidence Harris presented (1) touted her past performance and (2) disputed her performance relative to other managers at discrete points in time.

But this Court's precedent makes clear that past success does not render discipline for present poor performance pretextual. And whatever Harris's opinion of Golden-McElroy's and Hickman's performance, her efforts to show disparate treatment fail: unlike Harris, revenue for both of their AE teams increased in FY2019 and both had at least some team members at plan.

**III.** The district court's damages award is unlawful:

First, the district court erred in failing to apply well-established Fifth Circuit law limiting compensatory damages under the maximum-recovery rule to 150% of the inflation-adjusted amount awarded in an analogous decision within the Circuit. In this case, the rule limits Harris's total compensatory damages to $15,000, adjusted for inflation.

Second, the district court erred in failing to recognize that punitive damages are available in connection with a claim of retaliation *only* upon proof that the defendant acted "with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). That is not this case: FedEx's robust anti-retaliation policies and thorough investigation of Harris's complaints negate the scienter required.

Third, the district court erred in entering an egregious, unconstitutional punitive damages award that is equal to more than 300 times the compensatory damages. Even if punitive damages were available—and they are not—they should be no higher than the value of the compensatory award.

**IV.** Finally, and in the alternative, this Court should order a new trial because Harris's "human resources expert" provided unreliable,

misleading, and improper testimony. Harris's expert, Coneisha Sherrod, testified broadly to common-sense "protocols," incorrect legal standards, and unsupported legal conclusions, invading the province of court and jury. Sherrod proclaimed—based *solely* on her review of a complaint that the jury largely rejected—that FedEx "didn't follow normal protocol and procedure, and that discrimination and retaliation did occur." The district court abused its discretion in failing to exclude this testimony.

## Standards of Review

This Court reviews "a district court's ruling on a motion for judgment as a matter of law de novo." *Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 377 (5th Cir. 2015). When reviewing a district court's denial of a post-verdict Rule 50(b) motion, this Court uses the same standard to review the verdict as the district court: whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). Constitutional challenges to a punitive damages award are also reviewed de novo. *Lincoln v. Case*, 340 F.3d 283, 294 (5th Cir. 2003). And a district court's denial of a motion to exclude expert testimony is reviewed for abuse of discretion. *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018). This court reviews the denial of a motion for a new trial for abuse of discretion. *Fornesa v. Fifth Third Mortgage Co.*, 897 F.3d 624, 627 (5th Cir. 2018).

## ARGUMENT

## I. Harris's Section 1981 Claim is Barred by the Contractual Limitation Period.

In her employment application, Harris agreed to bring any "legal action against the Company. . . within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first." ROA.5653. But Harris filed her complaint alleging retaliation and discrimination under 42 U.S.C. § 1981 more than one year after her employment was terminated. Tellingly, Harris moved to amend her complaint to add claims under Title VII only *after* FedEx moved for summary judgment on the basis that her section 1981 claims were time-barred, "in the event the six-month limitation is applicable to the [s]ection 1981 claim." ROA.1773. While the district court should have denied Harris's motion for leave to amend for undue delay and bad faith, Harris was correct to be concerned: The agreed-to limitation period extends to any "legal action" against FedEx—including retaliation claims—and is enforceable as to Harris's section 1981 claim.

## A. The Agreed-to Limitation Clause Unambiguously Applies to Harris's Retaliation Claim.

Under Texas law, the "terms of an employment contract must be given a plain-meaning interpretation if they are clear and unambiguous." *Carrillo v. Anthony Indep. Sch. Dist.*, 921 S.W.2d 800, 804 (Tex. App.—El Paso 1996, no writ). "[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none

will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). And courts must avoid inserting language the parties did not use or "otherwise rewrit[ing] private agreements." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).

Harris's Employment Agreement states, in relevant part:

> This agreement constitutes the entire and final agreement between the parties . . . . ***To the extent the law allows an employee to bring legal action against the Company, I agree to bring that complaint within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first***.

ROA.5653 (emphasis added). At trial, the district court deemed this provision "inapplicable" to Harris's claims, interpreting it as limited to "lawsuits about events arising out of this contract of employment"—in other words, to violations of the agreement itself. ROA.5213-14.

This interpretation is contrary to the plain terms of the agreement. The agreement does not confine "legal action" to "claims about the contract" or any other specific kind of action—to the contrary, "legal action against the Company" is modified by the expansive phrase "[t]o the extent the law allows." ROA.5653.

Application of the limitation clause to Harris's retaliation claim is also wholly consistent with the rest of the Agreement. For example, the Agreement addresses intellectual property rights arising from Harris's work "during the course of my employment," *see* ROA.5652 para. 2, as well as a

requirement to abide by all company policies throughout employment, *see* ROA.5652 para 11. Logically, the limitation clause referencing "event[s] forming the basis of my lawsuit" also pertains to "events" that occur *during the course of* employment. *See Coker*, 650 S.W.2d at 393.

