No. 23-20035

# In the United States Court of Appeals for the Fifth Circuit

JENNIFER HARRIS,
*Plaintiff-Appellee,*

*v.*

FEDEX CORPORATE SERVICES, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Texas

———————————————————

**BRIEF FOR APPELLEE JENNIFER HARRIS**

———————————————————

**BRIAN P. SANFORD**
**Texas Bar No. 17630700**
**Elizabeth "BB" Sanford**
**Texas Bar No. 24100618**

**THE SANFORD FIRM**
**1910 Pacific Ave., Suite 15400**
**Dallas, Texas 75201**
**(214) 717-6653**
**(214) 919-0113 Fax**

**ATTORNEYS FOR APPELLEE JENNIFER HARRIS**

## CERTIFICATE OF INTERESTED PERSONS

No. 23-20035

Jennifer Harris, *Plaintiff-Appellee,*
*v.*
FedEx Corporate Services, Inc., *Defendant-Appellant.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Jennifer Harris, Plaintiff-Appellee

    Counsel for Plaintiff-Appellee:

    Brian P. Sanford (lead counsel)
    Elizabeth (BB) Sanford
    The Sanford Firm

FedEx Corporate Services, Inc. Defendant-Appellant

    Counsel for Defendant-Appellant:

    Kyle D. Hawkings
    Leah F. Bower
    Lehotsky Keller LLP
    Barak J. Babcock
    Christopher M. Ahearn
    Federal Express Corporation

*/s/   Brian P. Sanford*
Attorney for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

This case involves public policy issues related to the enforcement of the Civil Rights Act of 1866. A jury found that FedEx Corporate Services, Inc. retaliated against a Black employee who opposed race discrimination upon which the district court entered judgment. FedEx seeks to shorten the statute of limitation for plaintiff's claims under the Act in violation of Supreme Court precedent and to reduce the compensatory and punitive damages awarded by the jury based on its determination of the amounts needed to make the plaintiff whole and to punish and deter FedEx's wrongful conduct under the Civil Rights Act.

TABLE OF CONTENTS

STATEMENT OF THE CASE ............................................................... 1

I.    Harris Was a Rising Star
      at FedEx for 12 Consecutive Years ........................................... 1

II.   Harris's New Manager Treated Her
      Differently from Her White Peers, and
      FedEx Retaliated Against Her When She
      Filed Formal Complaints ............................................................ 1

III.  FedEx Failed to Comply with Established
      Human Resources Standards Designed to
      Prevent Discrimination and Retaliation in the Workplace ........................ 12

IV.   FedEx's Conduct Caused Harris
      Great Physical and Emotional Distress ..................................... 14

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT .................................................................................... 19

I.    The Six-Month Contractual Limitation
      Does Not Apply and Is Unenforceable ..................................... 19

      A.  Harris Did Not Knowingly and Voluntarily
          Waive the Statutes of Limitation on Her
          Civil Rights Claims ............................................................. 19

      B.  FedEx Concedes that the Six-Month
          Contractual Limitation Is Unenforceable
          as to Plaintiff's Title VII Claim ......................................... 21

      C.  The Six-Month Contractual Limitation Is
          Equally Unenforceable as to Plaintiff's
          Section 1981 Claim ............................................................. 21

D.  The Six-Month Contractual Limitation
It Is Unenforceable Under Texas Law .................................................25

E.  Contrary Decisions Are Not Binding .................................................27

II.  The Jury's Retaliation Verdict Is Firmly
Supported by the Evidence at Trial ..........................................................27

A.  Direct Evidence of Retaliation ............................................................ 29

B.  Indirect Evidence of Retaliation Claims ...............................................31

C.  The Last Element to Show Causation Is Pretext .................................34

i.  Disparate Treatment ....................................................35

ii.  Lack of or Suspicious Investigation ............................................35

iii.  Weaknesses, Implausibilities, Inconsistencies,
Incoherencies, and Contradictions ...........................................36

iv.  Subjective Criteria ....................................................37

v.  Failure to Follow Policies ............................................38

III.  Damages Should Stand, Even if Adjusted .................................................39

A.  The Jury's Compensatory Damages
Award Is Supported by the Unique Facts
Presented and Is Not "Clearly Excessive." .........................................39

B.  Evidence of Compensatory Damages .................................................. 40

C.  Maximum Recovery Rule ..................................................................... 42

iv

D.   The Jury's Punitive Damages Award
     Should Be Affirmed ................................................................. 47

     i.    Ample Evidence Supports the Jury's
           Finding that FedEx Acted with Malice
           or Reckless Indifference to Harris's Rights ............................ 47

     ii.   The Jury's Punitive Damages Award Is
           Consistent with Due Process ................................................. 48

IV.  The District Court Did Not Abuse its Discretion
     in Permitting the Expert to Testify ............................................. 55

     A.   Legal Standard .................................................................... 55

     B.   Analysis ............................................................................... 56

CONCLUSION ........................................................................................ 60

CERTIFICATE OF SERVICE .................................................................. 61

CERTIFICATE OF COMPLIANCE ......................................................... 62

TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Adams v. Groesbeck Indep. Sch. Dist.*,
    475 F.3d 688 (5th Cir. 2007) ...............................................32

*Baker v. Bd. of Regents of State of Kan.*,
    991 F.2d 628 (10th Cir. 1993) ............................................ 42

*Barfield v. Fed. Express Corp.*,
    351 F. Supp. 3d 1041 (S.D. Tex. 2019)............................... 28

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)...............................................51, 52, 53

*Boehms v. Crowell*,
    139 F.3d 452 (5th Cir. 1998) ............................................ 40

*Bogle v. McClure*,
    332 F.3d 1347 (11th Cir. 2003)...........................................54

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731 (2020) .......................................................34

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006) ........................................................... 31

*Burnett v. Grattan*,
    468 U.S. 42 (1984) .............................................. 23, 24, 25

*Cervantez v. Collier*,
    2019 WL 6727872 (W.D. Tex. Dec. 11, 2019)..................... 61

*Crawford v. W. Elec. Co., Inc.*,
    614 F.2d 1300 (5th Cir. 1980) ...........................................39

*Danville v. Reg'l Lab Corp.*,
    292 F.3d 1246 (10th Cir. 2002) .........................................38

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................ 58

*Day v. Woodworth*,
   54 U.S. 363 (1852) .............................................................. 52

*DeHart v. Baker Hughes Oilfield Operations, Inc.*,
   214 F. App'x 437 (5th Cir. 2007) ....................................... 31

*Dixon v. Int'l Harvester Co.*,
   754 F.2d 573 (5th Cir. 1985) ............................................. 41

*Douglass v. Delta Air Lines, Inc.*,
   897 F.2d 1336 (5th Cir. 1990) ..................................... 41, 44

*E.E.O.C. v. Chevron Phillips Chemical Co., LP*,
   570 F.3d 606 (5th Cir. 2009) ............................................. 37

*E.E.O.C. v. Fed. Express Corp.*,
   513 F.3d 360 (4th Cir. 2008) ............................................. 57

*Eichenseer v. Reserve Life Ins. Co.*,
   934 F.2d 1377 (5th Cir. 1991) ................................. 52, 55, 56

*Eiland v. Westinghouse Elec. Corp.*,
   58 F.3d 176 (5th Cir. 1995) ............................................... 41

*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*,
   547 F. App'x 484 (5th Cir. 2013) ................................... 31, 32

*Evans v. City of*,
   246 F.3d 344 (5th Cir.2001) .............................................. 34

*Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*,
   160 F.3d 1048 (5th Cir. 1998) ........................................... 27

*Felder v. Casey*,
   487 U.S. 131 (1988) ........................................................... 25

*Fischer v. United Parcel Serv., Inc.*,
   390 F. App'x 465 (6th Cir. 2010) ....................................... 49

*Foradori v. Harris,*
523 F.3d 477 (5th Cir. 2008)................................................................ 30, 43, 45

*Forsyth v. City of Dallas, Tex.,*
91 F.3d 769 (5th Cir. 1996) .................................................................. 47

*Foster v. Univ. of Maryland-E. Shore,*
787 F.3d 243 (4th Cir. 2015)................................................................ 34

*General Building Contractors Assn., Inc. v. Pennsylvania,*
458 U.S. 375 (1982) ............................................................................... 23

*Giles v. Gen. Elec. Co.,*
245 F.3d 474 (5th Cir. 2001)................................................................ 46

*Glasscock v. Armstrong Cork Co.,*
946 F.2d 1085 (5th Cir. 1991) ............................................................. 52

*Goldstine v. FedEx Freight Inc.,*
2021 WL 952354 (W.D. Wash. Mar. 11, 2021) ............................... 49, 57

*Goodman v. Lukens Steel Co.,*
482 U.S. 656 (1987).............................................................................. 42

*Gorzynski v. JetBlue Airways Corp.,*
596 F.3d 93 (2d Cir. 2010)................................................................... 37

*Gosby v. Apache Indus. Services, Inc.,*
30 F.4th 523 (5th Cir. 2022)................................................................ 34

*Hernandez v. Rush Enterprises, Inc.,*
4:19-CV-00638, 2021 WL 857987 (E.D. Tex. Mar. 8, 2021)............... 59

*Hindes v. F.D.I.C.,*
137 F.3d 148 (3d Cir. 1998) ................................................................ 26

*In re Air Crash Disaster Near New Orlean, La. On July 9,*
767 F.2d 1151 (5th Cir. 1985) ............................................................. 48

*In re Prudential Ins. Co. of Am.,*
148 S.W.3d 124 (Tex. 2004)................................................................ 26

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989) ...................................................................23

*Jiang v. Tex. Comm'n on Envtl. Quality*,
  321 F. Supp. 3d 738 (W.D. Tex. 2018)....................................35

*Jones v. Alfred H. Mayer Co.*,
  392 U.S. 409 (1968)...................................................................23

*Jones v. Preuit & Mauldin*,
  876 F.2d 1480 (11th Cir. 1989) ...............................................25

*Jones v. R.R. Donnelley & Sons Co.*,
  541 U.S. 369 (2004) ..................................................................23

*Jones v. Slay*,
  2014 WL 2804407 (E.D. Mo. June 20, 2014) .........................61

*Jones v. Wells Fargo Home Mortg., Inc.*,
  489 B.R. 645 (E.D. La. 2013) ...................................................55

*Kuhmo Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................58

*Laxton v. Gap Inc.*,
  333 F.3d 572 (5th Cir. 2003) ....................................................29

*Learmonth v. Sears, Roebuck & Co.*,
  631 F.3d 724 (5th Cir. 2011) ....................................44, 45, 47

*Learmonth v. Sears, Roebuck & Co.*,
  631 F.3d (5th Cir. 2011) ...........................................................19

*Lebron v. United States*,
  279 F.3d 321 (5th Cir. 2002)....................................................44

*Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*,
  9 F.4th 317 (5th Cir. 2021)..................................................38, 40

*Mayberry v. United States*,
  151 F.3d 855 (8th Cir. 1998) ....................................................42

