# Case No. 23-20035

## In the
## United States Court of Appeals
## For the Fifth Circuit

JENNIFER HARRIS

*Plaintiff-Appellee,*

v.

FEDEX CORPORATE SERVICES, INC.

*Defendant-Appellant*

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
Case No. 4:21-cv-458

## BRIEF OF AMICI CURIAE NATIONAL EMPLOYMENT LAWYERS ASSOCIATION, TEXAS EMPLOYMENT LAWYERS ASSOCIATION, AND NATIONAL INSTITUTE OF WORKERS' RIGHTS IN SUPPORT OF PLAINTIFF-APPELLEE

Tyler Talbert
SCANES YELVERTON
TALBERT, LLP
talbert@sytfirm.com

Walt Taylor
TAYLOR LAW FIRM
taylorlawfirmdfw@gmail.com

Kyla Cole
NEILL LEGLER COLE, PLLC
kyla@nlcemployeelaw.com

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I supplement the Certificate of Interested Persons provided in the briefs of Appellant and Appellee by naming the following persons who have an interest in the outcome of this litigation:

### Amici Curiae:

National Employment Lawyers Association

Texas Employment Lawyers Association

National Institute of Workers' Rights

## Counsel for Amici Curiae

Tyler Talbert
Scanes Yelverton Talbert, LLP
talbert@sytfirm.com
Texas State Bar No. 24088501
7901 Fish Pond Road, Suite 200
Waco, Texas 76702-096

Walt Taylor
Taylor Law Firm
taylorlawfirmdfw@gmail.com
Texas State Bar No. 19727030
6630 Colleyville Blvd.
Colleyville, Texas 76034

Kyla Cole
Neill Legler Cole, PLLC
kyla@nlcemployeelaw.com
Texas State Bar No. 24033113
3300 Oak Lawn Ave., Suite 425
Dallas, Texas 75219

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS............................2

COUNSEL FOR AMICI CURIAE....................................................3

TABLE OF CONTENTS .............................................................4

TABLE OF AUTHORITIES..........................................................5

INTEREST OF AMICI CURIAE ......................................................8

SUMMARY OF ARGUMENT ......................................................11

ARGUMENT....................................................................13

    I.    The contractual limitations period is void as a matter of
        public policy. ...........................................................13

        A. Altering the limitations period must comply with
            public policy, which is a question of law. ............................13

        B. Texas has a strong public policy against contractual
            limitations curbing the time to sue. ....................................15

        C. Lawsuits vindicating civil rights should receive no
            less protection than suits enforcing a deal. ..........................19

    II.    A six-month limitation provision ignores the
        practicalities of litigation and is therefore not
        reasonable. ...............................................................23

CONCLUSION ....................................................................35

CERTIFICATE OF SERVICE .........................................................37

CERTIFICATE OF COMPLIANCE ..................................................38

ECF CERTIFICATION .............................................................39

## TABLE OF AUTHORITIES

### Cases

*American Surety Co. of New York v. Blaine*,
  272 S.W. 828 (Tex.Civ.App. 1925)................................................. 15

*AMTRAK v. Morgan*,
  536 U.S. 101 (2002) ........................................................ 25

*Burnett v. Grattan*,
  468 U.S. 42 (1984) ....................................................... 21, 23, 24, 25

*Casa Ford, Inc. v. Warner*,
  656 S.W.3d 816 (Tex. App.—El Paso 2022, no pet.) ...................... 20

*CBOCS W., Inc. v. Humphries*,
  553 U.S. 442 (2008) ........................................................ 23

*Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*,
  489 U.S. 561 (1989) ........................................................ 14

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
  140 S. Ct. 1009 (2020) ..................................................... 20

*Delaware State College* v. *Ricks,*
  449 U.S. 250 (1980) ........................................................ 25

*DeSantis v. Wackenhut Corp.*,
  793 S.W.2d 670 (Tex. 1990)............................................... 17

*Ellis v. U.S. Sec. Associates*,
  224 Cal. App. 4th 1213.................................................... 32

*Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*,
  246 S.W.3d 653 (Tex. 2008)............................................... 15

*Fidelity & Deposit Co. of Maryland v. Conner*,
  973 F.2d 1236 (5th Cir. 1992) ........................................... 15

*Godoy v. Wells Fargo Bank*, N.A.,
    575 S.W.3d 531 (Tex. 2019) ............................................................ 14

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ............................................................... 21, 27

*Humphries v. CBOCS W., Inc.*,
    474 F.3d 387 (7th Cir. 2007) ............................................................ 23

*In re Poly-America, L.P.*,
    262 S.W.3d 337 (Tex. 2008) ........................................................ 14, 15

*Jackson v. Birmingham Bd. of Education.*,
    544 U.S. 167 (2005) ........................................................................ 21

*James v. Fulcrod*,
    5 Tex. 512 (1851) ........................................................................... 14

*Jenkins v. Fandango, Inc.* (*In re* Vectrix Bus. Sols.),
    Nos. 01-35656-SAF-11, 03-3843, 2004 Bankr. LEXIS
    792 (Bankr. N.D. Tex. 2004) ........................................................... 16