Were there any doubt, not one of the many courts to have considered this or similar limitation clauses have artificially limited them in the way the district court did here. Indeed, two other courts in the Southern District of Texas have held that the same language in other FedEx employment agreements barred employees' claims under section 1981 and the ADEA when brought more than six months from the termination of employment. *See Barfield v. Fed. Express Corp.*, 351 F. Supp. 3d 1041, 1049-51 (S.D. Tex. 2019); *Morgan v. Fed. Express Corp.*, 114 F. Supp. 3d 434, 444 (S.D. Tex. 2015); *see also Ray v. FedEx Corp. Servs.*, 668 F. Supp. 2d 1063, 1067-68 (W.D. Tenn. 2009).

## B.  The Agreed-to Limitation Clause Is Reasonable and Enforceable as to Harris's Section 1981 Claim.

Properly interpreted, the six-month limitation clause is enforceable with respect to Harris's section 1981 claim. Section 1981 contains no express limitation clause, so the federal four-year "catchall" provision applies. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371-75 (2004). It is well-established, though, that "a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations," if the shorter period is itself "reasonable." *Order of United Com. Travelers of Am. v. Wolfe*, 331 U.S. 586, 608

(1947). And "by enacting section 1981 without a statute of limitations, Congress implied that it is willing to live with a wide range of state statutes and rules governing limitations of actions under section 1981." *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1205 (7th Cir. 1992).

Under Texas law, "parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004). This includes the right to agree to a reasonable contractual limitation period. *See, e.g.*, *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 88-91 (Tex. 1996) (presuming enforceable parties' agreement to arbitrate no later than 180 days after a cause of action accrued); *Barfield*, 351 F. Supp. 3d at 1050-51; *Morgan*, 114 F. Supp. 3d at 444.

Courts outside of Texas also routinely conclude that contractual limitation agreements of the precise kind Harris signed do not violate law or public policy. That is because "six months is a reasonable period of time with respect to Section 1981 claims." *Njang v. Whitestone Grp., Inc.*, 187 F. Supp. 3d 172, 178-79 (D.D.C. 2016) (Jackson, J.). In *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 358 (6th Cir. 2004), for example, the Sixth Circuit confirmed that a six-month limitation clause in an employment agreement was reasonable as applied to a plaintiff's section 1981 claim, because it provided "a sufficient opportunity to investigate and file an action, as well as ascertain the damages suffered." In *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1205 (7th Cir. 1992), the Seventh Circuit reached the same conclusion.

Certainly, when limitation provisions "effectively limit a plaintiff's substantive right to recovery or act as a complete bar to relief, they are not reasonable." *Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d 682, 686 (S.D. Tex. 2013). Accordingly, some courts have "found that a six-month contractual limit with respect to filing a Title VII claim in court is unreasonable" in light of Title VII's "intricate exhaustion requirement." *Njang*, 187 F. Supp. 3d at 180 (citation omitted). But as then-Judge Ketanji Brown Jackson explained while analyzing this issue in the District Court for the District of Columbia, section 1981 does not include an exhaustion requirement, so "a six-month period within which to file suit is not an inherently unreasonable period of time." *Id*. at 179-80.

Because the limitation clause unambiguously applies to "legal action against" FedEx, and is reasonable and enforceable as against section 1981 claims, the district court erred as a matter of law in failing to apply it to Harris's claim. Accordingly, this Court should hold that Harris's section 1981 claim is time-barred.

## II. The Evidence is Insufficient to Demonstrate Retaliation as a Matter of Law.

The jury properly rejected Harris's discrimination claim at trial. But the evidence, even viewed in the light most favorable to Harris, is also legally insufficient to support the retaliation verdict. The record makes plain that Harris was fired for her declining performance—not her eventual complaints.

To establish retaliation, a plaintiff must prove that the adverse employment action would not have occurred *but for* her protected conduct. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022).[3] "This inquiry requires a greater showing than mere causal connection. It requires that the plaintiff show that protected conduct was *the reason* for the adverse action." *Id.* (emphasis added); *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 351 (5th Cir. 2014) (protected activity "had a determinative influence on the outcome"). Harris did not make this showing.

## A. Undisputed Evidence at Trial Confirmed FedEx's Legitimate Business Reasons for Terminating Harris's Employment.

"Job performance is a legitimate reason for termination." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 218 (5th Cir. 2016) (citation omitted). That includes an employee's "poor performance and demonstrated lack of effort to change her behavior." *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020); *see also Forbis v. Exeter Fin., L.L.C.*, No. 22-10193, 2022 WL 17986689, at *5 (5th Cir. Dec. 29, 2022) (finding termination justified where "[d]espite being given continuous feedback by his direct manager," an employee "failed to integrate the development into his work product for the

---

[3] Retaliation claims under Title VII and section 1981 are subject to the *McDonnell Douglas* burden-shifting framework. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). After trial, though, the framework "becomes moot," and the question is simply "whether legally sufficient evidence supported the jury's finding." *Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 690-91 (5th Cir. 2007) (citation omitted).

desired results needed to be successful in his role" (cleaned up)). This Court has repeatedly acknowledged that "[e]mployment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions.'" *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (citation omitted). Nor can such lawsuits "transform federal courts into human resources managers." *Owens*, 33 F. 4th at 826.