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)............................................32

*McIlwain v. Dodd*,
  2022 WL 492986 (W.D. Ky. Feb. 17, 2022) ..................... 26

*Medina v. Ramsey Steel Co., Inc.*,
  238 F.3d 674 (5th Cir. 2001)............................39

*Migis v. Pearle Vision, Inc.*,
  135 F.3d 1041 (5th Cir. 1998) ........................43

*Miller v. Knox Cnty.*,
  2001 WL 15528 (D. Me. Jan. 5, 2001).............................. 26

*Monroe v. Columbia Coll. Chicago*,
  990 F.3d 1098 (7th Cir. 2021) ...................... 42

*Morgan v. Fed. Exp. Corp.*,
  114 F. Supp. 3d 434 (S.D. Tex. 2015) ................. 28

*Njang v. Whitestone Grp., Inc.*,
  187 F.Supp.3d 172 (D.D.C. 2016).........................22, 28

*Oden v. Oktibbeha County, Miss.*,
  246 F.3d 458 (5th Cir. 2001) .........................43

*Operations Co.*,
  144 F.3d 364 (5th Cir. 1998) ........................33

*Order of United Commercial Travelers of America v. Wolfe*,
  331 U.S. 586 (1947) ...................................... 20

*Owens v. Circassia Pharm., Inc.*,
  33 F.4th 814 (5th Cir. 2022) .....................37

*Pac. Mut. Life Ins. Co. v. Haslip*,
  499 U.S. 1 (1991) ............................................. 51

*Passantino v. Johnson & Johnson Consumer Prod., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ............................ 48

*Patterson v. P.H.P. Healthcare Corp.*,
 90 F.3d 927 (5th Cir. 1996)....................................................................... 45, 46

*Philadelphia Indem. Ins. Co. v. White*,
 490 S.W.3d 468 (Tex. 2016)........................................................................ 26

*Puga v. RCX Solutions, Inc.*,
 922 F.3d 285 (5th Cir. 2019)........................................................................47

*Raggs v. Miss. Power & Light Co.*,
 278 F.3d 463 (5th Cir. 2002) .......................................................................33

*Ramos v. Performance Contracting Inc.*,
 2019 WL 1980399 (S.D. Tex. May 3, 2019) ........................................... 31

*Raynes v. McMoRan Exploration Co.*,
 2012 WL 1032902 (E.D. La. Mar. 27, 2012) ........................................45

*Reeves v. Sanderson Plumbing Products, Inc.*,
 530 U.S. 133 (2000)................................................................ 29, 30, 33

*Reilly v. TXU Corp.*,
 271 F. App'x 375 (5th Cir. 2008) ............................................................ 30

*Robinson v. Jackson State Univ.*,
 714 F. App'x 354 (5th Cir. 2017) ...........................................................33

*Rubinstein v. Administrators of Tulane Educ. Fund*,
 218 F.3d 392 (5th Cir. 2000) ......................................................................57

*Russell v. McKinney Hosp. Venture*,
 235 F.3d 2219 (5th Cir. 2000).............................................................. 40

*Saketkoo v. Administrators of Tulane Educ. Fund*,
 31 F.4th 990 (5th Cir. 2022) .....................................................................34

*Salinas v. O'Neill*,
 286 F.3d 827 (5th Cir. 2002) ............................................................ 41, 46

*Saunders v. Branch Banking & Tr. Co. of VA*,
 526 F.3d 142 (4th Cir. 2008) ......................................................................55

*Smith v. Bd. of Supervisors of S. Univ.*,
  656 F. App'x 30 ...................................................................... 33

*St. Martin v. Mobil Expl. & Producing U.S., Inc.*,
  224 F.3d 402 (5th Cir. 2000).................................................59

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .............................................................. 51

*Stennett v. Tupelo Pub. Sch. Dist.*,
  619 Fed. Appx. 310 (5th Cir. 2015) .....................................36

*Swinton v. Potomac Corp.*,
  270 F.3d 794 (9th Cir. 2001) ................................................54

*Taylor v. Western & Southern Life Insurance Co.*,
  966 F.2d 1188 (7th Cir. 1992) .............................................. 28

*Tex. Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981)...............................................................39

*Thorton v. Diamond Offshore Mgmt. Co.*,
  326 F. App'x 318 (5th Cir. 2009).........................................45

*Thurman v. DaimlerChrysler, Inc.*,
  397 F.3d 352 (6th Cir. 2004) ....................................... 20, 28

*Tisdale v. Federal Exp. Corp.*,
  415 F.3d 516 (6th Cir. 2005) ................................................37

*Trujillo v. PacifiCorp*,
  524 F.3d 1149 (10th Cir. 2008) ............................................ 37

*Tureaud v. Grambling State Univ.*,
  294 F. App'x 909 (5th Cir. 2008) (per curiam....................47

*Turley v. ISG Lackawanna, Inc.*,
  774 F.3d 140 (2d Cir. 2014) ................................................. 48

*TXO Prod. Corp. v. Alliance Res. Corp.*,
  509 U.S. 443 (1993) ....................................................... 51, 55

*United States v. Burke,*
   504 U.S. 229 (1992) ................................................................. 41, 42

*United States v. Moore,*
   708 F.3d 639 (5th Cir. 2013) ........................................................ 30

*Vadie v. Mississippi State University,*
   218 F.3d 365 (5th Cir. 2000)......................................................... 45

*Vogler v. Blackmore,*
   352 F.3d 150 (5th Cir. 2003).....................................................44, 48

*Wantou v. Wal-Mart Stores Texas, L.L.C.,*
   23 F.4th 422 (5th Cir. 2022).......................................................... 51

*Watkins v. Scott Paper co.,*
   530 F.2d 1159 (5th Cir. 1976) ....................................................... 20

*Watkins v. Tregre,*
   997 F.3d 275 (5th Cir. 2021) .........................................................38

*Watson v. Johnson Mobile Homes,*
   284 F.3d 568 (5th Cir. 2002) .........................................................52

*Wellogix, Inc. v. Accenture, L.L.P.,*
   716 F.3d 867 (5th Cir. 2013) .........................................................52

*Welsh v. Fort Bend Indep. Sch. Dist.,*
   941 F.3d 818 (5th Cir. 2019) .........................................................34

*Wheat v. United States,*
   860 F.2d 1256 (5th Cir. 1988) ....................................................... 41

*White v. Ford Motor Co.,*
   500 F.3d 963 (9th Cir. 2007) .........................................................55

*Williams v. Illinois,*
   567 U.S. 50 (2012).......................................................................... 61

*Williams v. Trader Publ'g Co.,*
   218 F.3d 481 (5th Cir. 2000) ........................................................ 46

*Wilson v. Garcia*,
    471 U.S. 261 (1985) ....................................................................25

*Woods v. Illinois Dep't of Child. & Fam. Servs.*,
    880 F. Supp. 2d 918 (N.D. Ill. 2012) ......................................25

*Woolsey v. Panhandle Ref. co.*,
    131 Tex. 449 (1938) ..................................................................26

*Yarbrough v. Glow Networks, Inc.*,
    2022 WL 1143295 (E.D. Tex. Apr. 18, 2022) .......................59

*Zavala v. City of Houston, Tex.*,
    196 F.3d 1256, 1999 WL 800008 (5th Cir. 1999)...........20, 21

**Statutes**

28 U.S.C. § 1658.........................................................................23

42 U.S.C. §1981 ........................................................ 27, 28, 30, 54

42 U.S.C. §1981a.........................................................................54

42 U.S.C. § 1988........................................................... 23, 24, 25

Tex. Civ. Prac. & Rem. Code Ann. § 16.070 .........................26, 28

**Rules**

Fed. R. App. P. 32(a)(7)(B) .................................................. 64, 65

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................. 64

Fed. R. Civ. P. 50(a)............................................................. 13, 29

Fed. R. Evid. 702 .......................................................................58

**Other Authorities**

H.R. Rep. No. 102–40...............................................................41

**TO THE HONORABLE FIFTH CIRCUIT COURT OF APPEALS:**

Jennifer Harris, the appellee and plaintiff, submits this brief on the appeal by FedEx Corporate Services, Inc., the appellant and defendant, from the orders and a judgment of the United States District Court for the Southern District of Texas, Houston Division.

## STATEMENT OF THE CASE

### I.     Harris Was a Rising Star at FedEx for 12 Consecutive Years.

Plaintiff Harris started working for FedEx in 2007. ROA.4782. She was an immensely hard worker with a solid work ethic. ROA.4352-53, 4475, 4477. Promoted several times, Harris earned numerous awards based upon the excellence of her performance. ROA. 4477, 4785-86, 4788-90, 4799, 4800-02; ROA.4786-98. Until she complained about workplace discrimination, always received positive reviews. ROA.4797.

### II.    Harris's New Manager Treated Her Differently from Her White Peers, and FedEx Retaliated Against Her When She Filed Formal Complaints.

When FedEx promoted Harris to a District Sales Manager position in 2017, it assigned her to a team supervised by Michelle Lamb. ROA.4513. Harris, who is Black, was well respected by members of her team. ROA.4485. Lamb is White, as

were the other District Sales Managers who report to Lamb (none of whom expressed negativity about Harris). ROA.4421, 4446, 4484-85, 4528.

Harris took on extra responsibilities as a result and tried to work with Lamb by requesting one-on-one meetings in addition to their regularly scheduled meetings. ROA.4514. Harris won her second President's Club award after her first full year in this position. ROA.4805-06. While the evidence showed that Harris was a superstar, it also showed that Lamb was an ineffective, hands-off supervisor, who refused to provide guidance or support to her subordinates, especially Harris. ROA.4476-77, 4899-4901.

In 2017, FedEx realized that it had been overcharging one of Harris's largest customers, BJ Services, because of a change in FedEx's electronic system. ROA.4553, 4814, 4898, 5765. Harris repeatedly asked Lamb to help fix the problem. ROA. 4554, 4899. Lamb refused to communicate with the pricing department or escalate the issue to an appropriate executive. ROA.4901. FedEx eventually gave a credit to BJ Services and Harris qualified for the President's Club even without including the overcharge. ROA.4554-56, 4908.

Lamb transferred the salesperson on Harris's team who was responsible for the BJ Services account to a different (White) District Sales Manager, Brian Conrey, without replacing that salesperson on Harris's team. ROA.4902. Although FedEx's

policy is to have sales goals accompany a transferred salesperson to a new District Sales Manager, Lamb kept the sales goals associated with BJ Services with Harris. ROA. 4902-03-06, 5808. Nothing in FedEx's policies requires this; Lamb could have simply given Conrey a reduced sales goal based on the pricing credit. ROA.4558, 4560-61, 4903, 4909. Lamb excluded Harris from the goal adjustment discussions or process. ROA.4910. Lamb also improperly assigned a customer, 4G Dental, to Conrey's district when that customer belonged in Harris's district. ROA.4614-15, 4911-12.