*Lynch v. Household Fin. Corp.*,
    405 U.S. 538 (1972) ........................................................................ 19

*Morgan v. Fed. Express Corp.*,
    114 F. Supp. 3d 434 (S.D. Tex. 2015) ............................................... 13

*National Military Mutual Life Ins. Co. v. Cross,*
    379 S.W.2d 96 (Tex. Civ. App.—Corpus Christi 1964,
    no writ) ......................................................................................... 16

*Ord. of United Commercial Travelers of America v. Wolfe*,
    331 U.S. 586 (1947) .................................................................. 13, 23

*Port Arthur Towing Co. v. Mission Ins. Co.*,
    623 F.2d 367 (5th Cir. 1980) ........................................................... 15

*Scarborough v. Travelers Ins. Co.*,
    718 F.2d 702 ................................................................ 15

*Scott v. United States Bank Nat'l Ass'n*,
    16 F.4th 1204 (5th Cir. 2021) ........................................ 22

*Taylor v. Western and Southern Life Ins. Co.*,
    966 F.2d 1188, 1203-4 (7th Cir. 1993) ........................... 13

*Twin City Pipeline Company v. Harding Glass Co.*,
    283 U.S. 353 .................................................................. 14

*Walters v. Cleveland Reg'l Med. Ctr.*,
    307 S.W.3d 292 (Tex. 2010) .......................................... 18

*Westchester Fire Ins. Co. v. Admiral Ins. Co.*,
    152 S.W.3d 172 (Tex. App.—Fort Worth 2004, pet. denied) ......... 15

**Statutes**

42 U.S.C. § 1981 ............................................................. *passim*

TEX. CIV. PRAC. & REM. CODE § 16.070 ........................... *passim*

**Constitutional Provisions**

TEX. CONST. Art. I, Sec. 13 ....................................... 17

TEX. CONST., ART I, Sec. 19 ...................................... 18

**Other Authorities**

MANUAL FOR COMPLEX LITIGATION, FEDERAL JUDICIAL CENTER,
Part III (4th ed. 2004) .................................................. 27

Texas Legislative Council, Third Revisor's Report, Civil
Practices and Remedies Code, April 1984 ...................... 17

Texas Rule of Professional Conduct 4.02 ...................... 28

## INTEREST OF AMICI CURIAE

Amici Curiae, National Employment Lawyers Association (NELA) Texas Employment Lawyers Association (TELA), and the National Institute of Workers' Rights (NIWR) are organizations consisting of attorneys who represent employees in Texas and throughout the United States.

Founded in 1985, NELA is the largest bar association in the country focused on empowering workers' rights attorneys. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who seek to protect the rights of workers in employment, wage and hour, labor, and civil rights disputes. NELA attorneys litigate daily in every circuit, giving NELA a unique perspective on how principles announced by courts in employment cases actually play out on the ground. Many NELA members represent workers who have been impacted by artificial employer-created time limits that impact access to justice, giving NELA a compelling interest in this case.

TELA is a voluntary bar association of Texas attorneys. TELA members represent employees in employment-related disputes, fight for equal rights, and promote working environments free from unlawful

discrimination. The organization seeks to protect and enforce the legal rights and opportunities of all Texas workers and to strengthen the community of lawyers who represent them. TELA promotes legislative protection of worker rights and supports judicial enforcement of those rights through advocacy and litigation. TELA has advocated for workers' rights for more than three decades, since 1992.

The mission of the National Institute for Workers' Rights is to advance workers' rights through research, thought leadership, and education for policymakers, advocates, and the public. The Institute aspires to a future in which all workers are treated with dignity and respect; workplaces are equitable, diverse, and inclusive; and the wellbeing of workers is a priority in business practices. As the nation's employee rights advocacy think tank, the Institute influences the broad, macro conversations that shape employment law, including access to justice issues.

NELA and TELA members routinely face, on behalf of their clients, issues in district and appellate courts on contractual limitation clauses and other efforts to strip employees of their legal and civil rights, or any meaningful redress of a violation of those rights.

Members of these organizations have expertise on employment litigation in Texas and across the nation, including on issues such as the ability to bring lawsuits promptly and the type of work that ordinarily goes into receiving, investigating, preparing, and filing employment and civil rights lawsuits. The propriety of a contractual limitations clause—substantially curtailing employees' ability to vindicate their legal rights—is at issue in this appeal.

## SUMMARY OF ARGUMENT

Amici Curiae are three organizations that advocate for workers' rights. Amici offer this brief to address FedEx's attempted enforcement of an employment application provision that purportedly allows just six months for employees to sue. The parties have addressed the apparent split among Texas federal courts on the enforceability of such provisions. Amici provide this brief to spotlight two points that have not been addressed about the public policy implications of such provisions.

First, Texas has a strong public policy interest against barring litigants from access to courts. This expression is manifested in Texas' robust open courts provisions, as well as century-old legislation preventing parties from artificially shortening limitations periods. Those principles must apply equally here, to a case involving not just a commercial transaction but the protection of one of the key safeguards of the Constitution as applied to an employment contract: the right to redress unlawful racial discrimination and retaliation.