The evidence here establishes beyond any doubt that Harris was terminated for poor performance. While this Court must draw all reasonable inferences in Harris's favor given the jury's verdict, the undisputed evidence confirms that, despite her prior sales successes, Harris failed to meet performance goals as a District Sales Manager. Harris was the *only* District Sales Manager who had overall declining revenue in Fiscal Year 2019 and the *only* District Sales Manager whose direct reports were all below revenue goals in the fourth quarter of that fiscal year. *See* ROA.8073-76, ROA.8210, ROA.5010-11, ROA.5025. Harris disregarded management direction regarding the rollout of the Coach2Grow 2.0 sales initiatives to the AEs on her team. ROA.5989, ROA.4641-45. And Harris failed to meet the requirements of two PIPs despite "continuous feedback by [her] direct manager" in the form of numerous meetings and letters. *See Forbis*, 2022 WL 17986689, at *5; *see also, e.g.*, ROA.5020, ROA.5682, ROA.6002-03.

Harris's disputes about discrete performance metrics do not negate the legitimacy of FedEx's decision as a matter of law. *See Saketkoo v. Admins. of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022) (employee's disagreement

with employer's assessment did not rebut business decision that "other physicians . . . added value in ways that she did not"); *Boyd v. Corr. Corp. of Am.*, 616 F. App'x 717, 721 (5th Cir. 2015) (employee's "subjective estimation" of the impact of her "insubordination" is irrelevant). Even "an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason" for termination. *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

The evidence presented in this case provides ample legitimate business justification. Harris's performance remained inadequate despite FedEx's efforts to support her. That gave FedEx a legally sufficient reason to terminate Harris's employment.

### B. No Legally Sufficient Evidence Demonstrates That Harris's Complaints Were "The Reason" for FedEx's Employment Decisions.

To sustain the verdict, Harris must point to legally sufficient evidence that, despite these legitimate and nondiscriminatory reasons, FedEx's decisions to issue letters of counseling and warning, and eventually terminate her employment, were nonetheless pretextual *and* the real reason was retaliation. She cannot. Throughout trial, Harris presented three core theories. First, she claimed that the *timing* of her counseling and firing reflects retaliation. Second, she pointed to *comparators*—that is, other individuals she believes performed equally poorly but were not terminated. Third, she drew upon her *prior success* as a sales associate before her promotion to a

managerial role. None of these three categories contains evidence sufficient to sustain the verdict.

### 1. Harris's performance was unsatisfactory *before* she engaged in protected activity, negating retaliatory animus.

The timing here negates any inference of retaliatory animus: Harris did not engage in protected activity until *after* her performance began to decline, and *after* her manager suggested she might prefer her previous sales role. Although Lamb and Harris began meeting weekly in the fall of 2018, Harris's performance did not improve and Harris did not follow direction concerning her AEs. ROA.5008-09, ROA.6010. In March 2019, Lamb observed that Harris seemed to struggle with the coaching aspect of her role, suggesting that Harris might be happier in her previous sales role, in which she had thrived. ROA.5989, ROA.4644-47. Only then did Harris file her first complaint alleging discrimination. Harris's performance continued to decline, and she continued to file internal complaints, each within days of any performance-related action by FedEx:

- **October 2018**: Harris and Lamb begin meeting regularly for coaching. ROA. 5008-09, ROA.6010.

- **February 2019**: Lamb coaches Harris extensively on how to present Coach2Grow 2.0. ROA.4640.

- **March 7, 2019**: Harris admits she did not follow through with the rollout of Coach2Grow 2.0. Lamb asks if Harris would be happier in her former sales role. ROA.5989, ROA.4644-47.

  - *March 11, 2019: In response, Harris files a complaint, accusing Lamb of discrimination. ROA.5663.*

- **May 31, 2019**: At the close of FY2019, Harris's team returns the worst performance of any district under Lamb's supervision. ROA.8074-76.

- **June 26, 2019:** Lamb issues Harris a Letter of Counseling and places her on a PIP. ROA.4652-53, ROA.5681-82.

  - *June 28, 2019: Harris files a second internal EEO complaint alleging that the Letter of Counseling was retaliatory.  ROA.5688.*

- **August 24, 2019**: Lamb notes she is "not seeing sufficient performance improvement from Harris," and has "concern with Harris's behavior." ROA.4602-05

- **September 13, 2019**: After Harris fails to meet the majority of goals in her PIP, Lamb issues her a Letter of Warning and a second PIP. ROA.5719.

  - *September 20, 2019: Harris files a third internal EEO complaint, alleging that the Letter of Warning was retaliatory. ROA.5722.*

- **December 2019**: After Harris fails to meet the majority of goals in her second PIP, Lamb submits a Request for Termination. ROA.4684-86.

- **January 8, 2020**: Harris's employment is terminated. ROA.6011.

This Court addressed a similar situation in *Shu-Hui Wu v. Mississippi State University*, 626 F. App'x 535 (5th Cir. 2015). In *Wu*, a professor contended that a supervisor "retaliated against her for filing EEOC complaints by writing a negative review of her performance." *Id*. at 538. This Court recognized, however, that the "negative review was not a change in attitude by [the supervisor] following the filing of the EEOC complaint." *Id*. To the contrary, the supervisor had "regarded and reviewed [the plaintiff] negatively long before she filed her EEOC complaints," and had "previously warned" her about her performance. *Id*.