In January 2019, Lamb allowed Harris's peers to attend FedEx's Pathway leadership program and prohibited Harris, purportedly for budgetary reasons. After Harris used her own vacation time and her own money to attend (and was awarded most improved manager at the program, ROA.4545-46), Lamb expressed dissatisfaction because she had not wanted Harris to participate, knowing that the Pathway program would enable Harris to rise within the company. ROA.4540, 4544-45, 4827-28, 5673. Despite the claimed budgetary constraints, Lamb later authorized a lower-level employee to travel to Texas. ROA.4955.

In March 2019, Lamb accused Harris of not coaching properly with FedEx's Coach2Grow program and suggested that Harris step down from her District Sales Manager position. ROA.4508-09, 4810, 4914, 5670. Harris was caught off guard

3

because Lamb had not discussed any areas in which Harris needed to grow before that conversation. ROA.4810. Harris's coaching was good enough for her team to win President's Club the previous year. ROA.4810. Lamb did not review Harris's history at FedEx as a leader. ROA.4539.

At this time, Harris submitted her first complaint of discrimination to a FedEx Vice President. ROA.4508, 4514-15, 4811, 4915-16, 4919, 4934-35, 5657, 5666. FedEx's policy is to complete an investigation of a complaint within 30 days. ROA.4921. FedEx does not allow a supervisor to discipline a person while an investigation is pending. ROA.4431.

FedEx assigned Michael Clark, a member of FedEx's HR department without any HR certifications, to investigate the complaint. ROA.4826, 5045-46, 5057. The investigation was not completed within 30 days. ROA.4825-26, 4920, 5672-73. Shortly after the investigation was completed, Lamb (on June 26, 2019) issued Harris the first disciplinary write up Harris ever received in her career. ROA.4931, 4407, 4691, 5086-87, 5681. Lamb deviated from FedEx's policy by not having a documented discussion of any concerns before moving to the next disciplinary step of a letter of counseling. ROA.4413, 4836, 4931, 5681.

The only formal training on discrimination and retaliation investigator Clark had received was part of his initial training when FedEx hired him in 2011.

ROA.5051. Clark acknowledged that FedEx should train its managers to comply with discrimination and retaliation laws and that it should supervise its managers and employees to make sure they are following non-discrimination and anti-retaliation laws. ROA.5057, 5059. Clark also acknowledged that FedEx needs to prevent discrimination and retaliation in the workplace, ROA.5061-2, that FedEx should care about workplace laws, ROA.5062, that employees have the right to raise the issue of discrimination, and that the company cannot retaliate against an employee who submits a complaint in good faith. ROA.5046.

FedEx did not train Clark how to recognize warning signs or red flags of discrimination in the workplace. ROA.5067. Nonetheless, Clark was aware that false statements, unfair comparisons, not following policies, an unfair investigation, or shifting justifications for different treatment could be signs of discrimination. ROA.5072-3. He was also aware that the timeline of events should be examined to determine if there is discrimination or retaliation. ROA.5073-4.

Although Clark's report concluded that "None of Complainant's allegations is substantiated," ROA.5678, the report, fairly read, substantiates the five specific allegations made by Harris. ROA.5663-34, 5673-78.

Clark did not interview material witnesses identified by Harris. ROA.4922. Clark omitted from the report his interview with Conrey who told Clark that Lamb

did not treat Harris the same way she treated Harris's peers, was picking on her, making her environment hostile and unfair, and was not consistent in her evaluation of Harris compared to her peers, causing Harris multiple times to be in tears. ROA.4698, 4734, 5096-8, 5673-78.

Even though Clark concluded that Harris's allegations were not substantiated, he recommended coaching for both Harris and Lamb. ROA.4930-31, 5678. FedEx did not present the report to Harris to allow her to examine its accuracy or provide a rebuttal. ROA.4835.

Lamb's June 26, 2019 letter of counseling given to Harris within a few weeks of the close of the investigation contained false statements, including that Harris had the lowest Year-to-Date goal attainment and that she failed to meet plan four out of four quarters in Fiscal Year 2019: if BJ Services had been calculated properly, Harris would have met goal for one of those quarters, the same as her White peers. ROA. 4626-27, 5008. In the past, some of Harris's peers failed to hit their goals four or five (if not more) quarters in a row yet had not received counseling letters. ROA.4837.

Harris produced revenue of around $57 million in FY2018, higher than several of her peers. ROA.4807, 5913. Although her sales in FY2019 were less than her previous year's skyrocketing figures, sales of her peers were also down. ROA.4630-31. At the end of May 2019, none of Lamb's reports (i.e., Harris's peers) had all of

their team members above plan. ROA.4622-23. FedEx nonetheless used the current figures as an excuse for disciplining Harris, even though for others it attributed the downturn to economic factors; FedEx admits that its policy is not to fire a person after a bad year and salespersons who win the President's club often fail to repeat their success the following year because their goals are substantially adjusted upward. ROA.4263, 4479, 4513-14, 4627-30, 4778-7979

On June 28, 2019, Harris submitted a second complaint to HR, reporting that Lamb's letter of concern was a retaliatory response to Harris's original complaint of Lamb's discriminatory treatment. ROA.4515, 4837, 5683. Although Harris performed as well as her peers, those peers were not written up, given a performance improvement plan, or even a documented discussion. ROA.4838. Harris also filed a charge with the EEOC outlining the discrimination. ROA.4934-36.

Lamb obtained approval for the letter of counseling from the HR strategic advisor. ROA.4395. At Harris's invitation, the HR strategic advisor met with Harris and her team members in the summer of 2019, each of whom reported positive feedback about Harris. ROA.4392-93.

On August 24, 2019, Lamb emailed her supervisor, HR, and Fed Ex's legal department that "in addition to performance," Lamb had "extreme concern with [Harris's] behavior." ROA.4604. Lamb characterized Harris's complaints about her

as "now taking the approach of arguing about many things" and "demonstrating an insubordinate attitude." ROA.4604. Lamb contended that Harris was being insubordinate by contesting the discipline. ROA.4604, 4616.

Harris's sales performance continued to improve, ROA.4608-10, and to exceed the sales averages of several of her White peers. ROA.4617-18.

Clark completed his investigation of Harris's second internal EEO complaint on September 6, 2019, more than the maximum 30 days. ROA 4937, 5688. Harris later learned that this report misrepresented facts and accused Harris of saying things she had never said. ROA.5689, 5694, 5696, 5739, 5892, 5908, 5981; *see* ROA.5696, 5986-89.

The report did not address the reason or basis for skipping the documented discussion, ROA.5688-92, or the fact that Lamb did not discipline Harris's White peers who were not meeting planned goals (other than Holley, who was another victim of discrimination and retaliation by Lamb). ROA.5688-92. Nonetheless, the report confirmed that Lamb knew the 4G Dental address was in Harris's district. ROA.5691-92.

Without mentioning Harris's stellar performance for years culminating in the President's Club award the year before, ROA.5688-92, or the economic difficulties that affected Harris' peers as well (none of whom were disciplined, ROA.5688-92),

the report concluded that the allegations were unsubstantiated and closed the investigation with no recommendations. ROA.5692.

On September 13, 2019, one week after the conclusion of this second investigation, Lamb gave Harris a letter of warning, a performance improvement plan, and a low performance review. ROA.4399, 4515. On November 9, 2019, Lamb reports to HR and Lamb's supervisor that Harris's opposition is insubordination and insulting. ROA.4611, 4614-16.

FedEx acknowledges that additional corrective action, a letter of warning, or a performance improvement plan could be a form of retaliation and that a disciplinary action could be a red flag of retaliation. ROA.4406-07. The FedEx HR strategic advisor was unaware that in Harris's 12 years at FedEx before June 2019, she had never received any form of disciplinary action. ROA.4407.

FedEx acknowledges that Harris opposed and reported discrimination and retaliation, and that if a manager starts shifting explanations on reasons for disciplinary actions, that could be a red flag. ROA.4423-24.

FedEx's HR strategic advisor understands that treating an employee differently from a peer, lying and false statements, and unfairly comparing an employee with a peer can each be signs of discrimination. ROA.4426. Harris submitted another EEO report on September 20, 2019. ROA.4515. Without slowing

down, Harris began to work more from home, taking some of her office pictures and decorations, so that she would not have to be around Lamb who was going to give her a constant beatdown. ROA.4955-57.

Continuing to experience ongoing retaliation, Harris made her fourth internal EEO complaint on December 4, 2019. ROA.4516, 5953, 5725-26. On December 31, 2019, FedEx provided a finding of unsubstantiation to Harris's third complaint and Lamb immediately submitted a request to have Harris's employment terminated January 7, 2020. ROA.4954, 4959-60, 5731, 5742-44.

The excuses Lamb gave for her actions in the third investigation are similar to the excuses she gave in her request for Harris's termination. ROA.5731-34, 5742-44. Lamb claims that Harris's sales district missed revenue targets in the past seven of eight quarters. ROA.5732, 5742. In fact, Harris exceeded her goals in at least two of the last eight quarters, ROA.4518, 4519-20, 5008. If the BJ Services' goal had been adjusted correctly, Harris would have attained her goals for the first quarter of FY19 as well, 4626-27, 5008, thus putting her in the same position as two other peers (Hickman and Golden-McElroy – who had lower goals, and one of whom had lower revenue) who did not file complaints and were not given corrective action. ROA.4522-23, 4530, 4620-21, 5732, 5910-11.

FedEx claims to have terminated Harris for not meeting three of five performance requirements on her performance improvement plan, specifically close business tracking, pricing, and revenue attainment. ROA.4682, 4692, 5742. But Harris was not the lowest among her peers in closed business tracking or pricing, ROA.4693, and Harris was even with two peers on goal attainment. ROA.4522, 4626-27, 5008, 5732, 5910-11. Lamb acknowledged that Harris's number of calls on customers was always high, making more calls than every other peer, except possibly Holley. ROA.4551-51.

Lamb admitted that the reason stated in the request for termination that Harris had not performed seven out of eight quarters was not true because the final quarter had not been completed. ROA.4518, 5742. At the time, there were no leading indicators to show whether the team was improving or declining in that last quarter. ROA.4518.

One of the shifting excuses FedEx used for terminating Harris was that she had a year-over-year revenue decline, but her revenues increased in 2018. ROA.4510-11, 5910-14. Lamb did not even know the year-over-year revenue increases or decreases except for the last year, and Lamb knew that Harris had a great year in FY 2018. ROA.4510-11. ROA.4511. In FY 2018, Harris had a stellar year and brought in more than everybody else on Lamb's team, except perhaps one person.

11

ROA.4630. At the time FedEx terminated Harris, FedEx knew that it was possible that the other District Sales Managers had lower sales than Harris for the last quarter. ROA.4521.

Instead of coaching to a number, FedEx's coaching program focused on coaching to the activities that a person does every day to help them get better at the job. ROA.4709. There are many important job functions, other than revenue goal attainment, that also lead to success in the District Sales Manager role. ROA.4523.

### III.   FedEx Failed to Comply with Established Human Resources Standards Designed to Prevent Discrimination and Retaliation in the Workplace.