FedEx's argument is unmoored from these realities and would open the door to allow private actors to artificially limit the time to sue. Allowing private parties to dictate the time to sue undercuts the civil

rights protections that Section 1981 safeguards: free and fair access to all dimensions of citizenship, including courts, regardless of race.

Second, a six-month limitation period like the one FedEx demands would make it harder to bring meritorious claims and risks encouraging meritless claims. As organizations focused on employment litigation, NELA, TELA, and NIWR are deeply familiar with the practical challenges of prosecuting these types of claims. The complexity of the claims and practicalities of litigation weigh against shortening the time to sue. A six-month limitation period would not offer adequate time for attorneys to receive and fully investigate employee claims before bringing them to court. Adhering to FedEx's dictated timeline may slow and complicate the process overall, as attorneys would be compelled to file first and ask questions later just to preserve their client's access to courts. Amici have a vested interest in ensuring full and fair access to courts to redress unlawful employment actions.

For these reasons, Amici ask the Court to consider the strong public policy expressions and practical realities that weigh against enforcing the artificial limitations period proposed by FedEx.

<u>ARGUMENT</u>

I.   <u>**The contractual limitations provision is void as a matter of public policy.**</u>

   A. **Altering the limitations period must comply with public policy, which is a question of law.**

Section 1981 actions are governed by the "catch-all" four-year statute of limitations in 28 U.S.C. § 1658. *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 378–79 (2004). But the Supreme Court has also indicated that "in the absence of a controlling statute to the contrary," parties can agree to a shorter time for filing as long as the shorter period is "reasonable." *See Ord. of United Commercial Travelers of America v. Wolfe*, 331 U.S. 586, 608 (1947).

The enforceability of the shortened limitations provision—like all interpretation of employment contracts—is a matter of state law. *Community Health Systems v. Hansen*, 525 S.W.3d 671, 681-82 (Texas 2017) (interpreting employment contract according to Texas law). And an agreement altering the time to sue must comport with a state's public policy. *Morgan v. Fed. Express Corp.*, 114 F. Supp. 3d 434, 442 (S.D. Tex. 2015), (quoting *Taylor v. Western and Southern Life Ins. Co.,* 966 F.2d 1188, 1203-4 (7th Cir. 1993) ("...such limitations clauses must be (1)

13

knowingly and voluntarily accepted, (2) reasonable, and (3) not inconsistent with public policy")).

As a result, agreements curtailing rights in violation of public policy are void. *In re Poly-America*, L.P., 262 S.W.3d 337, 352 (Tex. 2008) (provisions limiting remedies must be "fair so that the employee may effectively vindicate his statutory rights.").[1]

Whether parties seek to extend or restrict the time to sue, any change must track that public policy. *See, e.g.*, *Godoy v. Wells Fargo Bank*, N.A., 575 S.W.3d 531, 534 (Tex. 2019) (demonstrating this principle in the converse situation, in which parties sought to alter the limitations period by extending the time to file suit); *see also Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) (a lack of reasonable time limits in the claims procedure renders the procedure inadequate).

And Texas courts have long held that "contracts against public policy are void and will not be carried into effect by courts of justice." *James v. Fulcrod*, 5 Tex. 512, 520 (1851); *see also Twin City Pipeline*

---

[1] The provision in *Poly America* contained a waiver of certain categories of damages and imposed other restrictions, rather than forfeiture of an entire suit not filed within a particular time, as FedEx argues here. *In re Poly-America, L.P.*, 262 S.W.3d at 361.

*Company v. Harding Glass Co.,* 283 U.S. 353, 356-77 (1931); *Scarborough v. Travelers Ins. Co.*, 718 F.2d 702, 709 (5th Cir. 1983).[2]

Whether a contract provision purporting to shorten the statute of limitations is void against public policy is a question of law. *See Fidelity & Deposit Co. of Maryland v. Conner,* 973 F.2d 1236, 1241 (5th Cir. 1992); *see, e.g. In re Poly-America*, 262 S.W.3d 337 (invalidating provisions violating public policy).

## B. Texas has a strong public policy against contractual limitations curbing the time to sue.

In Texas, "[t]he Legislature determines public policy through the statutes it passes." *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008). Thus, "courts look to state statutes and judicial decisions to determine public policy." *Westchester Fire Ins. Co. v.*

---

[2] *See generally Port Arthur Towing Co. v. Mission Ins. Co.*, 623 F.2d 367 (5th Cir. 1980). The enforceability of a contractual limitation period was the subject of *Port Arthur Towing*, a federal diversity action governed by Texas law. At issue was an insurance policy clause that established a limitations period of twelve months or if the twelve-month period was invalid under state law, fixed the limitations period at "the shortest limit of time permitted by the laws of such state." Conceding that the twelve-month period was void under article 5545 (the predecessor statute to § 16.070) the defendant claimed that the alternative provision established a permissible contractual limitation of two years, which was allowed by article 5545. Recognizing that the precise issue had not been resolved in Texas, the Court, citing *American Surety Co. of New York v. Blaine*, 272 S.W. 828 (Tex.Civ.App. 1925), held that the clause properly established the two-year limitations period, the shortest time 5545 permits.