So too here: Lamb did not begin critiquing Harris's performance when Harris filed an internal complaint. The undisputed evidence shows that Lamb was concerned with Harris's leadership and execution of company goals in early 2019, *before* Harris engaged in any protected activity, and that Lamb had "previously warned" Harris about her performance, suggesting that Harris might be happier in a sales role.[4] *See Wu*, 626 F. App'x at 538. These facts, as in *Wu*, "negate a retaliatory motive for [Lamb's] negative assessment" of Harris's leadership and coaching abilities and, in the continued absence of sufficient improvement, Harris's termination. *Id.*; *see also Eubanks v. Endeavor Energy Res., L.P.*, No. 22-50737, 2023 WL 2612615, at *3 (5th Cir. Mar. 23, 2023) (rejecting pretext argument "in light of the extensive record" of "performance-related issues, both before and after this performance evaluation").

The need to draw reasonable inferences in Harris's favor does not require this Court to ignore undisputed evidence contradicting her claims. Certainly, an employer may not retaliate against a poorly performing employee any more than against a successful one. But "Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies [and] unsatisfactory performance." *Jackson v. Flint Ink N. Am. Corp.*, 370 F.3d 791, 798 (8th Cir. 2004),

---

[4] To the extent that Harris now contends that Lamb's assessment of Harris's performance was itself discriminatory, the jury flatly rejected that claim.

*vacated on rehearing and remanded only as to hostile work environment claim*, 382 F.3d 869 (8th Cir. 2004); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) (similar in the section 1983 retaliation context). Harris cannot rewrite the timeline to create legally sufficient evidence of pretext and retaliation.

### 2. Neither Harris's so-called comparators nor her past performance present legally sufficient evidence of pretext and retaliation.

Even if temporal proximity cut in Harris's favor, a reasonable jury would *still* lack legally sufficient evidence of but-for causation. Under this Court's precedent, "temporal proximity between [Harris's] protected activity and her termination is relevant to, but not alone sufficient to demonstrate, pretext." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 579 (5th Cir. 2020); *see also Strong v. Univ. Healthcare Sys.*, L.L.C., 482 F.3d 802, 808 (5th Cir. 2007). Rather, "other evidence, in combination with this temporal proximity," is required "for a reasonable jury to find but-for causation." *Brown*, 969 F.3d at 579. That is all the more true where, as here, corrective action closely follows a period in which an employee's performance was objectively poor. *See, e.g.*, *Alvarez v. Royal Atlantic Dev.*, 610 F.3d 1253, 1270 (11th Cir. 2010) ("Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").

Harris did not present "other evidence" "that would permit a reasonable inference that the real reason" for her termination was impermissible

retaliation. *See Owens*, 33 F.4th at 834-35. While an employee "may meet her burden through use of various forms of circumstantial evidence," such evidence must be of sufficient "nature, extent, and quality" to permit a jury to reasonably infer *retaliation*. *Id*. at 826, 834. The evidence here comes nowhere close.

Harris (1) attempted to show that she was treated differently than similarly situated colleagues, and (2) trumpeted her past performance. Neither is sufficient.

First, the undisputed evidence at trial squarely debunked Harris's efforts to establish pretext via comparators. "A plaintiff who proffers the treatment of a fellow employee must show that the plaintiff's termination was taken under nearly identical circumstances as those faced by the comparator." *Brown*, 969 F.3d at 580 (quotation omitted). While Harris disputed her sales metrics in comparison to certain of her fellow managers' metrics at select points in time, the undisputed evidence refutes any notion that she was disciplined or terminated under "nearly identical circumstances" to any colleague who was not disciplined or terminated. The evidence showed that Harris's team's revenue declined by nearly $400,000 in FY2019, while Golden-McElroy's increased by $4.8 million, and Hickman's increased by $2.1 million. ROA.5327, ROA.5391. Likewise, the undisputed evidence showed that none of Harris's direct reports were meeting plan, while at least some of Hickman's and Golden-McElroy's were. ROA.8075. And the undisputed evidence indicated that both Harris's supervisors and her direct

reports found her leadership lacking, while there was no evidence that Golden-McElroy and Hickman displayed the same shortcomings. *E.g.*, ROA.4748-69.

Second, no one disputes Harris's past contributions to the company. But "prior good evaluations" still "cannot establish that later unsatisfactory evaluations are pretextual." *Salazar*, 982 F.3d at 390 (quotations omitted). Indeed, even in combination, "identification of suspicious timing . . . and past satisfactory work performance is not enough to support [a] claim that 'but for' [an employee's] complaints to human resources, [she] would not have been terminated." *Forbis*, 2022 WL 17986689, at *5 (citing *Owens*, 33 F.4th at 834-35). While Harris returned positive performance in years past, the undisputed evidence indicates that FedEx did not terminate her employment until nearly a year from the time her manager began to express concerns with Harris's coaching capabilities and until after Harris was provided with multiple opportunities to improve. The facts simply cannot give rise to an inference of pretext sufficient to support the verdict.