Harris's expert, Coneisha Sherrod, testified that if FedEx had complied with established human resource standards, its wrongful discrimination and retaliation against Harris would have been prevented. ROA.4305. Sherrod has worked in the human resources industry over 20 years, is certified by Society for Human Resource Management (SHRM) and the Human Resource Certification Institute (HRCI), has led numerous HR teams, has an MBA and Bachelor's degree, and has served as a Vice President of Human Resources for an organization. ROA.4306.

Sherrod testified that workplace training on statistics of discrimination and retaliation in the workplace, which aids in understanding the degree of danger or risk of discrimination, is necessary to prevent discrimination and retaliation in the

workplace. <u>ROA.4308-09</u>. Sherrod opines that discrimination and retaliation is preventable if a company follows basic protocols. <u>ROA.4310</u>.

Sherrod testified that assuming Harris's claims were true, which she acknowledged is for the jury to decide, the system failure in this case resulted from FedEx's failure to hire qualified HR managers, failure to train its HR managers, and failure to supervise its HR managers to enforce basic employment laws. <u>ROA.4304, 4311</u>. Sherrod testified about industry standard checklists or protocols for hiring qualified HR persons, training managers to follow discrimination and retaliation laws, and monitoring the workplace. <u>ROA.4313-16</u>.

FedEx acknowledged and agreed to many of the same opinions as Sherrod. FedEx acknowledged that it has a duty to prevent discrimination and retaliation. <u>ROA.4375</u>. FedEx's HR strategic advisor knew that retaliation is potentially a big problem in the United States, and that FedEx should have hired qualified human resource managers, trained its managers to follow discrimination and retaliation laws, and supervised its managers to comply with discrimination and retaliation laws. <u>ROA.4427</u>.

FedEx's HR strategic advisor agreed that FedEx should care about workplace laws and should monitor the workplace to make sure that FedEx and its employees are not discriminating or retaliating, neither of which should be tolerated.

13

ROA.4427-28. HR advisors should have an appropriate number of employees to monitor so that they are not overwhelmed at work. ROA.4429. She has about 2,000 employees to oversee. ROA.4429. She was not trained to understand if an investigation is fair or unfair. ROA.4425-26. She received specific training on discrimination and retaliation at FedEx only one time. ROA.4385. In seven years with the company, she does not recall ever substantiating an EEO complaint. ROA.4362, 4377.

## IV.    FedEx's Conduct Caused Harris Great Physical and Emotional Distress.

Lamb's adverse treatment of Harris caused Harris great stress and anxiety. ROA.4967-68. Harris thought she could go to HR to share her concerns about retaliation, but HR offered her no assistance. ROA.4967. Rather than protect her, HR ignored her complaints, thereby compounding the humiliation of the retaliation, bullying, and aggressive treatment she suffered on a daily basis. ROA.4967-8.

FedEx's mistreatment of Harris caused her significant emotional and physical harm, including severe issues with dry heaving due to the anxiety, worry, and stress she faced every day at work, to the point where her esophagus contracted severely. ROA.4968-9. The esophageal contraction and severe dry heaving exacerbated a pre-existing condition and caused significant health issues. ROA.4969. FedEx's

treatment of Harris prior to termination also affected Harris's sleep and caused her to gain weight. ROA.4969-70.

Harris has overcome much adversity in her life, but she will never overcome the humiliation and indignity she suffered at FedEx. ROA.4974. It is something that will live with her forever. ROA.4974.

The termination plays over and over in Harris's mind. ROA.4976. Harris continues to try and rebuild a new work foundation but struggles. ROA.4976. Immediately following her termination, Harris was in a dark place. ROA.4976. Harris continues to suffer emotional distress, mental anguish, and loss of enjoyment of life even today. ROA.4976. It never goes away. ROA.4976. Every time Harris sees a FedEx truck, she wants to look away. ROA.4978. She met with a counselor for treatment on her emotional distress. ROA.4978.

A pastor who helped Harris navigate her way through corporate America while she worked at FedEx observed Harris when FedEx first hired her and saw her excitement as she embarked on her new career. ROA.4895. When FedEx terminated Harris, he saw how distraught and betrayed she was, how emotionally destroyed. ROA.4896. FedEx was supposed to be her lifelong career. ROA.4896. In the middle of a restaurant right after FedEx terminated her, she simply lost it, bursting into tears. ROA.4896.

Harris's cousin and friend saw Harris become more distant and change personality, becoming less bubbly and no longer outgoing. ROA.5151. Harris gained weight because of the stress, becoming more distant and sad, staying in her shell. ROA.5153. Harris just was not herself. ROA.5153.

Another lifelong friend saw Harris go through the ordeal with FedEx. ROA.5154. Harris had always made a big deal about working for FedEx; she was known as Ms. FedEx to their friend group because Harris was so committed to the business. ROA.5155. It was a shocking contrast to see how Harris changed after she was terminated. ROA.5157, 5159.

## SUMMARY OF THE ARGUMENT

**I.** FedEx's six-month contractual bar on all claims is unenforceable, not only with respect to Harris's Title VII claim (as FedEx concedes), but with respect to her claim under the Civil Rights Act of 1866. Parties may not contractually agree to a shortened limitation that is unreasonable or contrary to public policy. The Supreme Court has held that a six-month limitations period for a Civil Rights Act of 1866 claim is unreasonable and manifestly inconsistent with the central objective of civil rights statutes. Texas law also prohibits limitations on contract-related claims if shorter than two years. Furthermore, Harris did not knowingly, intelligently, and voluntarily waive the statutory limitations period on her civil rights claims.

16

**II.** The evidence at trial, particularly when construed in favor of the verdict with all inferences drawn in Harris's favor as it must be, fully supports the jury verdict. An exceptional employee who received the highest awards, Harris demonstrated that she was treated less favorably than her White peers by her new manager. When she reported the discrimination, the new manager disciplined her on pretextual performance grounds, even though Harris was performing as well or better than her White peers. When Harris reported the retaliation, the manager disciplined her further, characterizing her complaints as insubordination.

FedEx Failed to follow its own policies and deliberately sabotaged her sales performance. FedEx failed to hire qualified HR representatives or to adequately train or support them. Its purported investigations into Harris's complaints of discrimination and retaliation were inadequate and the results were predetermined and contrary to the evidence.

FedEx terminated Harris shortly after her last report of discrimination and retaliation for reasons the jury could reasonably conclude were false or not credible. FedEx admits that the principal purported reason for her termination, failure to meet sales goals in seven of eight quarters, was untrue.

**III.** The jury's $1,180,000 compensatory damages award is supported by the evidence, given the harm to Harris's dignity and reputation from persistent

retaliation that continued for nearly a year. The "maximum recovery" rule does not apply to this case because the damages are not based on garden-variety mental anguish and because FedEx cites no other case with factually similar claims for dignity and reputational harms. *See Learmonth v. Sears, Roebuck & Co.*, <u>631 F.3d 742, 739</u> (5th Cir. 2011) (maximum recovery rule not implicated where case presents unique facts). Harris also provided compelling damages evidence that the jury could reasonably have relied upon.

The punitive damages award is within constitutional bounds as well. Although the Supreme Court has stated that punitive damages in most cases should be limited to a single-digit multiple of compensatory damages, there is no constitutional bright line and the evidence in this case supports the jury's higher ratio.

The district court did not abuse its discretion in allowing Harris's HR expert witness to testify; her opinions were supported by practices, publications, and methodologies that are generally accepted in the HR community (and were accepted by FedEx's own HR representatives). It was permissible for Harris's expert to testify based on facts presented by her attorney, and the expert freely acknowledged that her opinions might change if any of those facts were not correct. The Supreme Court has long allowed experts to express hypothetical opinions based upon assumed facts.

## ARGUMENT

### I.    The Six-Month Contractual Limitation Does Not Apply and Is Unenforceable.

The Supreme Court has held that a six-month limitation for filing suit under Section 1981 is unreasonable.

#### A.    Harris Did Not Knowingly and Voluntarily Waive the Statutes of Limitation on Her Civil Rights Claims.

Parties may contractually shorten a statute of limitations only if the shorter period is itself reasonable and fairly imposed. *See Order of United Commercial Travelers of America v. Wolfe*, 331 U.S. 586, 608 (1947). A contractual limitation shortening a statutory limitations period cannot be enforced if it was not entered into "knowingly, intelligently, and voluntarily." *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 358 (6th Cir. 2004). In particular, "[w]aivers in civil rights cases must be carefully scrutinized for voluntariness." *Id. cf. Watkins v. Scott Paper co.*, 530 F.2d 1159, 1172 (5th Cir. 1976) ("A waiver of a federal remedial right is not lightly to be inferred[.]"); *Zavala v. City of Houston, Tex.*, 196 F.3d 1256, 1999 WL 800008, *2 (5th Cir. 1999). ("Any writing asserted as a waiver must specifically address the rights that it allegedly waives and must be strictly construed. Such a degree of specificity is necessary to demonstrate an actual voluntary and knowing waiver.

Furthermore, any ambiguity contained in a waiver, like any other contract, must be construed against the party who drafted it.").

The contract language that FedEx relies upon is set forth in small, hard-to-read print at the end of her employment application. ROA.428; RE 8. FedEx presented it to Harris at the beginning of her employment along with many other introductory documents. ROA.1693-1708. She does not remember reading that provision and no one pointed it out to her; nor is it reasonable to expect her to remember the small print of a document 12 years after her termination. ROA.1693-1708.

During the six-month period after the termination, Harris was trying to find a job. ROA.1693-1708. She had to move to Dallas, could no longer afford her prior attorneys, and needed to find an attorney who would take the case on a contingency. ROA.1693-1708. Harris was unaware that her employment application purported to strip her of her statutory right to a four-year limitation, and during those six months she was waiting for a response from the EEOC, with which she had filed a charge. *Id.* Harris did not voluntarily or knowingly waive her right to the full statutory limitations period on her Title VII and Section 1981 claims.

### B. FedEx Concedes that the Six-Month Contractual Limitation Is Unenforceable as to Plaintiff's Title VII Claim.

Even if Harris had knowingly and voluntarily waived the statutory limitations period on her civil rights claims, the six-month contractual limitation in her employment contract would still indisputably be unenforceable against her Title VII claim. Although FedEx weakly protests in passing that Plaintiff should not have been allowed to amend her complaint to add her Title VII claim, FedEx does not actually challenge the district court's order granting leave to amend or raise that as an issue presented on appeal. *See* AOB at 5. Nor does FedEx argue that the six-month contractual limitation is enforceable as to Title VII. To the contrary, FedEx concedes that "courts have 'found that a six-month contractual limit with respect to filing a Title VII claim in court is unreasonable'…." AOB at 31 (quoting *Njang v. Whitestone Grp., Inc.*, 187 F.Supp.3d 172, 180 (D.D.C. 2016)). Thus, it is undisputed that the six-month contractual limitation is unenforceable as to Plaintiff's Title VII claim.