*Admiral Ins. Co.*, 152 S.W.3d 172, 182 (Tex. App.—Fort Worth 2004, pet.

denied).

Texas has expressed a strong public policy interest prohibiting

parties from restricting access to courts, even by agreement. Texas

prohibits parties from agreeing to shorten contract-suit limitations

periods to under two years. TEX. CIV. PRAC. & REM. CODE § 16.070(a).

Under Texas law, a contractual provision shortening the time to sue to

less than two years is void for suits to enforce a contract. *Id*; *National

Military Mutual Life Ins. Co. v. Cross,* 379 S.W.2d 96, 99 (Tex. Civ. App.—

Corpus Christi 1964, no writ) (enforcing same).

The Texas statute provides:

> [A] person may not enter a stipulation, contract, or
> agreement that purports to limit the time in which
> to bring suit on the stipulation, contract, or
> agreement to a period shorter than two years. A
> stipulation, contract, or agreement that
> establishes a limitations period that is shorter
> than two years is void in this state.

TEX. CIV. PRAC. & REM. CODE § 16.070(a).

"That constitutes a legislated public policy." *Jenkins v. Fandango,

Inc.* (*In re Vectrix Bus. Sols.*), Nos. 01-35656-SAF-11, 03-3843, 2004

Bankr. LEXIS 792, at *6 (Bankr. N.D. Tex. 2004) (referencing Section

16.070). "The determination by the Legislature of the time to access a state's courts for the resolution of a contract dispute is a fundamental public policy." *Id.*, (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 674 (Tex. 1990) (fundamental nature of the policy at stake, not outcome of litigation, governs analysis)).[3]

Indeed, TEX. CIV. PRAC. & REM. CODE § 16.070(a) is a "controlling statute to the contrary" that overrides the default rule that parties can agree to a shorter time for filing as long as the shorter period is "reasonable."

Nor did this protection spring from a void. Texas has a vigorous history of protecting litigants' rights to access courts. The Texas Constitution's safeguards protecting court access have remained resolute through every iteration since 1836. TEX. CONST. Art. I, Sec. 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.")[4];

---

[3] The protection spans more than a century. *See, e.g.*, *Am. Sur. Co. v. Blaine*, 272 S.W. 828, 829 (Tex. Civ. App. 1925, writ ref'd). Article 5713 was amended to Article 5545 in 1955. The statute then became Section 16.070 in 1985. *See generally* Texas Legislative Council, Third Revisor's Report, Civil Practices and Remedies Code, April 1984, *available at* https://lrl.texas.gov/scanned/statutoryRevision/RevisorsReports/Civil_Practice_and_Remedies/Civil%20Practice%20and%20Remedies%20Code_Chapters_1_to_51.pdf (last visited July 19, 2023).

*see also* TEX. CONST., ART. Sec. I, Section 19 (enshrining "due course of law" protection). And Texas courts have consistently given teeth to this commitment. *See, e.g., Walters v. Cleveland Reg'l Med. Ctr.*, 307 S.W.3d 292, 295 (Tex. 2010) (open courts provision provides an exception to limitations period).

And pronouncements of the Supreme Court of Texas, during the Covid-19 pandemic in particular, similarly track that strong public policy interest in allowing parties ample time to file suit.[5] Amid the pandemic, the Supreme Court of Texas issued several Emergency Orders instructing Texas courts to "modify or suspend any and all deadlines and procedures…"[6] And the Court kept extending these provisions to ensure individuals—like Ms. Harris—had ample time to sue.[7] FedEx fired Ms. Harris in January 2020, bringing her squarely within the protections the Supreme Court of Texas extended to those filing suit amid a pandemic. ROA.6011.

---

[5] *See* Supreme Court of Texas Eight Emergency Order Regarding the COVID-19 State of Disaster.

[6] *See, e.g.*, Supreme Court of Texas, Twenty-Ninth Emergency Order Regarding the COVID-19 State of Disaster.

[7] The Supreme Court of Texas issued a more than fifty Emergency Orders relating to the pandemic. *See generally* Final General Emergency Order Regarding the COVID-19 State of Disaster.

Across the board, these authorities reflect a strongly expressed public policy against restrictions that impede access to the courts, including artificial limitations periods curtailing the time to sue.

### C. Lawsuits vindicating civil rights should receive no less protection than suits enforcing a deal.

Section 16.070 applies to agreements that "purport[] to limit the time in which to bring suit" on that agreement. TEX. CIV. PRAC. & REM. CODE § 16.070(a). And FedEx has argued that the scope of this agreement over limitations is broad, applying not just to "matters within the application itself," but extends to "claims arising out of such [legal] duties" FedEx owes Ms. Harris.[8] One such duty is that FedEx not discriminate against Ms. Harris based on race. Indeed, the public policy to preserve the right to sue should afford just as much protection for those vindicating their civil rights as it offers those seeking to enforce an employer's promise of a new computer.