\* \* \*

This Court does not overturn a jury's decision lightly. But this case is not a close call. Judgment as a matter of law is appropriate because there is no evidence that, despite the ample business rationales for Harris's firing, her complaints were "the reason for" the termination of her employment or that her employment would not have been terminated "in the absence of" her post-discipline complaints. *See Owens*, 33 F.4th at 835. If the pittance of

evidence here were sufficient to show both pretext and retaliatory motive, struggling employees could bar employers from taking appropriate corrective action by filing complaints. That is not the law. This Court should reverse and render judgment for FedEx. And even if this Court concludes that FedEx is not entitled to judgment as a matter of law, the Court should grant FedEx a new trial on the ground that the weight of the evidence so strongly supports FedEx that the jury's verdict is simply error. *See, e.g.*, *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

## III. The Damages Award Must Be Eliminated or Reduced.

Even were this Court to affirm the jury verdict as to retaliation, the judgment is plainly unlawful. The district court erred in (1) failing to apply well-established Fifth Circuit law limiting compensatory damages under the maximum-recovery rule, (2) awarding punitive damages where foreclosed by settled law, and (3) entering an egregious and unconstitutional punitive damages award of $365 million—over 300 times higher than the compensatory award.

### A. This Court's Maximum-Recovery Rule Limits Compensatory Damages in This Case to $15,000.

The district court failed to apply the maximum-recovery rule to remit the jury's $1,180,000 award for past and future emotional distress damages to

$15,000, adjusted for inflation, as required by this Court's precedent.[5]

A plaintiff seeking to "recover emotional distress damages" must provide "specific evidence of the nature and extent of the harm." *Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 368 (5th Cir. 2002). To establish harm, "corroboration and expert testimony" are "prefer[red]." *Id*. On appeal, "[t]his court uses the 'maximum recovery rule' to determine whether an award is excessive." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019). Under this rule, a verdict must be reduced "to 150% of the highest inflation-adjusted recovery in an analogous, published decision." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019). The "relevant jurisdiction" and cases here are Fifth Circuit employment cases. *See Thomas*, 297 F.3d at 368 (citation omitted).

In briefing below, Harris argued that this case fell outside the ambit of the mandatory maximum-recovery rule because it was "unique" such that no analogous published decision was available. ROA.3107-08. But the only thing unique about this case is the plainly unconstitutional award. This Court has approved emotional distress awards ranging from nominal damages to $150,000 in single-plaintiff, single-issue employment cases like this

---

[5] Assuming this Court finds that Harris's section 1981 claim is time-barred, the maximum-recovery rule is applied as if the jury had awarded Harris $300,000, the statutory cap under Title VII. *See Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002). "In other words, we treat the verdict as though the jury had awarded $300,000 . . . and we give no deference to the fact that the jury decided on more." *Id*.

one, providing ample "analogous, published decision[s]." *Longoria*, 932 F.3d at 365; *see, e.g.*, *Thomas*, 297 F.3d at 369-70 (surveying cases).

This Court's decision in *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir. 2000), involved near-identical allegations of emotional harm to those presented here. In *Vadie*, this Court remitted an award from $300,000 to $10,000 where the plaintiff presented evidence that an adverse employment action "destroyed" and "totally ruined" him. *Id*. at 377. The plaintiff in *Vadie* testified that he "bec[a]me sick" with "headache [and] nausea," "could not sleep for months," and was "under severe doctor surveillance." *Id*. The plaintiff did not present expert testimony, so the evidence was limited to descriptions of the mental and emotional disturbance he suffered. This Court concluded that the plaintiff's testimony "was sufficient to support a finding of actual injury," but "insufficient to support damages of the magnitude awarded." *Id*.

Similarly, in *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927 (5th Cir. 1996), this Court remitted a section 1981 retaliation award of $150,000 to nominal damages where a plaintiff testified that her dismissal caused "unemployment for almost one year," and "mental anguish" and distress when she eventually had to take a new job far from her children. *Id*. at 940-41. This Court acknowledged that "the retaliatory discharge caused a substantial disruption in Patterson's daily routine," but deemed the record "void of sufficient competent evidence to support anything more than nominal damages." *Id*. at 941.

The testimony describing Harris's emotional distress is similar to the evidence of physical and emotional "disruption" presented in *Vadie* and *Patterson*. As in *Vadie*, Harris testified to symptoms such as "weight gain," "dry heaving," and "mental anguish." ROA.4967-71, ROA.4976-78. Harris called her pastor and two friends to testify; each shared symptoms substantially similar to those described in *Vadie*. *See* ROA.4986-87 ("distraught" and "crying" in a restaurant); ROA.5150-51 ("no longer being as bubbly as she was"); ROA.5155 ("distant . . . down and isolated"). And as in *Vadie* and *Patterson*, Harris did not present "medical or psychological evidence in support of the damage award." *Patterson*, 90 F.3d at 940.

Harris's testimony in support of future emotional distress was even more limited. Harris testified at trial that she found a new job and has recovered through therapy and starting a T-shirt business. ROA.4978-79. Despite this, the jury awarded her $1,060,000 in future emotional distress, more than eight times the award of past emotional distress ($120,000). ROA.3938. There is simply no evidence to support such an award, and in fact Harris's own testimony precludes it. For this reason, the Court should, at minimum, reform the future emotional damages award based on the discrepancy between the evidence presented and the damages awarded for past versus future emotional distress. *See, e.g.*, *Thomas*, 297 F.3d at 370-72 (remittitur where evidence of future emotional distress lacking).