### C. The Six-Month Contractual Limitation Is Equally Unenforceable as to Plaintiff's Section 1981 Claim.

Section 1981 does not have an express statute of limitations provision, but since it was modified in part by the Civil Rights Act of 1991, the four-year catch-all

limitation period provided in Section 1658 for civil actions arising under Acts of Congress now applies. *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 383 (2004).[1]

Supreme Court authority and the immeasurable importance of the public policy behind the Civil Rights Act of 1866 make clear that a six-month contractual limitation is *not* reasonable as applied to Section 1981 claims that seek to vindicate important civil rights. Congress passed the Act to give "practical effect and force" to the Thirteenth Amendment. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 434 (1968) (quoting a Congressional comment, Cong. Globe, 39th Cong., 1st Sess., 43). Congress believed it "was approving a comprehensive statute forbidding *all* racial discrimination affecting the basic civil rights enumerated in the Act." *Id.* at 435. Indeed, the Civil Rights Act constituted an initial blueprint for the Fourteenth Amendment. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 721 (1989) (quoting *General Building Contractors Assn., Inc. v. Pennsylvania,* 458 U.S. 375, 389 (1982)).

In *Burnett v. Grattan*, 468 U.S. 42 (1984), the Supreme Court considered whether, under §1988, it was appropriate to borrow Maryland's six-month statute of limitations for state civil rights claims and apply it to §1981 claims. *Id.* at 45. The

---

[1] Previously, Section 1988 provided the guidance for the applicable statute of limitations for civil rights claims. *See* 42 U.S.C. § 1988(a); *see also Burnett v. Grattan*, 468 U.S. 42, 48 (1984). In 1990, Congress enacted a catch-all statute of limitations for civil actions arising under Acts of Congress. *See* 28 U.S.C. § 1658.

Supreme Court emphatically answered 'no,' explaining that a six-month limitations period would be "manifestly inconsistent with the central objective of the Reconstruction-Era civil rights statutes, which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." *Id.* at 54. Elaborating on these concerns, the Supreme Court explained that a six-month limitations period was not sufficiently responsive to the characteristics of litigation under the federal Civil Rights statutes and does not account for the practicalities of preparing for litigation; the time for an injured person to recognize the constitutional dimensions of the injury, obtain counsel or prepare to proceed pro se, conduct enough investigation to draft pleadings that meet the requirements of federal rules, establish the amount of damages, prepare legal documents, pay a substantial filing fee or prepare additional papers to support a request to proceed in forma pauperis, and file and serve a complaint. *Id.* at 50-51.

In finding the six-months unreasonable, the Supreme Court noted that before filing suit, the litigant must look ahead to the responsibilities that immediately follow filing of a complaint, be prepared to withstand various responses, such as a motion to dismiss, as well as to undertake additional discovery. *Id.* at 51 (noting that the administration of justice is not well served by the filing of premature, hastily drawn complaints).

Although *Burnett* was about borrowing statutes of limitations from analogous state laws under §1988, the Supreme Court's reasoning is significant to contractual limitations: the unreasonableness of the six-month period. And, state concerns, marginal when balanced against policies underlying the Civil Right Act of 1866, are inappropriate for civil rights claims. *See Burnett*, 468 U.S. at 53.

The decision in *Burnett* was abrogated on other grounds by *Wilson v. Garcia*, 471 U.S. 261, 272–76 (1985), *see Woods v. Illinois Dep't of Child. & Fam. Servs.*, 880 F. Supp. 2d 918, 922 (N.D. Ill. 2012), aff'd as modified, 710 F.3d 762 (7th Cir. 2013); *Burnett's* analysis of reasonableness and public policy continues to apply. *See Woods*, 880 F.Supp.2d at 924. Many courts continue to cite *Burnett* favorably or at least uncritically. *See Felder v. Casey*, 487 U.S. 131, 139–40 (1988) (recognizing disapproval of "a truncated time in which to file suit, because such statutes inadequately accommodate the complexities of federal civil rights litigation and are thus inconsistent with Congress' compensatory aims."); *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1484 (11th Cir. 1989) (state limitation applies unless it conflicts with federal policy); *Hindes v. F.D.I.C.,* 137 F.3d 148, 169 (3d Cir. 1998) (*Burnett* and *Felder* hold that a limitation cannot be inconsistent with objectives of federal civil rights legislation); *McIlwain v. Dodd*, No. 3:21-CV-406-RGJ, 2022 WL 492986, at *5 (W.D. Ky. Feb. 17, 2022) (recognizing modification by *Wilson*): *Miller v. Knox Cnty.,*

No. 98-CV-78-B, 2001 WL 15528, at *2 (D. Me. Jan. 5, 2001) (state law cannot impede Section 1983 claims).

### D. The Six-Month Contractual Limitation Is Unenforceable Under Texas Law.

The six-month contractual limitation is unenforceable as a matter of Texas state law which also prohibits enforcement of contracts that violate public policy. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004); *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 490 (Tex. 2016) ("[W]hen a contractual arrangement is inconsonant with public policy expressed in a regulatory statute, preservation of contractual freedom and its 'indispensable partner'—contract enforcement—must yield."); *Woolsey v. Panhandle Ref. co.*, 131 Tex. 449, 456 (1938).

Texas expressly prohibits contractual limitations shorter than two years for suits based on the contract or agreement. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.070 ("[A] person may not enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to a period shorter than two years. A stipulation, contract, or agreement that establishes a limitations period that is shorter than two years is void in this state."). This statutory prohibition invalidates FedEx's attempt to contractually impose a six-month limitation on claims arising from Harris's employment contract;

Harris's §1981 claim is fundamentally a claim for equal enjoyment of the terms and conditions of that contract. *See* 42 U.S.C. §1981 (prohibiting "racial discrimination in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998) (at-will employee stands in a contractual relationship with his employer and thus may maintain a cause of action under §1981).

At trial, the District Court provided additional support for its conclusion that FedEx could not rely upon its shortened limitations period for plaintiff's §1981 claim, finding the contract provision "inapplicable" to Harris's claims by its terms because it was tied to the statement that the employment application "constitutes the entire and final agreement between the parties." ROA.5214; RE 7. Giving effect to all the language in the section, the limitation applies to "lawsuits about events arising out of this contract of employment"— not discrimination or retaliation claims under the Civil Rights Act of 1866. ROA.5213-14. If Harris's claims are construed as "arising out of this contract of employment," then Texas's bar on contractual limitations shorter than two years for suits based on the contract or agreement squarely applies and expressly prohibits enforcement of the six-month limitations period.

### E.      Contrary Decisions Are Not Binding.

FedEx notes that some other courts have concluded that a six-month contractual limitation is enforceable, including against a §1981 claim. *See e.g., Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 358 (6th Cir. 2004); *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1205 (7th Cir. 1992); *Njang v. Whitestone Grp., Inc.*, 187 F. Supp. 3d 172, 178-79 (D.D.C. 2016); *Morgan v. Fed. Exp. Corp.*, 114 F. Supp. 3d 434, 442 (S.D. Tex. 2015); *Barfield v. Fed. Express Corp.*, 351 F. Supp. 3d 1041, 1052 (S.D. Tex. 2019) (applicable to ADEA claim). None of those decisions, however, consider or address *Burnett* or the Texas Civil Practice and Remedies Code §16.070. The District Court here, by contrast, correctly held that the six-month limitation period "cuts against public policy and sidesteps a federal administrative process designed to meet and defeat long-standing policies of bias and discrimination in the workplace." ROA.2365; RE 5. *Burnett* is dispositive: a six-month contractual limitation is unreasonable and contrary to public policy. The limitation is unenforceable as a matter of both federal and Texas state law.

## II.   The Jury's Retaliation Verdict Is Firmly Supported by the Evidence at Trial.

Judgment as a matter of law ("JMOL") is appropriate only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that

issue," Fed. R. Civ. P. 50(a), an onerous standard that is met only "when the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003). In reviewing the record, the Court "must draw all reasonable inferences in favor of the nonmoving party, and [it] may not make credibility determinations or weigh the evidence.'" *Id.*; *see Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). Thus, although the Court should review the record as a whole, it "must disregard evidence favorable to the moving party that the jury is not required to believe." *Laxton*, 333 F.3d at 577; *see Reeves*, 530 U.S. at 151. That is, the Court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (quoting 9A C. Wright & A. Miller, Fed. Practice & Proc. §2529, p.300 (2d ed. 1995)).

FedEx's statement of facts in its brief is not helpful because it ignores evidence overwhelmingly supporting the verdict. *See United States v. Moore*, 708 F.3d 639, 646 (5th Cir. 2013); *Foradori v. Harris*, 523 F.3d 477, 494 (5th Cir. 2008) (Defendant

28

"simply ignores the testimony of its managers and employees").[2] Applying the correct standard, the evidence overwhelmingly supports the jury's verdict finding that FedEx retaliated against Harris for engaging in the protected activity of filing complaints of race discrimination, in violation of Title VII and Section 1981. The district court correctly denied FedEx's motion for JMOL.

## A.    Direct Evidence of Retaliation.

Direct evidence is evidence, which if believed, proves the fact in question without inference or presumption. *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008). The evidence must be directly connected to an adverse action and not just inferred from anger at the opposition. *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 489 (5th Cir. 2013).

Harris presented direct evidence of retaliation.[3] Lamb admits that she reported Harris to HR and Lamb's supervisor for opposing the discipline. ROA4602-04. The purpose of the report was to "discuss next steps" for Harris.

---

[2] FedEx started the trial by discriminating against a Black prospective juror. The district court sustained plaintiff's *Batson* challenge to FedEx's strike of the only remaining Black prospective juror eligible to serve on the panel. ROA.4212-18.

[3] To say that the jury "squarely" rejected discrimination is debatable. The jury disagreed over the discrimination question during the first day of deliberation. *See* Jury Notes Number One and Two. ROA.5608.

ROA.5947. Reporting an employee as insubordinate for opposing discrimination and retaliation might well dissuade a reasonable person from complaining. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). *But see DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (warning for protected activity not adverse based on particular circumstances of case) (distinguished by *Ramos v. Performance Contracting Inc.*, No. CV H-17-2852, 2019 WL 1980399, at *2 (S.D. Tex. May 3, 2019)).

Lamb tells HR and her supervisor in August 2019, "In addition to performance, I have extreme concern with her behavior." ROA.4604, 5947. The behavior for which Lamb is upset "is Harris is now taking the approach of arguing with me about many things." ROA.4604, 5947. "She is demonstrating an insubordinate attitude." ROA.4604, 5947. Lamb admits that she is saying Harris is insubordinate for opposing the discipline. ROA.4604. Lamb admits to the same comments November 2019, adding that the protected activity is "insulting." ROA.4611, 4614, 4116. These statements satisfy the test of direct evidence: 1) the statements are related to Harris's protected activity, (2) proximate in time to ongoing discipline and a termination on the way, (3) made by Lamb who has authority over the employment decisions at issue, and (4) related to the employment decisions at issue – the reasons for discipline and termination. To the extent the

30

comments are not direct evidence, they are properly considered with inferences as indirect evidence of retaliation. *See Etienne* at 489.