Section 1981 enshrines one of the most sacred tenets of our democracy, that all citizens are protected from discrimination and retaliation. 42 U.S.C. § 1981; *Lynch v. Household Fin. Corp.*, 405 U.S.

---

[8] FedEx Memorandum of Law in Support of Motion for Judgment as a Matter of Law at *8, *Harris v. FedEx Corp.*, No. 4:21-cv-1651, 2022 WL 17085009 (S.D. Tex. Jan. 12, 2023).

538, 539, (1972) (noting "the broad concept of civil rights embodied in the Civil Rights Act of 1866.").

The civil rights protections within Section 1981 derive from Section 1 of the 1866 Civil Rights Act. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020) ("Congress passed the Civil Rights Act of 1866 in the aftermath of the Civil War to vindicate the rights of former slaves. Section 1 of that statute included the language found codified today in §1981(a), promising that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, [and] give evidence . . . as is enjoyed by white citizens.").

Moreover, Texas public policy strongly favors preserving the right to pursue civil rights claims and preserving all rights and remedies. *See, e.g.*, *Casa Ford, Inc. v. Warner*, 656 S.W.3d 816, 821 (Tex. App.—El Paso 2022, no pet.) (provision that purported to limit rights in discrimination action was "substantively unconscionable"). Thus, courts seek to protect rights and remedies that are "part of a measured legislative decision for the public policy purpose of endeavoring to eliminate discrimination in the workplace." *Id.*

Simply put, ensuring "effective access" to redress violations of key rights is a lynchpin of these statutes. *Hensley v. Eckerhart*, 461 U.S. 424, 429, (1983) ("The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances."); *Burnett v. Grattan*, 468 U.S. 42, 55 (1984) (noting the significance of century-old civil rights protections, stressing that the federal statute could not be curtailed considering its goal of "prevent[ing] civil rights abuses through judicial assistance and enforcement."); *see also Jackson v. Birmingham Bd. of Education.*, 544 U.S. 167, 180 (2005) (broadly construing Title IX to encompass retaliation protections and noting that it "would be difficult, if not impossible, to achieve [Congressional objectives] if persons who complain about sex discrimination did not have effective protection against retaliation.")(internal quotation omitted).

A century-old expression of public policy preserving parties' time to sue should apply with equal force to a vindication of fundamental rights in employment as it does in a commercial transaction. Otherwise, the purchase of a pile of sand is afforded more protection than one's core, constitutional rights to be free from unlawful race discrimination and retaliation. There is nothing in the public policy of either Texas or the

United States supporting such an incongruous result that undermines the very purpose of the statutes. In short, those protections expressed broadly across Texas law should provide no less guarantee of ample time to file suit for civil rights actions than enforcing a contract.

Further, Section 1981 expressly enshrines the guarantee to be free from discrimination and from non-government impairment of rights. Yet, here, FedEx, a non-governmental actor—whom the jury found engaged in retaliation against an employee for opposing or reporting discrimination—insists that it cannot be held to account because of a clause in its employment application. That sort of non-governmental impairment of both substantive and procedural rights is precisely what Section 1981 must protect. The safeguards would mean little if they must wither and give way to adhesion provisions curtailing the right to sue. It would be odd indeed if the statute guaranteeing the right to be free from discrimination and from non-government impairment of that right could be impaired by a non-government actor, who had in fact engaged in the very discrimination and retaliation the statute was designed to prevent.[9]

---

[9] Here, the jury found retaliation and answered no to discrimination. ROA.2964-68. Section 1981 prohibits both discrimination and retaliation. *See Scott v. United States Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) ("Section 1981 makes it unlawful to discriminate on the basis of race in mak[ing] and enforc[ing] contracts.

For these reasons, Amici ask the Court to give effect to Texas' strong public policy interest in preventing parties from artificially shortening limitations periods and impeding effective access to courts for matters as important as one's core constitutional rights.

## II. A six-month limitation provision ignores the practicalities of litigation and is therefore not reasonable.

Amici submit that TEX. CIV. PRAC. & REM. CODE § 16.070(a) is "a controlling statute to the contrary" under *Wolfe,* 331 U.S. at 608, and so the agreement to a shorter time is void both in plain text and policy. But even if the Court determines otherwise, the period proposed here is not "reasonable." *Id*.

In an analogous context, the Supreme Court has said that assessing the validity of a limitations period under the Civil Rights Act "necessitates attention to the practicalities of litigation." *Burnett*, 468 U.S. at 50-51. The Supreme Court has acknowledged the "considerable preparation" required for an injured person to litigate civil rights claims.

---

42 U.S.C. § 1981(a). It encompasses complaint[s] of retaliation against a person who has complained about a violation of another person's contract-related right.") (internal quotations omitted) (quoting *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008)); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 389 (7th Cir. 2007) ("Though, Section 1981 applies to claims of retaliation, the plain text of the statute, as amended in 1991, makes clear that § 1981 encompasses the termination of contracts, and there can be no doubt that a retaliatory discharge is indeed a termination of an employment contract.").