Under this Court's precedent, Harris's evidence cannot support an award of $1,180,000—or even $300,000—for emotional distress damages,

past or future. Indeed, "the quantum and quality of the evidence that was presented [by Harris] has *never* been deemed [by this Court] to justify an award as high as $300,000." *See Salinas v. O'Neill*, 286 F.3d 827, 831 (5th Cir. 2002) (emphasis added).[6] Accordingly, remittitur to $15,000 adjusted for inflation—150% of the award approved in *Vadie*—is appropriate. This Court "ha[s] discretion to set that amount" itself rather than "remand[ing] for the district court to do so," and should exercise that discretion here. *Longoria*, 932 F.3d at 368.

## B. Punitive Damages are Unavailable as a Matter of Law.

In addition to failing to properly remit compensatory damages, the district court failed to recognize that the evidence is legally insufficient to support any award of punitive damages.

Punitive damages are available for retaliation *only* upon proof that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). This is a higher standard than the showing necessary for compensatory damages. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). "[N]ot every sufficient

---

[6] Even in single-plaintiff employment cases where evidence of harm far exceeds that offered here, this Court has deemed $150,000 (150% of $100,000) the maximum permissible emotional-distress award. *See Salinas*, 286 F.3d at 832-33 (remitting Title VII award from $300,000 to $150,000 where plaintiff suffered paranoia, deteriorating relationships with family, and more than 70 doctor visits); *Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) (similar).

proof of pretext and discrimination is sufficient proof of malice or reckless indifference." *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000). Rather, to be liable for punitive damages, "a positive element of conscious wrongdoing is always required." *Kolstad*, 527 U.S. at 538 (citation omitted). And "even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show" that the agents' actions were contrary to the employer's "good-faith efforts to comply with Title VII." *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 467 (5th Cir. 2013) (citing *Kolstad*, 527 U.S. at 545-46).

No evidence supports the "conscious wrongdoing" required for punitive damages here. To the contrary, the evidence at trial demonstrated that FedEx enforced policies that expressly prohibit retaliation, trained its managers on recognizing and combating retaliation, and investigated allegations of retaliation. *Supra* pp.6, 13. Each of Harris's complaints was thoroughly investigated by an independent human resources department, which exchanged "dozens of e-mails" with Harris, interviewed multiple persons, and reviewed multiple documents each time Harris complained. *See, e.g.*, ROA.5141, ROA.5673-78, ROA.5688-92. And, pursuant to FedEx policy, Harris's supervisors obtained human resources' approval before any corrective action was taken in relation to her declining performance. *See, e.g.*, ROA.4603-05, ROA.5119-20.

These facts lie in stark contrast to cases in which this Court has found evidence sufficient to support punitive damages. In *Rhines v. Salinas*

*Construction Technologies, Ltd.*, 574 F. App'x 362, 368-69 (5th Cir. 2014), for example, this Court found "sufficient evidence to support the jury's award of punitive damages" where an employer provided false affidavits to the EEOC and falsely claimed to have conducted an internal investigation. *See also Wantou v. Wal-Mart Stores Texas, L.L.C*, 23 F.4th 422, 440 (5th Cir. 2022) (punitive damages acceptable where "jury could conclude that at least certain of [plaintiff's] ethics complaints were ignored").

Unlike *Rhines* and *Walmart*, this case is far from one in which an employer showed "reckless indifference" to the law and is thus not a rare case in which punitive damages are warranted. Accordingly, in addition to reducing the compensatory damages, this Court should overturn the punitive damages award in its entirety.

## C.  The Extraordinary $365 Million Punitive Damages Award Violates Due Process.

At minimum, this Court must conform the plainly excessive and unconstitutional punitive damages award to meet the minimum requirements of due process. In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003), the Supreme Court explained that, while no "bright-line ratio" limited punitive damages, "an award of more than four times the amount of compensatory damages" fell "close to the line of constitutional impropriety." Relevant here, the Court also explained that when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to

compensatory damages, can reach the outermost limit of the due process guarantee." *Id*.

The staggering $365,000,000 punitive damages award entered by the district court in this case is flatly unconstitutional—it is more than *300 times* the compensatory damages award. *See id*. at 426 ("presumption against . . . a 145-to-1 ratio"). This grossly excessive award is "neither reasonable nor proportionate to the [alleged] wrong committed" and thus effects an "arbitrary deprivation of the property of [FedEx]." *Id*. at 429.

Under the "guideposts" laid out in *BMW of North America v. Gore*, 517 U.S. 559, 574-80 (1996), and subsequently applied in *State Farm*, this Court should limit any punitive award to no more than the compensatory damages awarded. To begin with, the degree of reprehensibility—"the most important indicium" of the propriety of punitive damages—is non-existent. *Id*. at 575. In evaluating reprehensibility, courts consider, among other things, whether "the harm caused was physical as opposed to economic," whether "the conduct involved repeated actions or was an isolated incident," and whether "the harm was the result of intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419.