### B.    Indirect Evidence of Retaliation Claims.

Under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), an employee plaintiff establishes a prima facie claim of unlawful retaliation by showing that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) a causal connection exists between the protected activity and the adverse employment action. *See Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688, 690-91 (5th Cir. 2007). If the plaintiff makes this prima facie showing, the burden shifts to the employer defendant to articulate a "legitimate, non-retaliatory reason" for the adverse employment action. *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). If the employer supplies a justification, "the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's nondiscrimination explanation is pretextual." *Id.*

Following a jury trial, "the *McDonnell-Douglas* burden-shifting framework 'becomes moot,'" and a court considering a motion for JMOL need only evaluate whether legally sufficient evidence supported the jury's finding on the ultimate question of "whether, 'but for' the protected conduct, the employer would not have

engaged in the adverse employment action." *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 359 (5th Cir. 2017) (quoting *Douglas v. DynMcDermott Petro. Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998)). Nevertheless, the Supreme Court has instructed that evidence satisfying the *McDonnell-Douglas* standard at trial is sufficient to deny a Rule 50 motion. *See Reeves,* 530 U.S. at 147. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id* at 148; *see Smith v. Bd. of Supervisors of S. Univ.*, 656 F. App'x 30, 33 n. 4 (5th Cir. 2016) (but-for test satisfied by the third step of *McDonnell Douglas*); *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (but-for causation does not demand anything beyond what is already required by the *McDonnell Douglas* "real reason" standard).

The prima facie case for retaliation does not require comparators, and retaliatory adverse employment actions need not rise to the level of ultimate employment decisions. *See Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826-27 (5th Cir. 2019). A causal connection in the prima facie case can be shown by the close proximity of the protected activity and the adverse action. *See Gosby v. Apache Indus. Services, Inc.*, 30 F.4th 523, 527 (5th Cir. 2022); *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir. 2022); *Evans v. City of Hous.,* 246 F.3d 344,

354 (5th Cir.2001). Lamb disciplined Harris each time within days of the first opportunity after each investigation was closed and terminated Harris within days after Harris's last complaint. ROA.5673-82, 5688-5721, 5731-44. Harris meets the temporal proximity test.

The Supreme Court recently explained that but-for causation does not require that the protected conduct be the *sole* cause; indeed, it need not even be the primary cause. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020). Under this standard, disproving one of the employer's reasons is enough. *See Jiang v. Tex. Comm'n on Envtl. Quality*, 321 F. Supp. 3d 738, 747 (W.D. Tex. 2018) ("A reasonable jury could conclude that Defendants were not being truthful about some of their stated reasons for terminating Jiang, infer from that conclusion that the other stated reasons are also untrue, and then further infer from the totality of the evidence that the true reason was discriminatory."); *see also* Robert S. Mantel, "Pretext After Bostock—Disproving One of the Employer's Reasons is Enough," 28 Wash. & Lee J. Civ. Rts. & Soc. Just. 65, 68 (2022). FedEx could have terminated Harris both for poor performance and retaliation; and if retaliation was a necessary motivation, that is enough to satisfy the but-for test.

###### C.    The Last Element to Show Causation Is Pretext.

The undisputed evidence established that Harris was an exemplary employee at FedEx for 12 years who received numerous awards and accolades and multiple promotions. ROA.4352-53, 4475, 4477, 4785-86, 4788-90, 4799, 4800-02. In 2017, she was promoted to District Sales Manager and won her second President's Club award after her first full year in that position. ROA.4805-06. Her new supervisor Michelle Lamb, however, seemed determined to cut down Harris's meteoric rise and to see Harris fail in her position. Whether motivated by racial animus or not, the undisputed evidence showed that Lamb treated Harris differently and worse than she treated Harris's White peers, holding Harris to different performance standards, sabotaging Harris's sales performance record, thwarting Harris's efforts to attend FedEx's Pathway leadership program while authorizing Harris's White peers to attend, and falsifying statements to HR advisors and investigators.

Despite Harris's impressive record of service, FedEx terminated her shortly after she stood up for herself and filed multiple complaints of racial discrimination and retaliation. A significant pretextual fact is that Lamb admits that a key reason for terminating Harris, that she missed her goal seven out of eight quarters, is false. ROA.4518, 5742.

### i.      Disparate Treatment.

The Fifth Circuit has "recognized that one method of creating a genuine issue as to pretext is by presenting evidence showing disparate treatment." *Stennett v. Tupelo Pub. Sch. Dist.*, 619 Fed. Appx. 310, 317 (5th Cir. 2015). FedEx treated Harris differently that her White comparators who did not report or oppose discrimination. For example, FedEx sabotaged Harris's performance by holding her responsible for a large customer for which she had no control, having been assigned to a White peer. FedEx promoted and allowed White peers to participate in FedEx's national development program while discouraging and refusing to pay for Harris to attend. FedEx ignored Harris's stellar career that included the highest sales awards at FedEx, singling her out in a year when most salespersons across the company were not meeting goals, including Harris's manager, Lamb. None of Harris's White peers were disciplined except one who also complained of discrimination.

### ii.      Lack of or Suspicious Investigation.

The lack of an investigation is evidence of pretext. *See E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 624-625 (5th Cir. 2009) (no attempt to check the accuracy of incorrect assumptions). An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the

"defendant's explanation ... unworthy of credence" and permits an inference of discrimination. *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 828–29 (5th Cir. 2022).

The failure to interview key witnesses is also relevant. *See* e.g., *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010); *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008); *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 529-30 (6th Cir. 2005).

FedEx found evidence substantiating the claims, then falsely stated the claims were not substantiated. FedEx ignored the timeline showing a complaint, then adverse action, then another complaint, then another adverse action, then another complaint, and then termination. The investigation also included false information about Harris not meeting goals for a number of consecutive quarters. The reports excluded notes or comments of key witnesses it interviewed, including a witness to the hostile and unfair treatment of Harris.

### iii.    Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions.

Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (internal quotation marks and citation omitted). Any evidence that casts doubt on the

employer's assertion is in play, and a fact dispute exists so long as the plaintiff's evidence "is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. *Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 325–26 (5th Cir. 2021) (quoting *Watkins v. Tregre*, 997 F.3d 275, 283-84 (5th Cir. 2021).

FedEx's proffered explanations are weak, implausible, inconsistent, incoherent, and contradictory. FedEx cannot substantiate that Harris is a poor performer compared to all of her White peers. For example, FedEx states that Harris failed to meet goals four consecutive quarters in a row when FedEx placed her on a performance improvement plan after she complained of hostile work environment and discrimination. It was not true. Regardless, other White peers did not meet goals four quarters in a row and were not disciplined.

### iv.    Subjective Criteria.

Subjective criteria are inappropriate for the employer's explanation. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001). Deciding the appropriateness of using measures that is "in the eye of the beholder" is "the trier-of-fact's duty to determine." *Id.* at 682. *See also Crawford v. W. Elec. Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980). The defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to

37

demonstrate pretext. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981) ("The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions"). Lamb's criticism that Harris was not a good coach is a subjective conclusion.

### v.    Failure to Follow Policies.

The failure of an employer to follow its policies in the matter is evidence of pretext. *See Lindsey v. Bio-Med. Applications of Louisiana, L.L.C.*, 9 F.4th 317, 326 (5th Cir. 2021) (employer's failure to follow its own progressive discipline policy); *Russell v. McKinney Hosp. Venture,* 235 F.3d 2219, 224 (5th Cir. 2000) (reversing JMOL in part because of pretext evidence that employer had not followed its progressive discipline policies) (ADEA); *Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir. 1998) (ADEA).

FedEx did not follow its own policy of having a Documented Discussion before giving a Letter of Counseling within days after FedEx counseled Lamb after investigating Harris's complained of hostile work environment and discrimination, Lamb gave Harris a Letter of Counseling without following FedEx's policy of issuing a Documented Discussion first.

Additionally, FedEx did not follow its alignment policy assigning customers and goals in alignment with the salesperson or sales manager's territory, sabotaging

Harris's performance pretext to retaliate. The overwhelming facts support the verdict and judgment.

### III.    Damages Should Stand, Even if Adjusted.

#### A.    The Jury's Compensatory Damages Award Is Supported by the Unique Facts Presented and Is Not "Clearly Excessive."

In the Fifth Circuit, district courts enjoy "wide discretion" in awarding damages, *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990); *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir. 1988), and the district court's denial of remittitur is reviewed for abuse of discretion. *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002) (citing *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995)). This Court will set aside a district court's denial of remittitur "only when 'left with the perception that the verdict is clearly excessive.'" *Id.* (quoting *Eiland*, 58 F.3d at 183). A trial court's damages award is a finding of fact reviewed for clear error, and this Court will suggest or direct the district court to issue a remittitur only "when a jury's award exceeds the bounds of reasonable recovery." *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985).

A verdict of $1,180,000 in past and future emotional distress is not outside the bounds of reality. First, Harris's damages were unique in that they were as the Supreme Court described them: the harm to dignity and reputation. *United States v.*

39

*Burke*, 504 U.S. 229, 241 n. 12 (1992) (quoting H.R. Rep. No. 102–40, pt. 2, p. 25 (1991) (Report of Committee on the Judiciary) (noting that monetary damages under anti-discrimination statutes are "necessary to make discrimination victims whole for the terrible injury to their careers, to their mental and emotional health, and to their self-respect and dignity.").

The Supreme Court also acknowledges that compensation under Title VII includes harm to reputation. Id. at 239. "[R]acial discrimination … is a fundamental injury to the individual rights of a person." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661 (1987). *See also Monroe v. Columbia Coll. Chicago*, 990 F.3d 1098, 1100 (7th Cir. 2021), reh'g denied (Apr. 12, 2021) ("An injury resulting from discrimination produces impairments and wounds to the rights and dignities of the individual."); *Baker v. Bd. of Regents of State of Kan.,* 991 F.2d 628, 631 (10th Cir. 1993); *Mayberry v. United States*, 151 F.3d 855, 859 (8th Cir. 1998) (discussing tax consequences for dignity losses in an ERISA claim.) The injury to rights and dignity of Harris is different from garden variety mental anguish. Harris has no comparison cases. Hers should, at a minimum, set the standard.

### B.    Evidence of Compensatory Damages.

The compensatory damages in this case are unique. First, this is a case of widespread retaliation that continued for almost a year; not limited to a single

incident. The company's systemic retaliation ran deep, with Harris repeatedly seeking assistance in compliance with FedEx's policies by reaching out to management and the human resource department. She suffered three separate sham investigations and was subjected to repeated unjustified progressive disciplines, which led to her wrongful termination and FedEx destruction of her successful career. No other case is similar to the severe and repeated retaliatory acts in this case.