*Id.* Once an injured person recognizes the constitutional or statutory injury (however long that takes) he must then search for and obtain counsel, investigate the facts sufficient to meet federal pleading standards, and undertake all the steps required for effective litigation. In short, time-intensive preparations are necessary to enforce the Civil Rights Act's guarantees.

The "practicalities of litigation" are no more efficient and no less burdensome than in 1984 when the Supreme Court examined a six-month limitations period under Maryland's administrative scheme. *Burnett*, 468 U.S. at 50-52. Allowing employers to shrink a civil-rights plaintiff's time period for enforcing rights under the Civil Rights Act ignores "practicalities of litigation" just as much as Maryland's stricken statute did. *Id*. It encourages, if not demands, a "fire-aim-ready" approach to civil-rights enforcement, which also impedes a lawyer's or litigant's obligation to comply with Federal Rule of Civil Procedure 11.

The shortened limitations period FedEx seeks to impose on employees it retaliates against for opposing or reporting discrimination (like Ms. Harris) undercuts the Civil Rights Act and its objectives.

Consider the preliminary steps an employee typically needs to complete before they will be ready to file a lawsuit:

First, as *Burnett* notes, an individual must recognize her injury. Employees may not learn of the specific circumstances underlying discrimination claims until weeks or months later. *Burnett*, 468 U.S. at 51. The employer may not replace the employee immediately, or the employee may not learn the identity of the replacement outside the protected class for weeks or months. The *McDonnell Douglas* burden-shifting framework itself is a recognition that employers are unlikely to reveal overt discriminatory motives and tend to obscure unlawful motives. Whatever suspicions generated by the employment action may not crystallize for the employee until extensive inquiry or until more facts come forward more randomly. In short, an employee may have no reason to start the preparations for a Civil Rights Act claim until a sizeable portion of FedEx's reduced limitations period has elapsed.[10]

---

[10] Consistent with this concern, the trigger to file suit may not always be the date of firing. While "the date of the event forming the basis" may often coincide with the date of termination, that is not always the case. Accrual of a claim occurs on the date of the illegal decision—not the date that the decision was to take effect, nor the date that damages started to "accrue" *AMTRAK v. Morgan*, 536 U.S. 101 (2002). In fact, the conduct giving rise to a cause of action may occur more than a year before the employee is terminated. *Delaware State College* v. *Ricks,* 449 U.S. 250 (1980). ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause

Second, once the injury is clear, the employee must locate competent counsel—hopefully someone with employment-law experience—or be left to litigate *pro se*. Generally, civil-rights claims are undertaken on a contingent-fee basis. While Ms. Harris might have spoken to any of Texas's tens of thousands of lawyers, only 654 are Board Certified in Labor and Employment law (and only a fraction of that number represent plaintiffs on a contingent-fee basis).[11] Locating and then scheduling and meeting with an attorney to evaluate a case adds weeks, if not longer, to the pre-filing timeline. And the process often entails consulting multiple lawyers or firms before finding the right combination of expertise, availability, fit, and interest to represent the plaintiff. Contingent-fee litigation in the employment context—involving relatively high rates of summary-judgment dismissal, capped damages, and specific technical doctrines (like *McDonnell Douglas*) fashioned by

---

of action for employment discrimination."). The provision here leans into that sort of gamesmanship, creating not just a small window for filing, but an obscure, quickly vanishing time frame when measured from the date(s) of each of several actionable (yet not ultimate) events likely to occur during the employment relationship. ROA.5653. ("…from the date of the event forming the basis of my lawsuit…").

[11] *See* Labor and Employment Law, Texas Board of Legal Specialization (available at: *https://www.tbls.org/specialtyarea/LB* (last visited Jul. 2, 2023). Common sense dictates that few recently unemployed plaintiffs can afford to pay hourly. Moreover, a substantial number of labor and employment lawyers work in-house for government agencies or large corporations, or for defense firms who regularly advise management or defend employers in litigation.

courts—is not as attractive as work for fee-paying clients or large-dollar contingent-fee work. Supply and demand for legal services is not, in practice, aligned in this area. As a result, a considerable chunk of FedEx's shortened limitations period could be consumed just between recognizing a possible claim and locating an attorney willing to discuss pursuing it purely on a contingent-fee basis.

Third, adequate preparation must follow before making a "federal case" out of it. Employment litigation stands among the areas of "complex Federal litigation." *Hensley*, 461 U.S. at 430 n.4; *see also* MANUAL FOR COMPLEX LITIGATION, FEDERAL JUDICIAL CENTER, Part III (4th ed. 2004) (including chapters on antitrust, securities, employment discrimination, intellectual property, CERCLA (superfund), and Civil RICO).[12]

Discrimination cases require additional due diligence by an attorney evaluating a claim. Unlike a breach of contract or a physical injury case, the *McDonnell Douglas* burden-shifting framework requires a plaintiff to prove more than a prima facia case. Employees are often required to prove pretext to overcome an employer's claimed "legitimate"

---

[12] Available at: https://www.uscourts.gov/sites/default/files/mcl4.pdf (last visited Jul. 2, 2023).

business reason. The evidence necessary to prove pretext is often developed through the testimony of co-workers or comparators, because the discovery process granting access to the employer's internal documents is not yet available pre-suit. This requires an attorney who is vetting a potential case to interview potential witnesses and review available evidence before agreeing to accept the case.