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) provides an example of high reprehensibility in the employment context. In *Turley*, the plaintiff, the only African-American employee at his company, was harassed for more than three years. *See id*. at 148-49. His co-workers spray-painted "KKK" near his workstation, threatened to kill him, and hung a stuffed

monkey with a noose around its neck on his car. *Id.* at 148-49. Management was minimally responsive to the plaintiff's complaints, and the plaintiff was diagnosed with a panic disorder and PTSD. *Id.* at 150-51. The Second Circuit ultimately upheld a compensatory damages verdict of $1.32 million and remitted a punitive damages award from a 4-to-1 ratio down to a 2-to-1 ratio. The court acknowledged that the punitive damages were still large, yet concluded they were constitutionally permissible "in the aggravated circumstances of this case." *Id.* at 167. *See also, e.g.*, *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1206-09 (10th Cir. 2012) (1-to-1 ratio "maximum constitutionally allowable" for retaliatory discharge).

It is clear that even a 2-to-1 ratio (not to mention a 300-to-1 ratio) would be unlawful on the facts presented here. There is no "physical harm" or "intentional malice." *See State Farm*, 538 U.S. at 419.  Unlike in *Turley*, there is no repeated or egregious violation. Instead, FedEx (1) addressed Harris's performance deficiencies before any complaints; (2) investigated Harris's complaints thoroughly; and (3) terminated Harris's employment only after providing her several chances to improve. Moreover, the jury rejected Harris's allegations of discrimination. *See supra* pp.32-37. Based on this first and "most important indicium," *Gore*, 517 U.S. at 575, punitive damages "equal to compensatory damages" clearly reaches "the outermost limit of the due process guarantee" in this case. *See State Farm*, 538 U.S. at 425.

The second and third guideposts confirm this conclusion. In terms of the second guidepost, the "disparity between the actual or potential harm

suffered by the plaintiff and the punitive damages award" is enormous. *Id*. at 418. As in *State Farm*, "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma." *Id*. at 426. And, as described above, Harris's evidence of harm was minimal. *Supra* p.44. So once Harris's damages are remitted in keeping with the maximum-recovery rule, she will have received "complete compensation." *State Farm*, 538 U.S. at 426.

Likewise, in terms of the third guidepost, the damages awarded in this case bear no relation to those imposed in comparable cases. Punitive awards involving claims of employment discrimination or retaliation in this Circuit are typically in the range of $50,000 to $100,000—a far cry from the $365 million awarded here. *See, e.g.*, *Stelly v. W. Gulf Mar. Ass'n*, 407 F. Supp. 3d 673 (S.D. Tex. 2019) ($200,000 in Title VII retaliation case remitted to $55,000); *Kalina v. Brazoria Cnty.*, 2011 WL 4436731 (S.D. Tex. Sept. 20, 2011) ($1,000,000 in section 1983 sexual harassment case remitted to $100,000).

FedEx vigorously disputes the legal sufficiency of the evidence to support any finding of retaliation, much less punitive damages. *Supra* pp.34-46. But should this Court believe that punitive damages are available, under *State Farm*'s guideposts, this Court should limit any punitive-damages award to an amount equal to the compensatory award.

## IV. In the Alternative, a New Trial Is Warranted Because the District Court Abused Its Discretion in Failing to Exclude Harris's "Human Resources Expert."

As set out above, the Court should reverse and render judgment for FedEx on Harris's retaliation claim or, at minimum, correct the unlawful damages award. In the alternative, this Court should order a retrial because the district court abused its discretion in permitting Harris's "human resources expert," Coneisha Sherrod, to offer unreliable and unhelpful testimony.[7]

Federal Rule of Evidence 702 allows admission of testimony by a qualified expert only if it "is the product of reliable principles and methods" and "will help the trier of fact to understand the evidence or to determine a fact in issue." Sherrod's testimony satisfies neither.

First, Sherrod's testimony was not supported by "reliable principles or methods." *See id*. In support of her conclusions, Sherrod referenced broad ranging EEOC statistics, her own "common sense," and a manual she called "the Bible for HR." ROA.4312-13. Sherrod conceded, though, that she did not have "any idea" whether the statistics she recited "include[d] FedEx employees" or were tied in any way to the facts of the case. ROA.4332-33. Sherrod confirmed she had not reviewed a single FedEx policy or investigation report, and that she had no idea what records FedEx kept, what procedures

---

[7] This Court may also order a new trial on the basis that the verdict was against the great weight of the evidence. *Supra* p.41.

FedEx's human resources department followed, or whether and to what extent FedEx monitored its workplace for discrimination. ROA.4335-40. An expert opinion is fundamentally unreliable where it "fails to consider the relevant facts of the case." *Neb. Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005); *see also, e.g., Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (expert testimony unreliable where merely general observations regarding usual business practice, not tied to company's policies). That is the case here. Sherrod's testimony was based solely on the factual allegations in Harris's Complaint—the majority of which the jury rejected in rejecting Harris's discrimination claim—"common sense," and the human resources "Bible." It had nothing to do with the facts of the case as developed in discovery and bore no indicia of reliability or applicability.