Second, there are no reported cases in the Fifth Circuit for dignity damages based on race discrimination and retaliation. When a review of the case law reveals that there are no factually similar cases in the relevant jurisdiction, the maximum recovery rule is not triggered. *Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008) (maximum recovery rule not applicable if no reported similar cases). Harris testified to mental anguish, humiliation, pain and suffering, emotional distress, and loss of enjoyment of life, and most importantly, damage to dignity. Experts or corroborating testimony is not required for an award of mental anguish damages. *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 470–471 (5th Cir. 2001); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998). However, Harris testified to seeing two professionals: a counselor and a pastor. Testimony by others who observed her also supported the damages. Harris did not ask for lost wages at trial. Harris found another position in sales and has been able to work her way back into management,

Case: 23-20035    Document: 111-1    Page: 57    Date Filed: 07/14/2023

but this is not where the core of her damages exists. She is a great employee, and her wages will increase. However, the memory and emotion of the treatment will last throughout her lifetime. The verdict and judgment for compensatory damages should stand.

### C.    Maximum Recovery Rule.

FedEx invokes this Circuit's "maximum recovery rule," a "'judge-made rule [that] essentially provides that we will decline to reduce damages where the amount is not disproportionate to at least *one factually similar* case from the relevant jurisdiction.'" *Lebron v. United States*, 279 F.3d 321, 325 (5th Cir. 2002) (quoting *Douglass*, 897 F.2d at 1344) (emphasis in original)). However, FedEx ignores that "[b]ecause the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'" *Id.* at 326 (quoting *Douglass*, 897 F.2d at 1339).

Where, as here, a "case presents unique facts for which there are no controlling cases in the relevant jurisdiction, the maximum recovery rule is not implicated" and this Court will "refuse to substitute [its] judgment for that of the jury." *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 739 (5th Cir. 2011) (citing *Vogler v. Blackmore*, 352 F.3d 150, 158 (5th Cir. 2003)). Thus, for example, this Court

42

held the maximum recovery rule inapplicable in a car accident case where, despite the similarity between plaintiff's initial injuries and the injuries of plaintiffs in other car accident cases, differences in plaintiff's recovery trajectory and ongoing medical treatment presented unique facts that rendered those past awards improper comparators. *See id.* at 738-39; *see also, e.g.*, *Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008) (maximum recovery rule inapplicable because there were no comparable reported cases in the relevant jurisdiction addressing recovery for pain and suffering for injuries like those sustained by the plaintiff); *Thorton v. Diamond Offshore Drilling, Inc.*, Civ. A. No. 07-1839, 2008 WL 2622998, at *4-5 (E.D. La. June 30, 2008), *aff'd sub nom. Thorton v. Diamond Offshore Mgmt. Co.*, 326 F. App'x 318 (5th Cir. 2009) (maximum recovery rule not implicated where cases on which defendant relied were over ten years old and factually distinguishable based on scope of physical and mental injuries sustained); *Raynes v. McMoRan Exploration Co.*, Civ. A. No. 08-5018, 2012 WL 1032902, at *2-3 (E.D. La. Mar. 27, 2012), *aff'd*, 508 F. App'x 285 (5th Cir. 2013) (similar)..

The only two cases cited by FedEx—both over 20 years old—are clearly distinguishable. In *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir. 2000), the only emotional distress evidence presented to the jury was plaintiff's own terse testimony in response to a single question from his counsel. *See id.* at 377. In *Patterson*

*v. P.H.P. Healthcare Corp.*, 90 F.3d 927 (5th Cir. 1996), plaintiff offered no corroborating testimony to support her own testimony, and plaintiff failed to present any evidence that she was "humiliated" or otherwise injured by her retaliatory firing. Instead, her testimony focused on the familial discord that resulted from her having to take another job further from her home and away from her children. *See id.* at 940-41. In contrast here, Harris presented evidence of humiliation and destruction of her dignity.

In choosing to highlight only *Vadie* and *Patterson*, FedEx ignores other Fifth Circuit discrimination and retaliation decisions that awarded between $100,000 and $150,000 in compensatory damages, which are more factually analogous to this case, though still factually distinguishable, outdated, and thus still improper comparators. *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827 (5th Cir. 2002) (distinguishing *Vadie* and awarding $100,000 in emotional distress damages in Title VII retaliation case where plaintiff "offered a much more detailed description of the emotional harm he had suffered, noting the effect it had on his job and on his relationship with his wife and son," including "particular manifestations of his emotional harm in health problems leading to numerous visits to a physician," all of which was corroborated by his wife); *Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) (awarding $150,000 in compensatory damages in discrimination and retaliation case under the Americans

with Disabilities Act); *Williams v. Trader Publ'g Co.*, 218 F.3d 481 (5th Cir. 2000) (upholding $100,000 emotional distress award in Title VII sex discrimination case where plaintiff testified to her "severe emotional distress," "sleep loss," "severe loss of weight," and "beginning smoking"); *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769 (5th Cir. 1996) (upholding $100,000 award for combined past and future emotional anguish to officer who experienced retaliatory transfer and testified that "she suffered depression, weight loss, intestinal troubles, and depression, and that she had to consult a psychologist because of the retaliation"); *see also Tureaud v. Grambling State Univ.*, 294 F. App'x 909 (5th Cir. 2008) (per curiam) (unpublished) (affirming $140,000 emotional distress damages award in Title VII case of retaliatory discharge).[4]

Because FedEx has failed to identify any factually analogous comparator, the maximum recovery rule is not implicated, and this Court should "refuse to substitute [its] judgment for that of the jury." *Learmonth*, 631 F.3d at 739. The jury's

---

[4] If the Court were to determine that any of these cases is sufficiently factually analogous to implicate the maximum recovery rule, the jury's compensatory damages award should be remitted to an amount no less than 150% of the inflation-adjusted value of these awards. For example, if *Forsyth* is used as the comparator, then the compensatory damages award should be remitted to no less than $290,013. *See* Bureau of Labor Statistics's CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl; *see Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 298 n.12 (5th Cir. 2019) (using this calculator to make inflation adjustments).

verdict awarding $120,000 in past emotional damages and $1,060,000 in future emotional damages is soundly supported by the record. The Court "give[s] special solicitude to findings of damages for …emotional distress, in large part '[b]ecause the assessment of damages for … emotional distress is so dependent on the facts and is so largely a matter of judgment …. [The trial judge] has seen the parties and heard the evidence; we have only read papers. The jury's assessment of damages is even more weighted against appellate reconsideration, especially when … the trial judge has approved it.'" *Vogler*, 352 F.3d at 154 (quoting *In re Air Crash Disaster Near New Orlean, La. On July 9, 1982*, 767 F.2d 1151, 1155 (5th Cir. 1985))." Moreover, the jury's damages award here falls comfortably within the range of compensatory damages awarded in other more analogous cases from other jurisdictions. *See, e.g.*, *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) (affirming $1.32 million compensatory damages award in race discrimination case); *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 513-14 (9th Cir. 2000) (affirming $1 million compensatory damages award in sex discrimination case where plaintiff testified that she "constantly worried, cried, and felt trapped and upset," spent less time with her family, "suffered stomach problems, rashes, and headaches," and sought counseling from her pastor); *Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465, 472 (6th Cir. 2010) (affirming $650,000 compensatory damages award in

retaliatory discharge case where plaintiff's termination ended an 18-year career and he testified, among other things, that his hiring was "'horrible' and 'depressing'" and caused him humiliation, embarrassment, disappointment, and other forms of mental anguish).[5]

### D. The Jury's Punitive Damages Award Should Be Affirmed.

#### i. Ample Evidence Supports the Jury's Finding that FedEx Acted with Malice or Reckless Indifference to Harris's Rights.

FedEx acknowledged that it should hire qualified and properly trained HR professionals. The HR employees who investigated Harris's claims and approved the retaliatory discipline she received were not certified and scarcely trained. Their investigations excluded interviews with important witnesses, excluded discriminatory evidence from a witness, and falsely found Harris's claims to be unsubstantiated.

FedEx's HR and management failed to supervise or monitor the workplace to recognize and prevent the retaliation, ignoring all the signs and red flags of retaliation: Harris's excellent history, false statements by Lamb, the survey showing

---

[5] Recently a district court in Washington affirmed a verdict of $1.25 in emotional distress in a disability discrimination case against FedEx Freight, Inc. *See Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *8-9 (W.D. Wash. Mar. 11, 2021).

Harris as a strong leader and Lamb as the problem, the lack of any discipline before Harris reported the discrimination, the quick adverse actions within days of the each new opportunity to punish Harris, the refusal to help Harris and restrain Lamb, the refusal to care about the law. FedEx also gave Lamb free rein to retaliate against Harris and to treat Harris worse than her peers. Indeed, Lamb admitted that that her proffered justification for Harris's termination – the supposed failure to meet goal attainment of seven out of eight quarters – was not true and conflicted with the known fact that that Harris's peers, like Lamb herself, were performing at the same level as Harris in a particularly difficult year. The malice was intense. FedEx's HR Manager overseeing the investigations agreed that a company ignoring several red flags or signs of retaliation would be reckless. ROA.5310.

### ii.   The Jury's Punitive Damages Award Is Consistent with Due Process.

FedEx's principal argument for a remittitur of the punitive damages award rests entirely on the ratio between punitive and compensatory damages. But as FedEx acknowledges, the Supreme Court has repeatedly refused to "impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *see BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) ("[W]e have consistently rejected the notion that the

48

constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991) ("[W]e cannot[] draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.").

Although as a general matter "[s]ingle-digit multipliers are more likely to comport with due process" than awards with significantly higher ratios, *Campbell*, 538 U.S. at 425, the reasonableness of a punitive damages award depends on the specific circumstances of each case, and double-digit ratios have been repeatedly approved by this Court and others. *See, e.g.*, *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993) (affirming punitive damages award 526 times the amount of actual damages); *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 440 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745 (2023) (affirming punitive damages award with a 14.5:1 ratio to back pay in Title VII race discrimination and retaliation case); *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 573-74 (5th Cir. 2002) (remitting punitive damages to an amount 37.5 times greater than the amount of compensatory damages); *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382-84 (5th Cir. 1991) (punitive damages award 500 times the amount of compensatory damages was reasonable and did not violate due process); *Glasscock v. Armstrong Cork Co.*, 946

F.2d 1085, 1088 (5th Cir. 1991) (affirming $6.1 million punitive damages award with

a 19:1 ratio to compensatory damages). "[T]he factfinder occupies the best position

to determine the amount of a punitive damages award because 'the degree of

punishment to be thus inflicted must depend on the peculiar circumstances of each

case.'" *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382 (5th Cir. 1991) (quoting

*Day v. Woodworth*, 54 U.S. 363, 371 (1852)).

The Supreme Court has identified "three guideposts" courts should consider

when evaluating whether a punitive damages award is constitutionally excessive:

"the degree of the defendant's reprehensibility or culpability; the disparity between

the harm or potential harm suffered by the victim and the punitive damages award;

and the sanctions authorized or imposed in other cases for comparable

misconduct.'" *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 885 (5th Cir. 2013)

(internal quotation marks and citation omitted; citing *Gore*, 517 U.S. at 574-75).

The first *Gore* guidepost—the "degree of reprehensibility of the defendant's

conduct"—is "the most important indicium of the reasonableness of a punitive

damages award …." *Gore*, 517 U.S. at 575. Relevant considerations include whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced

an indifference to or a reckless disregard of the health or safety of others; the target

of the conduct had financial vulnerability; the conduct involved repeated actions or

was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576-77. FedEx acted in the face of a perceived risk that its actions would violate federal law. It knew it should prevent retaliation, understood red flags and signs of retaliation, ignored Lamb's hostility to the conducted sham investigations covering up the retaliation, false findings of unsubstantiation of Harris's claims, hostility to Harris's protected activity, and false reasons for discipline and termination.

FedEx's reckless disregard for the law, the truth, and the overt repeated humiliation of Harris leading up to her termination in open violation of the law supports the finding of considerable reprehensibility.

The second and third *Gore* guideposts are the disparity between the harm and the punitive damages "the difference between [punitive damages] and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. The amount is a little less than 365 times the compensatory damages. This is a large disparity, unless the comparison is made in relation to accountability and deterrence. For a company whose net worth is almost $750 million and part of a multi-billion-dollar company, a punitive damage award in the seven figures is comparable to a parking ticket for the average person. Deterrence exists but is minimal. Our criminal system allows due process that includes death. Punishing a corporation less than its net

worth is not lethal. For punitive damages to have a deterrent effect on systemic problems at a corporation of thousands, the amount for accountability has to be substantial.

Although 42 U.S.C. §1981a imposes a $300,000 cap on damages under Title VII, there is no such cap on damages for a claim under 42 U.S.C. §1981. *See, e.g.*, *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003) (affirming $2 million punitive damages award with a 4:1 ratio in race discrimination case under §1983, refusing to apply the Title VII damages cap by analogy under the third *Gore* guidepost); *Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (affirming $1 million punitive damages award with a 28:1 ratio in racial harassment case, noting that, in contrast to Title VII, "Congress has not seen fit to impose any recovery caps in cases under §1981 (or §1983), although it has had ample opportunity to do since the 1991 amendments to Title VII").

In determining the reasonableness of an award, the net worth of the defendant corporation should be considered, for as this Court has long recognized, "[o]ne of the fundamental purposes of punitive damages is to deter a wrongdoer from future misconduct." *Eichenseer*, 934 F.2d at 1384; *see TXO Prod. Corp.*, 509 U.S. at 462 n.28 ("Under well-settled law … factors such as [net worth] are typically considered in assessing punitive damages."); *White v. Ford Motor Co.*, 500 F.3d 963, 976 (9th Cir.

2007) (discussing "the Supreme Court's and this circuit's longstanding recognition of the admissibility of net worth evidence" in punitive damages calculations"). "A mere slap on the wrist is inadequate to punish" and deter a large corporation with vast resources. *Eichenseer*, 934 F.2d at 1383 (size of corporation defendant a relevant factor justifying reasonableness of a punitive damages award 500 times the compensatory damages award); *see also, e.g.*, *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 154 (4th Cir. 2008) (upholding 80:1 ratio because "reducing the punitive damages award … would leave little deterrent or punitive effect, particularly given [defendant's] net worth"); *Jones v. Wells Fargo Home Mortg., Inc.*, 489 B.R. 645, 655 (E.D. La. 2013) (affirming punitive damages award with 10:1 ratio based in part on relative wealth of defendant corporation).

For this same reason, consideration of whether the defendant has previously been assessed a punitive damages award is appropriate. "If a lesser and comparatively small punitive damages award does not deter wrongful conduct, then a court may reason, as a matter of common sense, that a larger award is necessary in subsequent cases." *Eichenseer*, 934 F.2d at 1384 (district court reasonably concluded that $500,000 punitive damages award was appropriate because an earlier punitive damages award of $150,000 in different case evidently "had little deterrent effect").

FedEx and its related entities are repeat offenders, and a large punitive damages award is therefore necessary in order to achieve any deterrent effect. In 2006, a jury in California found FedEx's parent company, Federal Express Corporation, liable for racial discrimination and harassment and issued a $61 million verdict, including $50 million in punitive damages, which the trial judge remitted to $12.4 million. *Kamil Issa and Edgar Rizkallah v. Roadway Package System Inc., d/b/a RPS Inc., FDX Inc., d/b/a FedEx Ground Inc., Stacy Shoun, Paul Martin and Does 1 through 75*, 2006 WL 2561275.

That same year, a jury in Maryland found Federal Express Corporation liable for discriminating against another employee in violation of the Americans with Disabilities Act. *See E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360 (4th Cir. 2008) (affirming $100,000 punitive damages award (a 12.5:1 ratio to compensatory damages)). The facts of this case show that those awards did not deter FedEx from continuing to discriminate. *See, e.g.*, *Goldstine v. FedEx Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *8 (W.D. Wash. Mar. 11, 2021) (upholding $5 million punitive damages and $1.75 million emotional damage verdict in disability discrimination case).

If this Court were to issue a remittitur, at most the jury's punitive damages award should only be remitted to an amount no less than ten times the compensatory

damages award. *See, e.g.*, *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 408 (5th Cir. 2000) (remitting punitive damages from an amount 30 times larger than the compensatory damages to an amount 10 times larger); *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360 (4th Cir. 2008) (affirming punitive damages award 12.5 times larger than the compensatory damages award in discrimination case against Federal Express Corporation). The district court properly denied the motion to eliminate or reduce the damages.

### IV.    The District Court Did Not Abuse its Discretion in Permitting the Expert to Testify.

#### A.    Legal Standard.

Under Federal Rule of Evidence 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

FED. R. EVID. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000).

## B.    Analysis.

In addition to testifying at this trial in the Southern District of Texas, the Eastern District of Texas previously denied the exclusion of Sherrod testifying as an expert in *Hernandez v. Rush Enterprises, Inc.*, 4:19-CV-00638, 2021 WL 857987 (E.D. Tex. Mar. 8, 2021). The Eastern District also allowed Sherrod to testify at trial, including testifying about the same statistics in the report at issue. *Yarbrough v. Glow Networks, Inc.*, No. 4:19-CV-905-SDJ, 2022 WL 1143295 (E.D. Tex. Apr. 18, 2022)

(order entering judgment). Sherrod's report is similar to the reports in the *Hernandez* and *Yarbrough* cases, race discrimination and retaliation being the key claims in both cases.

An HR expert is essential to combat the impression that assessment of the facts by Defendant and its professionals are superior to Harris's knowledge and testimony and therefore, Defendant prevails simply on their stated credentials. An HR expert is needed to correctly explain the employment practices, policies and procedures, and rules of conduct accepted in the industry and as proper human resource practices, contrary to Defendant's unofficial, and in this case uncertified, experts in the form of Defendant's HR representatives.

The expert's opinions were reliable because they were based upon recognizable and reliable sources of information regarding human resource expectations. Sherrod also offered information on how the human resource protocols could, and arguably should, be applied in the workplace setting. Sherrod relied on professional sources—including the SHRM and the EEOC — in formulating her opinions. Sherrod's human resource techniques were part of fundamental human resource practices, supported by peer review and publications, with virtually undisputed error challenging the methodology, and generally accepted within the

human resource community. The standards, procedures, protocols, and checklists are so widely accepted, including by the Defendant, that they are rarely questioned.

Defendant contests Sherrod's report as unreliable because it assumed that certain facts were true, subject to examining documents and depositions provided in discovery. Sherrod did not testify as to the truth of the facts in the case. The jury was free to determine them. For an expert to assume a set of facts does not diminish that expert's reliability—it simply gives the opposing party another opportunity to challenge the expert's opinion.

"Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams v. Illinois*, 567 U.S. 50, 57 (2012) ("For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case."— hypotheticals) Sherrod expressed opinions on human resource practices and whether the facts as alleged conform to those practices. This was entirely proper. *See Cervantez v. Collier*, A-18-CV-1059-RP, 2019 WL 6727872, at *1 (W.D. Tex. Dec. 11, 2019); *Jones v. Slay,* 2014 WL 2804407, at *7-8 (E.D. Mo. June 20, 2014) (an expert may assume the facts as true but may not opine that a witness is believable and that the assumed facts are indeed true). Sherrod did not offer opinions about credibility or did not testify as to the truthfulness of the facts she assumed to be true.

Sherrod did not draw an ultimate legal conclusion. The purpose of human resource policies is to implement the law and prevent violations of the law and expressly refer to the law, albeit in general terms. Policies and practices cannot be discussed without discussing the law generally. Nevertheless, Sherrod did not draw ultimate legal conclusions any more than any human resource employee testifying for FedEx did. For example, the law prohibits discrimination in employment based on race. Discussing this law in context of the policies is not giving an opinion on the law. Sherrod restricted her opinions to human resource policies and practices and the qualifications, training, and supervision of the policies and practices in the industry. The Court, in the *Hernandez* case, acknowledged that Sherrod could testify as to Defendants' lack of supervision and monitoring the workplace, with the omission of "the enforcement of the laws" or "to enforce the law." *Hernandez,* at *8.

The statistics are relevant to underlying need for and importance of the policies and practices and whether FedEx intentionally or recklessly ignored a national policy concerning a known national problem. The statistics show the prevalence of the problem. They were part of the training in human resources to show the need and importance of the policies. The statistics were not statistics of Defendants and were not used for that purpose. The link is knowledge and training

concerning human resource practices, expectations, and foreseeability. Accordingly, the Court did not abuse its discretion to permit the expert to testify.

## CONCLUSION

Harris requests the Court to affirm the district court.

Respectfully submitted,

*/s/ Brian P. Sanford*

BRIAN P. SANFORD
Texas Bar No. 17630700
Elizabeth "BB" Sanford
Texas Bar No. 24100618

THE SANFORD FIRM
1910 Pacific Ave., Suite 15400
Dallas, Texas 75201
(214) 717-6653
(214) 919-0113 Fax

**ATTORNEYS FOR APPELLANT
JENNIFER HARRIS**

60

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief has been filed with the Clerk for the U.S. Court of Appeals for the Fifth Circuit and served on counsel for Appellee on this the 2nd day of August, 2023, by electronic means as follows:

All Counsel of Record

and

Lyle W. Cayce, Clerk
Fifth Circuit Court of Appeals
600 S. Maestri Place
New Orleans, LA 70130-3408

_/s/ Brian P. Sanford_

## CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 32, the undersigned certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B).

1.    Exclusive of the exempted portions in FED. R. APP. P. 32(a)(7)(B)(iii), this brief contains: 12,990 words.

2.    This brief has been prepared:
      in proportionally spaced typeface using:
      Software Name and Version: Word, Microsoft 365, Version 2909
      in (Typeface Name and Font Size): Equity A, 14 point font.

3.    If the Court so requests, the undersigned will provide an electronic version of the brief or a copy of the word or line printout.

4.    The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in FED. R. APP. R. 32(a)(7)(B), may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

*/s/ Brian P. Sanford*
Attorney for Appellant
Jennifer Harris
Dated: August 2, 2023