What's more, the intake process is more complicated in discrimination cases than in other areas of the law. Texas employers need not give any reason when terminating an employee. Often the first documented explanation for termination is the employer's response to the Texas Workforce Commission in the unemployment appeals process, which itself is weeks and months long. Only then can the attorney begin interviewing the potential plaintiff and witnesses to determine whether the employer's stated reason is pretextual.

Likewise, a Texas employee has no legal right to obtain his or her personnel file. An attorney cannot speak to certain management witnesses still employed with the company because of ethics rules,[13] and often witnesses who leave the company are prevented from speaking to

---

[13] Texas Rule of Professional Conduct 4.02(a) and (c).

attorneys because they signed non-disclosure agreements or non-cooperation clauses. Thus, employment attorneys often must first file EEOC charges asserting a claim under the Civil Rights Act, to learn the employer's alleged nondiscriminatory reason before filing suit. These hurdles are added to the many pre-litigation steps required in all cases—such as determining the identity of the correct defendant or defendants, determining how to name and serve those defendants and completing service of process.

Astute observers may note that the EEOC maintains a six-month filing limitation on discrimination claims. The EEOC's limitations, however, are not analogous to filing a lawsuit in court. As an administrative agency tasked with enforcement, the EEOC conducts its own, independent inquiry into the facts of a case, and the process is designed for non-lawyers to navigate. EEOC filings are not subject to the same Federal Rule 11 requirements as court filings.

Moreover, every employment attorney worth her salt knows about the administrative deadlines when a case comes in the door. Here, though, the problem is two-fold. It is both an unreasonably short timeline to sue and is deceptively inconspicuous.

Ms. Harris filled out an employment application about two decades before filing suit. ROA.5653. Tucked away is a clause purporting to curtail rights not exercised within an accelerated time.

In countless other contexts, state and federal law require waiver of rights to be eye-poppingly conspicuous, requiring bolding, increased font size, differentiated colors, or explicit language warning an individual of just what rights they are giving up. *See, e.g.*, TEX. BUS. & COM. CODE § 17.42(b) (conspicuousness requirements in DTPA); *see also Dresser Indus. v. Page Petroleum*, 853 S.W.2d 505, 508 (Tex. 1993) (noting the "fair notice" and "conspicuousness" required in indemnity provisions); *see also* 29 CFR § 1625.22 (requiring waiver of rights and claims under ADEA to take a certain form to alert employees to its existence); *see also Pioneer Energy Servs. Corp. v. Burlington Ins. Co. As Subrogree of Premier Coil Sols.*, Inc., No. 14-18-00879-CV, 2020 Tex. App. LEXIS 8528, at *12 n.10 (Tex. App.—Houston [14th Dist.] Oct. 29, 2020, pet. denied) (construing "conspicuous" provisions of the UCC and noting that the provision should include features like a printed heading in capitals, larger type, or contrasting color). Thus, when an individual is asked to give up even a fraction of their rights, such language is required.

And yet, here, the unremarkable clause forfeits all rights the employee fails to exercise within an abbreviated time. No bolding, off-set coloring, or headings exist alerting the employee to the provision.[14]

In short, the administrative deadlines to file within 180 days set both an exceedingly lower bar than filing a lawsuit and are plainly known to practitioners. FedEx wants to ratchet up the heat on both fronts, requiring employees to file not just an administrative complaint but their lawsuit with the benefit of little investigation in a timeframe few employees or their attorneys would have any knowledge of given the clause tucked away in its multi-page employment application.

Additionally, some courts have focused on the presence of the administrative exhaustion requirement in statutes like Title VII as a reason why a shorter limitations period is not reasonable, while pointing to the lack of such a requirement under section 1981 as grounds for upholding reasonableness.  But this distinction makes little sense in the context of a case involving racial discrimination in the workplace, where many plaintiffs bring claims under both Section 1981 and Title VII,

---

[14] Nor was the ability to make certain provisions "conspicuous" any difficulty for FedEx. In fact, FedEx was sure to make the provision immediately preceding the limitations clause conspicuous, ensuring its right to fire employees was in all-caps. The very next clause curbing the time to sue received no such special callout.

which offer overlapping protection. The "reasonableness" of how long it should take before filing suit cannot be analyzed as to each statute contained in hermetically sealed boxes. If such distinctions are drawn, wise counsel will file with the section 1981 claim first, while waiting for a right-to-sue letter from the EEOC, and then add the Title VII claim later. But such an approach may make it harder to settle pre-litigation.

Just as seriously, most terminated employees are walked out the door immediately and barred access to their company computer or the company's internal document portal or storage system. Many employees are therefore unable to access or find out what documents they have signed, much less provide them to a lawyer for review and a determination of the statute of limitations. Strong claims may therefore be rejected by counsel because of this uncertainty or dismissed for failure to comply with an obscure statute of limitations known only to the employer – both of which would frustrate the public policy reflected in statutes designed to remedy discrimination.[15]

---

[15] Courts in other jurisdictions have noted these types of concerns as well in striking down similar provisions. *Ellis v. U.S. Sec. Associates*, 224 Cal. App. 4th 1213, 1226 (Cal. Ct. App.—1st Dist. 2014) (concluding that "the shortened limitation provision here would be against public policy" and noting "anomalous effects.").

And FedEx's multi-page application containing an "employment agreement," at the end—that it requires employees to sign even to apply—further fuels these concerns. The sprawling multi-point agreement is chockfull of one-sided provisions seeking to strip employees of benefits and remedies. ROA.5653. Like a perverse, right-curtailing word search, the employee must scour the many provisions—in minuscule font—in hopes of discovering that point 15 curbs any reasonable time to sue.

Fourth, this intake and preparation process serves to screen out weaker claims, and a six-month limitations period risks undermining that goal. A critical benefit of the contingent-fee model is that lawyers are more likely to accept cases they think have a reasonable chance of succeeding—a screening process that helps the legal system overall. The existence of short limitations periods like FedEx's could prompt lawyers or pro se litigants to sue immediately, even before they have fully evaluated the strength of the case. That outcome risks burdening the court system without sufficient benefit.

Finally, a potential plaintiff must obtain the basic needs of food, shelter, security, and mental health before they can contemplate filing a

federal lawsuit. As of April 2023, 58%, of all Americans are living paycheck to paycheck. *See* Dickler, Jessica, "With inflation stubbornly high, 58% of Americans are living paycheck to paycheck: CNBC survey," CNBC YOUR MONEY (Apr. 11, 2023).[16] Thus when a potential plaintiff is fired, they may be mere weeks away from losing their home or being unable to feed their family. Their priority necessarily must be searching for a job, applying for unemployment, or obtaining other financial assistance to ensure that their family's basic needs are met. Once a potential plaintiff obtains a job, they may not be immediately eligible to take time off or leave work during business hours to interview and meet with potential attorneys.

Terminated employees also often experience shock and depression, especially if the termination was unfair or unexpected. This can even result in physical manifestations or impairments, as it did in Ms. Harris's case. Increased stress levels and uncertainty surrounding job loss, combined with the loss of routine and a perceived lack of purpose, may

---

[16] Available at:  https://www.cnbc.com/2023/04/11/58percent-of-americans-are-living-paycheck-to-paycheck-cnbc-survey-reveals.html#:~:text=Between%20higher%20costs%20and%20a%20possible%20recession%20on%20the%20horizon,conducted%20in%20partnership%20with%20Momentive. (last visited: Jul. 2, 2023).

lead to depression and anxiety. The loss of a long-term job and daily contact with co-workers is like a divorce requiring a terminated employee to go through a grieving process. Potential plaintiffs must work through these mental and emotional barriers before they can summon the willpower and courage to find an attorney and contemplate filing suit.

For all these reasons, the Court should not allow companies to curtail, restrict, or otherwise impair effective access to courts to vindicate violation of core constitutional rights. If it did, stock, boilerplate adhesion waivers buried in the fine print would carry more power than hard-fought civil rights protection legislation. Likewise, the necessities of litigation weigh heavily against allowing such a limitation.

## CONCLUSION

For each of these reasons, Amici Curiae ask the Court to reject Appellant's statute of limitations arguments, which would curtail the right to sue to just six months.

Respectfully Submitted,

By:   */s/ Tyler Talbert*
        Tyler B. Talbert
        State Bar No. 24088501
        talbert@sytfirm.com
        SCANES YELVERTON TALBERT, LLP
        7901 Fish Pond Road, Suite 200
        Waco, Texas 76702
        (254) 399-8788

        Walter L. Taylor
        State Bar No. 19727030
        taylorlawfirmdfw@gmail.com
        TAYLOR LAW FIRM
        6630 Colleyville Blvd, Suite 100
        Colleyville, Texas 76034
        Tel: (817) 770-4343
        Tel: (512) 474-6600

        Kyla Cole
        NEILL LEGLER COLE, PLLC
        kyla@nlcemployeelaw.com
        Texas State Bar No. 24033113
        3300 Oak Lawn Ave., Suite 425
        Dallas, Texas 75219

## CERTIFICATE OF SERVICE

This is to certify that on July 24, 2023, a true and correct copy of the foregoing document was filed with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Tyler Talbert*
Tyler Talbert

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,681 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in Century Schoolbook 14 pt. for text and Century Schoolbook 12pt for footnotes.

*/s/ Tyler Talbert*
Tyler Talbert

**ECF CERTIFICATION**

I hereby certify (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of any paper document submitted pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

*/s/ Tyler Talbert*
Tyler Talbert