Nor could Sherrod's testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Certainly, testimony concerning industry standards is appropriate and even necessary in some cases. But where testimony does not explain anything a rational juror could not herself understand, it is unreliable and unhelpful under Rule 702. *See Curtis v. Okla. City Pub. Schs. Bd.*, 147 F.3d 1200, 1219 (10th Cir. 1998) (jury could determine for itself whether recruitment plan was evidence of retaliation); *Barfield v. Orange Cnty.*, 911 F.2d 644, 651 n.8 (11th Cir. 1990) (opinion

about whether discrimination occurred would not assist the trier of fact).[8] At trial, Sherrod testified broadly to what she referred to as human resources "red flags" such as "making false statements" and "not following policy and procedures." ROA.4320-23. These vague, common-sense pronouncements untethered to the facts of the case could not help the jury. *See, e.g., Sherrod v. United Way of Tarrant Cnty.*, 2018 WL 10435245, at *1 (N.D. Tex. Dec. 11, 2018) (excluding "human resource expert" testimony as irrelevant "to whether Ms. Sherrod was fired or retaliated against based on race" because "case is about discrimination and retaliation, not proper human resources management").

Sherrod also testified to (incorrect) legal standards and, ultimately, legal conclusions. But "[a]n expert who usurps either the role of the judge by instructing the jury on the applicable law or the role of the jury by applying the law to the facts at issue by definition does not aid the jury in making a decision." *Nagle v. Gusman*, No. CV 12-1910, 2016 WL 541436, at *5 (E.D. La. Feb. 11, 2016) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)). Thus, expert testimony "offer[ing] a legal opinion" is "inadmissible." *Estate of Sowell v. United States*, 198 F.3d 169, 171 (5th Cir. 1999); *see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir.

---

[8] *See also, e.g., Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002) (issues "not so impenetrable as to require expert testimony"); *Kotla v. Regents of Univ. of Cal.*, 8 Cal. Rptr. 3d 898, 903 (Cal. Ct. App. 2004) (reversing verdict because human resources "expert" testimony about "indicators" of retaliation "invaded the province of the jury").

1997) (expert testimony that defendant discriminated is an impermissible legal conclusion). Courts have barred Sherrod's legal opinions in employment disputes for this exact reason. *E.g.*, *Sullivan v. Schlumberger Ltd.*, No. 4:20-CV-662, 2021 WL 1550812, at *4 (E.D. Tex. Apr. 20, 2021) (refusing to allow Sherrod to testify as to legal issues); *Hernandez v. Rush Enters., Inc.*, No. 4:19-CV-00638, 2021 WL 857987, at *8 (E.D. Tex. Mar. 8, 2021) (same).

Ignoring those bedrock principles, the district court permitted Sherrod to offer a legal opinion as to the ultimate issues. Sherrod opined—*without* any knowledge of the actual facts—that FedEx "didn't follow normal protocol and procedure, and that discrimination and retaliation did occur." ROA.4305. And in so doing, she *got the law wrong*. She testified that, based solely on her review of largely debunked allegations in a complaint, there was a "system failure" by FedEx to "monitor the workplace" with regard to certain "safety protocols." ROA.4310-28. This was based on an alleged "duty" FedEx had to "prevent" violations of the law. ROA.4311-12. But while employers may have an obligation to exercise reasonable care to prevent retaliation, the duty does not rise to nearly the level that Sherrod advocated, as if an employer has the same duties under Title VII as it does under OSHA to provide a safe working environment. *Compare Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (no strict liability under Title VII) *with Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 493 (1981) (duty under OSHA to "assure" "safe and healthful working conditions").

Courts widely recognize that "because of an expert's stature *qua* expert, jurors may assign more weight to expert testimony than it deserves." *United States v. Naidoo*, 995 F.3d 367, 375 (5th Cir. 2021) (citation omitted). That is almost certainly what happened here. As the first witness called, Sherrod's misleading testimony set up an improper, heightened legal standard which Harris's counsel repeatedly referenced throughout trial. Sherrod displaced both judge and jury, prejudicing FedEx with "expert testimony" that was nothing of the sort. *See Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1068 (9th Cir. 2002) (reversing verdict where expert "drew the inference of discrimination for the jury in a case otherwise based entirely on less-than-convincing circumstantial evidence" and thus "more probably than not was the cause of the result reached").

Because the district court erred in denying FedEx's motions to exclude Sherrod's testimony and that testimony prejudiced FedEx, a new trial is warranted.

## Conclusion

The Court should reverse the judgment below and render judgment for FedEx. In the alternative, the Court should reverse the unlawful compensatory and punitive damages awards. In the alternative, this Court should reverse and remand for a new trial.

Respectfully submitted.

/s/ *Kyle D. Hawkins*

| | |
|---|---|
| Barak J. Babcock | Kyle D. Hawkins |
| Christopher M. Ahearn | Leah Bower |
| FEDERAL EXPRESS CORPORATION | LEHOTSKY KELLER LLP |
| 3620 Hacks Cross Road | 919 Congress Ave., Suite 1100 |
| Memphis, TN 38125 | Austin, TX 78701 |
| | (512) 693-8350 |
| | kyle@lehotskykeller.com |

*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

On April 26, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,988 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins